**IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

BOBBY L. RADCLIFF, *et al.,*            :

     Plaintiffs,                            :

v.                                     :            CA 06-345-CG-M

TATE & LYLE SUCRALOSE, INC.,            :

     Defendant.                            :

                                  :     :      :

<u>**DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT ON COMMON ISSUES AMONG PLAINTIFFS**</u>

Defendant Tate & Lyle Sucralose, Inc. ("Tate & Lyle"), by and through its undersigned

counsel, pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rules 7.1 and

7.2, respectfully submits this memorandum in support of its motion for summary judgment on

common issues among Plaintiffs.

<u>**INTRODUCTION**</u>

Thirty-seven (37) Plaintiffs from fifteen (15) different properties allege obnoxious odors

and/or noises emanate from Tate & Lyle's manufacturing plant thereby causing property

diminution, personal injury, emotional distress and/or loss of use and enjoyment of property.

Plaintiffs bring causes of action for nuisance, negligence, wantonness, inverse condemnation and

injunctive relief.  Tate & Lyle is entitled to summary judgment on all claims for a variety of

reasons.

First, Tate & Lyle does not have the power or right of condemnation and therefore

Plaintiffs' claim for inverse condemnation fails as a matter of law.  Second, Plaintiffs have

absolutely no evidence of wanton conduct by Tate & Lyle to support their claims of wantonness

and/or punitive damages.  Third, Plaintiffs have no evidence establishing (a) the applicable standard of care for Tate & Lyle's manufacturing operations, or (b) a breach of such standard of care, and therefore Plaintiffs have no viable claim for negligence.

Fourth, Plaintiffs lack admissible and/or sufficient evidence of proximate causation of their claimed damages.  Plaintiffs have not and cannot prove that Tate & Lyle's actions are the factual and proximate cause of their claimed physical symptoms or injuries, property diminution, or loss of use and enjoyment of property.  They lack the essential and required expert testimony establishing proximate causation for these injuries and their unsupported, lay opinions are insufficient to establish the same.  Because proximate causation is a crucial element to each tort cause of action alleged by Plaintiffs – nuisance, negligence and wantonness – this lack of proof entitles Tate & Lyle to summary judgment on each of these claims.

Fifth, because they have no viable claims for physical injury, Plaintiffs can recover for emotional distress only if they prove that (a) Tate & Lyle acted under circumstances of malice, insult or contumely, or (b) they were at risk of imminent physical harm as a result of Tate & Lyle's actions, *i.e.* within a zone of danger, assuming *arguendo* their negligence claim survives. Plaintiffs cannot prove either situation, and therefore Tate & Lyle is entitled to summary judgment on Plaintiffs' emotional distress claims.

Sixth, because there is no actionable nuisance or harm to Plaintiffs, their injunctive relief count fails as a matter of law and Tate & Lyle is entitled to summary judgment on this claim. Finally, if Plaintiffs' claims and/or damages are not barred in their entirety as a matter of law, any allowable damages are limited to those occurring with the two years preceding the filing of Plaintiffs' complaint pursuant to the applicable statute of limitations and/or continuing tort doctrine, and Tate & Lyle is entitled to summary judgment on Plaintiffs' damages accordingly.

## STATEMENT OF UNDISPUTED FACTS

Since April of 2004, Tate & Lyle has owned and operated a plant within McIntosh, Alabama's Industrial Park that manufactures sucralose, a product used in the production of Splenda® (hereinafter "the Plant"). Exhibit A, at ¶ 3.  The Plant was originally designed and constructed in 1998-2000 by McNeil-PPC, Inc. ("McNeil"), which owned and operated the Plant from May of 2000 to April of 2004, when Tate & Lyle acquired the Plant and took over operations. Id.  Tate & Lyle expanded the production capacity of the Plant from 2004-2006 by adding additional structures and/or equipment, but otherwise continued all manufacturing operations of sucralose in the same manner as previously performed by McNeil, *i.e.* the chemical processes have remained consistent from May of 2000 through the present date. Id. at ¶ 4.

The production of sucralose involves a variety of chemicals and/or compounds, including dimethylamine ("DMA") and dimethylformamide ("DMF"), among others. Id. at ¶ 5.  Pursuant to applicable environmental statutes and regulations, both McNeil and Tate & Lyle obtained any and all necessary environmental and operational permits from the Alabama Department of Environmental Management ("ADEM") prior to designing, constructing, expanding and/or operating the Plant.   Id.  Since the commencement of Tate & Lyle's operations in April of 2004, the Plant has been expanded, operated and/or maintained pursuant to and in accordance with governmental oversight and approval. Id.  Throughout Tate & Lyle's operations from April of 2004 to present, no governmental agency or court of law has cited the McIntosh Plant for violation of any environmental statute, regulation, environmental or operational permit, or other governing law relating to air or noise emissions. Id.; Exhibit B at p. 33.

Plaintiffs, who own or reside on property anywhere from 3,327 feet to 6,024 feet east of the center of Tate & Lyle's Plant, filed suit against Tate & Lyle on June 2, 2006. *See* Original

Complaint (Doc. #1-1); Exhibit B at p. 4.  Plaintiffs allege that Tate & Lyle's Plant operations expose Plaintiffs to obnoxious odors and/or noise, thereby causing the following injuries or damages: "(a) diminution and/or depreciation in value of real estate; (b) physical injury such as sinus, breathing, allergies and pulmonary damage; (c) loss of enjoyment and use of their properties, jointly and severally; (d) loss of sleep; (e) severe emotional stress and mental anguish; and (f) other actual damages that will be provided at trial."  *See* Fourth Amended Complaint ("Complaint") (Doc. #59, at ¶ 27).[1]

In their Rule 26(a) disclosures and/or discovery responses, Plaintiffs (a) identify only themselves as persons with discoverable information regarding their claims and damages, (b) deny they possess any documents, data compilations or tangible things that may be used to support their claims, (c) produce no documentary evidence in support of their claims with the sole exception of some property deeds, two dated appraisals, and signed medical authorizations, (d) provide no computations for any categories of damages claimed, stating the scope and extent of any diminution damages will be supplied in the form of appraisal or lay testimony from the individual owners, the scope of any medical damages will be defined more specifically as medical records are supplied, and damages such as mental anguish and punitive damages are not quantifiable and/or subject to jury deliberation, and (e) identify and submit a report from only one expert witness – James R. Montgomery, P.E.  Exhibits D, F, G, H-01 through H-37, K01- through K-37, L-01, L-02.

---

[1]  The substantive allegations, causes of action, and claimed damages have remained the same throughout the various amended complaints.  The only significant difference among the complaints is the naming of additional Plaintiffs.  (Docs. #1-1 and #59).

Montgomery attempted to link Plaintiffs' complaints of obnoxious odor to emissions of DMA and/or DMF from Tate & Lyle's Plant.[2]  Given the absence of any objective evidence as to the existence or level of DMA on Plaintiffs' properties,[3] Montgomery developed a theory wherein he hypothesized that a sufficient amount of DMA or DMF could be released from the Plant so as to reach Plaintiffs' properties some 3,500 feet away and cause the odor and/or symptoms of which Plaintiffs complain.  Exhibit D at p. 3-4.

To test his hypothesis, Montgomery used the "Threshold Limit Values" (TLVs) of DMA and DMF as the benchmark against which to measure Tate & Lyle's Plant emissions.  TLV's are the highest reasonable levels to which a worker at a plant can be exposed to a certain chemical over an eight (8) hour period without adverse health effects, as recommended by the American Conference of Government Industrial Hygienists ("ACGIH").  Id. at p. 3-7.  TLV's have been adopted and incorporated into the Occupational Safety and Health Administration's regulations as setting forth a permissible, non-hazardous level of exposure for employees.  29 C.F.R. 1900.1200(d)(3)(ii) (2007).[4]

---

[2] Although Montgomery purported to analyze several chemicals, he opined that only DMA or DMF could be the source for any noted obnoxious odor and/or physical symptoms as described by the Plaintiffs.  Exhibit E at p. 116:3-8, 116:22 – 117:2, 211:10-11.

[3] Indeed, Montgomery himself never encountered any odor while conducting his investigation near the Plant and/or at Plaintiffs' properties.  Exhibit E at p. 100:6-17; 102:14 – 103:8.  Nor did he attempt to detect or measure the presence or extent of any DMA or DMF on Plaintiffs' properties.  Id. at 150:9 – 152:23; 158:5-9; 166:20 – 167:5.  Instead, the only bases for Montgomery's belief that any DMA or obnoxious odor actually was present on or around Plaintiffs' properties are the Plaintiffs' subjective complaints themselves, which Montgomery learned through Plaintiffs' counsel.  Id.

[4] Tate & Lyle disputes Montgomery's use of TLV's as an appropriate "measuring stick" in this case.  TLV's are not by definition indicative of any alleged obnoxious odor.  Rather, they set forth relevant health and safety standards for employees working with chemicals on a daily basis, for up to eight (8) hours per day.  This is not an appropriate standard by which to measure Plaintiffs' exposure to DMA or DMF at their properties (if any), and/or to suggest that any such exposure is sufficient enough to cause some type of obnoxious odor or alleged harm.  Moreover,

Montgomery then reviewed routine discharge monitoring reports and/or other materials submitted by McNeil or Tate & Lyle to ADEM describing Plant emissions.  Exhibit D at p. 3; Exhibit E at p. 108-114.  From these materials he analyzed two types of air emissions released from the Plant – "stack" emissions and alleged "fugitive" emissions.[5]  He then applied a "dispersion factor" to such emissions to purportedly arrive at the minimal amount of DMA and DMF that must be released from the Plant in order for such emission to exceed the TLV's for DMA and DMF at 3,500 feet away from the Plant.  Exhibit D at p. 3-4, 7; Exhibit E at p. 52-53, 91:13 – 92:13; 194:10-19; 205:17 – 206:10.  In other words, Montgomery hypothesized a certain level of emissions of DMA and DMF that, had they happened, could have resulted in DMA and/or DMF levels in excess of TLV's at a property 3,500 feet away from the Plant.

Montgomery then went back to McNeil and/or Tate & Lyle's monitoring reports and other materials to see if there were in fact any emissions meeting or exceeding his hypothesized emission levels.  He found no "stack" emissions from the Tate & Lyle Plant satisfying his hypothesis, *i.e.* no stack emissions producing levels of DMA or DMF that could exceed their respective TLV's at any Plaintiff's property.  Exhibit D at p. 3.  Similarly, he identified no "fugitive" releases of DMA or DMF at the Plant after April of 2004 that could have exceeded the TLV level at any Plaintiff's property.  Id. at p. 4; Exhibit E at p. 194:10-19, 217:7 – 219:14.  Thus, even if one accepts Montgomery's methodology as valid (which Tate & Lyle does not), Montgomery's methodology cannot objectively determine or confirm whether *any* particular Plaintiff smelled DMA or otherwise was exposed to *any* DMA emission at his or her property at

---

Plaintiffs are located some several thousand feet away from the Plant and allege being exposed to any odor, if at all, during isolated intervals, not during a continuous eight (8) hour period.  Exhibits B, I-01 through I-37.

[5]  Montgomery defined "stack emissions" as those coming from the Plant's thermal oxidizer or flare, and "fugitive emissions" as those coming from any other source.  Exhibit E at p. 89:14-18, 92:7 – 93:6, 109:3-11.

any point in time after Tate & Lyle acquired the Plant.  Exhibit E at 100:6-17; 102:14 – 103:8; 150:9 – 152:23; 158:5-9; 166:20 – 167:5.

Montgomery is not a toxicologist or medical doctor, nor does he consider himself to be an expert in either field.  Id. at p. 51:18 – 52:10, 53:15-22, 61:20 – 62:11.  He did not review the medical records for any of the Plaintiffs or their deposition testimony, and does not know the physical symptoms or injuries claimed by any particular Plaintiff.  Id. at p. 54:1-22, 61:20 – 62:11.  Nonetheless, Montgomery identified various physical symptoms that DMA can cause generally, which included some of the symptoms claimed by Plaintiffs, and therefore opined that Plaintiffs' symptoms "could" be caused by the release of DMA from Tate & Lyle's Plant.  Id. at 162:14 – 164:16.  The only objective basis for this opinion is the fact that Plaintiffs complain of these symptoms.  Exhibit D at p. 4; Exhibit E at p. 166:20 – 167:5.  Montgomery made no effort to determine whether Plaintiffs' symptoms were *actually* caused by any exposure or certain level of exposure to these chemicals, *i.e.* he did not analyze whether and/or at what level any particular Plaintiff was exposed to these chemicals or whether such exposure was sufficient to cause the symptoms claimed, instead admitting that other expert testimony was needed to address this issue.  Exhibit D at p. 3-4; Exhibit E at p. 61:20 – 62:11, 160:8 – 161:18.  Finally, Montgomery also opined that there is "no imminent health hazard" related to any alleged DMA odor/emission.  Exhibit E at p. 150:18-23.

Montgomery did not address any noises allegedly coming from Tate & Lyle's Plant and he has no opinions on this issue.  Id. at p. 54:23 – 55:5.  Likewise, Montgomery did not address any alleged property diminution damages suffered by any of the Plaintiffs.  Exhibit D.  Nowhere in his report or deposition testimony does Montgomery opine as to the standard of care

applicable to Tate & Lyle's expansion of and/or operations at the Plant, or otherwise discuss whether Tate & Lyle breached any such standard of care.  Id.; Exhibit E.

No Plaintiff has offered any evidence regarding the alleged diminution in value of his or her property, other than a personal opinion as to the existence, cause and amount of such diminution.  Exhibits F, G, H-01 through H-37, I-01 through I-37.  No recent appraisals or documentary evidence supporting the existence, cause or amount of any claimed diminution have been produced.  Id.[6]  No Plaintiff has attempted to sell his or her property or otherwise determine its current value through objective evidence.  Exhibits I-01 through I-37.  Each Plaintiff admits that the sole basis for any claimed diminution is his or her personal opinion.  Id.[7]

Moreover, for *each* of the 15 properties allegedly devalued in this case, Plaintiffs believe that other chemical or industrial plants in the area, namely plants owned and operated by Olin Corporation ("Olin") or Ciba Specialty Chemicals Corporation ("Ciba"), *also damaged* their properties or otherwise contributed to the alleged diminution in value of such properties. Exhibits I-01, I-03, I-04, I-06, I-08, I-10 through I-14, I-17, I-21, I-24, I-25, I-27, I-30, I-34.  For eight (8) of the properties, Plaintiffs assign specific percentages among Tate & Lyle, Olin and Ciba as suggestive of the amount of diminution each entity caused, with Tate & Lyle allegedly being responsible for anywhere from less than 50% of the diminution to 100% of the diminution. *See, e.g.*, Exhibit I-34 at p. 77:14 – 78:12 (Lora Ward – less than 50%); Exhibit I-11 at p. 104:6-

---

[6]  Only two Plaintiffs – Laurina Law and Bobby McKenize – provided any appraisals.  However, their appraisals are 8 and 9 years old, respectively, and therefore fail to provide sufficient evidence of any current property value or alleged diminution thereof.  Exhibits L-01, L-02 .

[7]  Notably, Plaintiff Billie Barnes testified that Tate & Lyle's operations have *not* caused her any property diminution damages.  Exhibit I-04 at p. 70:8-20 (first transcript).  Two other Plaintiffs – Anita Hicks and Bernice Pressley – did not have or provide even their own personal opinions as to the value of their properties and/or any diminution thereof.  Exhibit I-06 at 59:2-5, 60:11-19 (Anita Hicks); Exhibit I-16 at p. 49:14 – 50:10 (Bernice Pressley).  Thus, these Plaintiffs provided absolutely no evidence of property diminution damages.

20 (Laurina Law – 100%).[8]   The only bases for allocating the percentages of fault among the

three alleged causes of property diminution are Plaintiffs' personal beliefs.  Id.[9]  For the

remaining seven (7) properties, Plaintiffs do not know and/or cannot separate how much of the

total claimed diminution damages are attributable to Tate & Lyle, as opposed to Olin and/or

Ciba.  Exhibits I-04, I-06, I-08, I-14, I-21, I-24, I-30 (Plaintiffs Billie Barnes, Anita Hicks, Eva

Gray Jones, Elizabeth Mitchell, Bobby Radcliff, Jr., Linda Reed, and Linda Thomas,

respectively).

---

[8]  The other Plaintiffs providing some type of apportionment among the three plants are
Sylvester Abrams, Leroy Adams, Sr., Spencer Lang, Bobby and Dianne McKenzie, Lloyd
Pressley, and Bonnie Sullivan.  Exhibits I-01, I-03, I-10, I-12, I-13, I-19, I-27.  Incredulously,
even those Plaintiffs opining that Tate & Lyle is 100% responsible for any claimed property
diminution acknowledge that they sued and/or settled with Olin or Ciba for recovery of the same
alleged damages.  See, e.g., Exhibit I-11 at p. 102:22 – 105:8 (Laurina Law).  Moreover, at least
six Plaintiffs herein are involved in *current* litigation against Olin and/or Ciba claiming those
entities caused diminution in value of the same properties at issue in this case.  *See Cleon
Abrams, et al. v. Olin Corporation,* Case No. 07-900038, Circuit Court of Washington County,
Alabama (Plaintiffs Eva Gray Jones, Linda Reed, John Sullivan, Jr., Bonnie Sullivan, and Lora
Ward claim property diminution against Olin on same properties identified in this case), copies
of the original and amended complaints are attached hereto as Exhibits N-01 through N-03, and
*Cleon Abrams, et al. v. Ciba Specialty Chemicals Corp., et al.*, Case No. 08-0068-WS-B, United
State District Court for the Southern District of Alabama (Plaintiffs Eva G. Jones, Laurina Law,
Malanda Reed, Linda Reed and Bonnie Sullivan claim property diminution against Ciba on same
properties identified in this case), copy of the complaint is attached hereto as Exhibit O.
Plaintiffs Laurina Law, Bonnie Sullivan and John Sullivan, Jr.'s allegations in this case that Tate
& Lyle is responsible for 100% of their alleged property diminution is clearly inconsistent with
their positions in both *Abrams* cases claiming Olin and/or Ciba are responsible for the same
damages.  Exhibits I-11, I-27, I-29.

[9]  The personal, subjective nature of Plaintiffs' opinions on property diminution is evidenced by
Plaintiffs' different and conflicting opinions about the same pieces of property.  For instance,
Electa Mae Pressley testified that Olin and/or Ciba contributed to the diminution in value of her
property but could not opine on each entity's portion of the total damages claimed.  Exhibit I-17
at p. 81:8 – 82:15.  However, her brother and joint owner, Plaintiff Lloyd Pressley, testified that
Tate & Lyle was 100% responsible for any diminution in value for the same piece of property.
Exhibit I-19 at p. 74:16-20.  Similarly, Bobby McKenzie testified his property was diminished
by $42,000 and opined that Tate & Lyle was responsible for 90% of this amount.  Exhibit I-12 at
p. 91:16 – 93:8.  However, his wife and joint owner, Dianne McKenzie, testified this same
property was diminished by $60,000 and opined that Tate & Lyle was responsible for 60% of
this amount.  Exhibit I-13 at p. 62:8-18, 69:20 – 70:14.

Thirty-three (33) of the Plaintiffs claim various physical injuries as a result of Tate & Lyle's operations, but only twenty-four (24) Plaintiffs claim that they sought medical treatment for such injuries.  Exhibits I-01 through I-37.  Even of those Plaintiffs claiming that they sought medical treatment, no Plaintiff offers the testimony or opinion of a toxicologist or health care provider as establishing medical causation between his or her symptoms and Tate & Lyle's operations.  Id.  No Plaintiff provides medical records or documents stating or otherwise establishing medical causation of any claimed injuries.  Id.; Exhibits J-01 through J-37.

Indeed, all Plaintiffs who claim they actually sought medical treatment for their injuries admit that they never discussed the cause(s) of such injuries with their treating physicians and/or never asked or otherwise addressed whether Tate & Lyle's operations were or could be the cause of such symptoms.  Id.[10]  The only evidence linking Plaintiffs' physical symptoms to the operations of Tate & Lyle's Plant is Plaintiffs' personal beliefs and opinions.  Id.  Plaintiffs' beliefs and opinions are based solely on their claims that such symptoms or injuries did not exist, or were not as severe, prior to Tate & Lyle's operations.  Id.

Thirty-four (34) Plaintiffs testified that noise stemming from Tate & Lyle's Plant caused them some type of interference with the use or enjoyment of their property, such as lack of sleep, inconvenience, worry or annoyance.  Exhibits I-01 through I-15, I-17 through I-22, I-24 through I-27, and I-29 through I-37.  Plaintiffs live approximately 3,300 to 6,000 feet away from the center of the Plant.  Exhibit B at p. 4.  Positioned in-between Plaintiffs' properties and Tate &

---

[10]  Only three Plaintiffs – Linda Thomas, Michelle Thomas, and Kolandski Ward – testified that they discussed Tate & Lyle's operations with their treating physician.  Exhibits I-30, I-31, I-33.  However, the medical records for each of these Plaintiffs do not support this testimony.  Exhibits K-30, K-31, K-33.  None of these Plaintiffs' medical records refer to Tate & Lyle, DMA or any odor experienced on or near Plaintiffs' properties.  Id.  Indeed, there is no indication in the medical records for *any* of the Plaintiffs that he or she raised any of these issues with his or her treating physician, let alone discussed whether Tate & Lyle's operations or any odor could be causing or contributing to their physical complaints.  Exhibits K-01 through K-37.

Lyle's Plant are Norfolk Southern Railway's railroad tracks and an undeveloped area of pine trees.  Id. at p. 10-13 (narrative and maps).  Some Plaintiffs live only 300 to 1,000 feet away from the railroad track.  Exhibit C at p. 13.  Plaintiffs admit that noises such as a passing train or vehicle traffic also interfere with their use and enjoyment of property at times.  *See, e.g.,* Exhibit I-03 at p. 91:10 – 92:2 (LeRoy Adams/traffic noise); Exhibit I-06 at p. 34:16- 35:5 (Anita Hicks/ train and traffic noise).  Plaintiffs testified that noises from the Tate & Lyle Plant were ongoing for anywhere from two to six years.  Exhibits I-01 through I-37.   Plaintiffs offer no scientific, specialized or expert evidence regarding the sound level for any noises heard at their properties, whether originating from Tate & Lyle's Plant or some other source, such as the nearby railroad track.  Exhibits F, G, H-01 through H-37.

However, Tate & Lyle's retained expert, Certified Environmental Management, Ltd. ("CEM"), conducted level noise contours and octave band evaluations at the Plant perimeter and various locations throughout the McIntosh community from October 8-11, 2007.  Exhibit C. Sound levels were measured during all hours of day and night, including when the Plant was at full production.  Id. at p. 4.  CEM utilized two methods to measure the basic noise unit, or dBA (A-weighted Sound Level), stemming from the Plant.  First, it positioned sound level meters with octave band filters at the north, east, south and west fence lines of the Tate & Lyle Plant.[11]  Id. at p. 8.  Second, noise dosimeters were placed at various geographic perimeters both inside and outside the Plant.[12]  Id. at p. 9-16.  CEM compared its findings from Tate & Lyle's Plant to the

---

[11]  Sound level meters are lightweight instruments that measure the sound pressure level of a noise source in decibels.  Id. at p. 6.  They are used primarily for instantaneous measurements of noise.  Id.  The octave band filters attached or integrated into the sound level meters are used to analyze the frequency content of noise so that the actual range of frequency for that noise can be identified.  Id.

[12]  Noise dosimeters are monitors with remote microphones that monitor noise exposure readings on a continuous basis while the dosimeters are running.  Id. at p. 6.

typical dBA levels of various transit and non-transit noise sources as determined by the Federal

Transit Administration ("FTA").  Id. at p. 2-3.  The sound level meters captured dBA levels at

the Plant perimeter anywhere from 43.2 to 68.7 decibels, while the dosimeters measured time

weighted averages of 4.7 to 74.5 dBA levels .  Id. at p. 8-16.

The 40 to 60 dBA range is described as "moderately quiet" by the California Department

of Transportation ("CDOT").  Id. at p. 2-3.  Common indoor noise sources within this level

include refrigerators, air conditioners, a quiet office, and normal conversation, all measured at

three (3) feet away.  Id.  The FTA identifies no common outdoor noise sources (which are

measured at 50 feet away) within this dBA range.  Id.  Within the 60 to 80 dBA range, described

as "moderately loud" by the CDOT, common indoor noise sources include washing machines,

food blenders, a large business office, a vacuum cleaner, a noisy restaurant, and shouting within

a jet air cabin, all measured at three (3) feet away.  Id.  Common outdoor noise sources at this

level include lawn tillers and mowers, air conditioners, air compressors, a rail transit in the

station and/or at-grade at 50 mph, a city bus idling, an automobile traveling anywhere from 30-

65 mph, and a busy street, all measured from fifty (50) feet away.  Id.

CEM also measured the sound levels at the railroad track located approximately 300 to

1,000 feet from some Plaintiffs' properties, as well as from vehicle traffic on two major roads

near the Plant and/or Plaintiffs' properties.  Id. at p. 13-16.  Measurements at the railroad track

were 73.9 to 91.2 dBA, while measurements from vehicle traffic were 43.4 to 98.4 dBA.  Id.

Both of these measurements were equivalent to or in excess of the highest dBA levels measured

at the Plant perimeter, some 3,000 or more feet away from Plaintiffs' properties.  Id.

## ARGUMENT

**I)      Standard of Review**

The standards for ruling on a summary judgment motion are well established.  *See*, *e.g.*,

*Phillips v. Am. Honda Motor Co., Inc.*, 438 F.Supp.2d 1328, 1336-37 (S.D.Ala. 2006); *Dickinson*

*v. Springhill Hosp., Inc.*, 397 F.Supp.2d 1337, 1340-41 (S.D.Ala. 2005); *Bonner v. Home Depot*,

323 F.Supp.2d 1250, 1255-56 (S.D.Ala. 2004).  As this Court explained in the foregoing cases:

> The purpose of summary judgment "is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  In opposing a motion for summary judgment, "a party may not rely on his pleadings to avoid judgment against him."
> …
> The "complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  The failure by the nonmoving party to make a sufficient showing on an essential element of its action entitles the moving party to judgment as a matter of law.

*Dickinson*, 397 F. Supp.2d at 1341.  Application of these standards to the undisputed facts in this

case compels summary judgment in favor of Tate & Lyle as set forth below.

## II)     The Court Should Grant Summary Judgment With Respect To Plaintiffs' Claim For Inverse Condemnation Because Tate & Lyle Does Not Have The Right Or Power Of Condemnation.

In Count Four of the Complaint, Plaintiffs allege that Tate & Lyle has "inversely

condemned Plaintiffs' property, jointly and severally, without just compensation."  (Doc. #59 at

¶ 37).  As a matter of law, Plaintiffs' claim for inverse condemnation fails because Plaintiffs

cannot establish that Tate & Lyle, a non-governmental entity, has the right or power of

condemnation – an essential element for a claim of inverse condemnation.

In *Ex parte Carter*, 395 So.2d 65 (Ala. 1980), the Alabama Supreme Court stated:

> **It has been said that an action claiming inverse condemnation is very limited and that all elements must be present**.  Inverse condemnation is defined as the taking of private property for public use without formal condemnation proceedings and without just compensation being paid by a **governmental agency or entity which has the right or power of condemnation**.

*Id.* at 67 (emphasis added).  Consistent with this standard, the Alabama Supreme Court

"affirm[ed] the holding that inverse condemnation did not apply" because "the last element [was]

missing."  *Id.*

Similarly, in *Cove Props., Inc. v. Walter Trent Marina, Inc.*, 702 So.2d 472 (Ala. Civ.

App. 1997), the court dismissed plaintiff's claim for inverse condemnation because the plaintiff

failed to show that the defendant, a private marina, had the right or power of condemnation:

> Moreover, with respect to Cove's fourth claim, the Alabama Supreme Court has
> held that an action for inverse condemnation will not lie when the defendant does
> not have the right or power of condemnation.  *See Ex parte Carter*, 395 So.2d 65,
> 67 (Ala. 1980).  **Because Cove has not alleged or shown that Trent has any**
> **power to condemn its riparian rights or the submerged lands adjacent to its**
> **property, we conclude that the trial court correctly dismissed this claim**.

702 So.2d at 477 (emphasis added).

Likewise, Plaintiffs here have not alleged and cannot establish with any evidence that

Tate & Lyle has the right or power of condemnation.  To the contrary, Plaintiffs' complaint

alleges, and Tate & Lyle's answer admits, that Tate & Lyle is a private Delaware corporation

with its principal place of business in Illinois, qualified to conduct business in the state of

Alabama, and conducts business in Alabama by owning and operating a manufacturing plant in

Washington County.  (Doc. #59 at ¶ 1, Doc. #76 at ¶ 1).  Nowhere in their complaint do

Plaintiffs allege that Tate & Lyle has the right or power of condemnation, a necessary element of

their inverse condemnation claim.  Plaintiffs only summarily conclude that Tate & Lyle

"inversely condemned Plaintiffs' property."  (Doc. #59 at ¶ 37).  This is insufficient to withstand

Tate & Lyle's motion for summary judgment.  Due to the lack of any allegation or evidence that

Tate & Lyle is a governmental agency or entity with the right or power of condemnation, the

Court should grant summary judgment with respect to Plaintiffs' claim for inverse

condemnation.

III)    **The Court Should Grant Summary Judgment With Respect To Plaintiffs' Claim For Wantonness And/Or For Punitive Damages Under Plaintiffs' Nuisance Claim Because There Is No Evidence Of Wanton Conduct By Tate & Lyle.**

In Count Three of their Complaint, Plaintiffs allege that Tate & Lyle engaged in "wanton" conduct.  (Doc. #59 at ¶¶ 33-34).   In addition, Plaintiffs claim that they are entitled to punitive damages pursuant to their nuisance claim (Count One) based on Tate & Lyle's alleged wanton conduct.  (Id. at ¶¶ 28, 35).  As a matter of law, the Court should grant summary judgment on both the wantonness count and on any claim for punitive damages under Plaintiffs' nuisance count because Plaintiffs cannot present any evidence that Tate & Lyle acted in a wanton manner.

The Alabama Code defines wantonness as "[c]onduct which is carried on with a reckless or conscious disregard of the rights or safety of others."  ALA. CODE § 6-11-20(b)(3).  In addition, the Alabama Supreme Court has emphasized that wantonness is "the conscious doing of some act or the conscious omission of some duty, while knowing of the existing conditions and being conscious that, from doing or omitting to do an act, injury would likely or probably result."  *Kmart Corp. v. Peak*, 757 So.2d 1138, 1144 (Ala. 1999).  Under Alabama law, wanton conduct must be proved by "substantial evidence [or] evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved."  *Rommell v. Auto. Racing Club of Am., Inc.*, 964 F.2d 1090, 1097 (11th Cir. 1992) (citing *Berry v. Fife*, 590 So.2d 884 (Ala. 1991)).

The threshold for recovery of punitive damages is similar.  In other words, to recover punitive damages under their nuisance count, Plaintiffs must prove "by clear and convincing evidence that [Tate & Lyle] consciously or deliberately engaged in oppression, fraud,

wantonness, or malice with regard to [Plaintiffs]."  ALA. CODE § 6-11-20(a) (2007).[13]  Clear and

convincing evidence means "[e]vidence that, when weighed against evidence in opposition, will

produce in the mind of the trier of fact a firm conviction as to each essential element of the claim

and a high probability as to the correctness of the conclusion."  *Id.* at § 20(b)(4).

Applying the foregoing stringent standards, courts in this circuit grant summary judgment

on claims for wantonness and/or punitive damages for failure to present clear and convincing

evidence that the defendant acted with a "conscious disregard" of the plaintiff's rights.  *See*, *e.g.*,

*Rommell*, 964 F.2d at 1096-98 (affirming summary judgment because "plaintiff's evidence was

not sufficient to establish wanton conduct"); *Molinari v. Tuskegee Univ.*, 339 F.Supp.2d 1293,

1303-04 (M.D.Ala. 2004) (granting summary judgment because "[t]he record is devoid of

evidence that would support the conclusion that Bellamy acted with a purpose or intent or design

to injure Molinari, or that, with knowledge of the danger or peril to Molinari, Bellany

consciously pursued a course of conduct with a design, intent, and purpose of inflicting injury on

Molinari"); *Yelder v. Credit Bureau of Montgomery, L.L.C.*, 131 F.Supp.2d 1275, 1286-87

(M.D.Ala. 2001) (granting summary judgment because "Yelder has presented no evidence to

show that Providian acted with conscious disregard of Yelder's rights by issuing a credit card in

Yelder's name to an imposter"); *Rawlings v. Dovenmuehle Mortgage, Inc.*, 64 F.Supp.2d 1156,

1168 (M.D.Ala. 1999) (granting summary judgment because "the evidence before the court is

insufficient to permit a finding of reckless or conscious disregard").

---

[13]  Like wantonness, oppression is defined as "[s]ubjecting a person to cruel and unjust hardship
in conscious disregard of that person's rights."  ALA. CODE § 6-11-20(b)(5).  There is no claim of
fraud in this case and therefore the statute's definition of fraud is inapposite.  Malice is defined
as "[t]he intentional doing of a wrongful act without just cause or excuse, either (a) with an intent
to injure the person or property of another person or entity, or (b) under such circumstances that
the law will imply an evil intent."  *Id.* at § 20(b)(2).

This Court's Order in *Lavender v. Florida Gas Transmission Co.*, Civil Action No. 02-0361-CG-L (August 6, 2003), attached hereto as <u>Exhibit M</u>, is directly on point. Plaintiffs brought claims for nuisance, negligence and wantonness relating to the "construction and operation of the Florida Gas Transmission Company's compressor station 44." *Id.* at 2. Relying on many of the authorities discussed above, this Court granted summary judgment with respect to plaintiffs' claim for wantonness because "plaintiffs have presented no evidence whatsoever to support any claim that defendants in this case acted in a wanton manner." *Id.* at 17. The court likewise summarily rejected plaintiffs' request for punitive damages on their nuisance claim for the same complete failure of proof of wanton conduct. *Id.* at 14.

The Court should reach the same conclusion here. As in *Lavender* and the other cases cited above, Plaintiffs have not and cannot present any evidence that Tate & Lyle acted in a wanton, oppressive or malicious manner, *i.e.* with a "conscious disregard" of Plaintiffs' rights. Notably, in their wantonness count, Plaintiffs plead the same conduct of Tate & Lyle that they claim is merely negligent in the preceding count.   (Doc. #59 at ¶¶ 31, 34). However, a finding of wanton conduct "must be based upon facts beyond mere negligence." *Rommell*, 964 F.2d at 1096. Indeed, negligence and wantonness are "qualitatively different." *Gibson v. Norfolk Southern Corp.*, 878 F.Supp. 1455, 1462-63 (N.D.Ala. 1994) (noting "[w]antonness is not just a more egregious form of negligence" and "[s]imple negligence is not an element of wantonness") (citations omitted). To the extent Plaintiffs rely on the same allegations and evidence of Tate & Lyle's negligence as proof of wanton conduct, such reliance is misplaced and fails to establish wanton conduct by clear and convincing evidence, as required under Alabama law. Accordingly, Tate & Lyle is entitled to summary judgment on Plaintiffs' wantonness count.

As to their claim for punitive damages under their nuisance count, Plaintiffs allege Tate & Lyle acted wantonly in creating or maintaining a nuisance because (1) it purchased, designed, built and/or constructed the Plant knowing that it would be "in close proximity to Plaintiffs' residences" without any "buffer" or "effective separation" between the Plant's operations and Plaintiffs' properties, (2) it failed to implement "viable options" allowing it to operate the plant without causing damage or harm to Plaintiffs' properties, and (3) Plaintiffs brought their damages to Tate & Lyle's attention but it continues to operate the Plant and refuses to abate or cease the nuisance. (Doc. #59 at ¶¶ 22-28). The undisputed facts and evidence in this case, however, do not support any of these allegations. Instead, quite the opposite is true.

As to their first allegation of "wanton" conduct, it is undisputed that the initial design, construction and operation of the Plant were done not by Tate & Lyle, but by non-party McNeil. Thus, if any entity initially constructed and operated the Plant in "conscious disregard" of Plaintiffs' proximity to the Plant without a "buffer" or "effective separation," it was McNeil, not Tate & Lyle, and Tate & Lyle cannot be held liable for any alleged negligence or wantonness of McNeil. *See Brown v. Economy Baler Co.*, 599 So.2d 1, 3 (Ala. 1992) (the transferee/purchasing corporation is not liable for the debts or liabilities of the transferor/seller corporation); Exhibit A at ¶ 3.

Moreover, the evidence conclusively establishes that McNeil was neither negligent nor wanton in its construction and operation of the Plant, even if the Plant is "in close proximity to" Plaintiffs' properties. The Plant was constructed in McIntosh's Industrial Park – an area zoned for the operation of government-approved industrial plants. Exhibit A at ¶ 3. Moreover, the Plant is separated from Plaintiffs' properties by some 3,000 feet of pine trees. Exhibit B at p. 10. McNeil built the Plant in accordance with all necessary permits and governmental authorizations,

and operated the Plant for three years within the confines of regulatory oversight and approval.
Exhibit A at ¶ 5.  Thus, when it took over operations in April of 2004, Tate & Lyle reasonably
could assume, and did so assume, that its continuance of the same operations in the same
location would not adversely affect Plaintiffs, let alone constitute a willful or conscious disregard
of Plaintiffs' rights.

Tate & Lyle's Plant expansion from 2004 to 2006 did not constitute a willful or
conscious disregard of Plaintiffs' rights either.  The expansion did not relocate the Plant or
otherwise render it any "closer in proximity" to Plaintiffs' properties, and was completed only
after issuance of the necessary permits and governmental approval.    Exhibit A at ¶ 5.
Moreover, the expansion only changed the Plant's production *capacity*.  It did not change the
manufacturing *processes* or *chemicals* involved therein, and has <u>not</u> caused any chemical
*emissions* or releases in excess or violation of those authorized by permit or government
regulation.  <u>Id.</u>; <u>Exhibit B</u> at p. 33.  Indeed, even Plaintiffs' expert admits that there were no
"stack" <u>or</u> "fugitive" emissions exceeding TLV's after Tate & Lyle's takeover in April of 2004.
<u>Exhibits D, E</u>.  Accordingly, at no time since its commencement of operations in April of 2004
did Tate & Lyle operate the Plant in a wanton manner.

As to their second allegation of "wanton" conduct, Plaintiffs present absolutely no
evidence of any "viable options" available to Tate & Lyle allowing it to operate the Plant without
causing the alleged harm to Plaintiffs.[14]  None of the Plaintiffs testified about any such
alternatives, nor could they, as presumably such information would be outside the scope of their

---

[14]  It is entirely unclear from the Complaint and/or the evidentiary record just what are the
"viable options" or "alternatives" available to Tate & Lyle.  Plaintiffs do not address this issue
anywhere in their discovery responses, document production, deposition testimony, or expert
disclosures.  Tate & Lyle does not know if Plaintiffs are referring to alternative technologies,
equipment, manufacturing processes, environmental controls, chemicals, or some combination
thereof.

knowledge or expertise.  Nor did Plaintiffs present any documentary evidence identifying or

otherwise discussing any such alternatives.  <u>Exhibits F, H-01 through H-37</u>.  Finally, Plaintiffs'

expert did not identify or discuss the need for or use of alternative technologies, equipment,

processes, etc. <u>Exhibits D, E</u>.  Failure to substantiate this allegation with any evidentiary support

renders it an insufficient allegation to withstand Tate & Lyle's motion.

 As to Plaintiffs' third allegation regarding "wanton" conduct – that Plaintiffs' brought

their injuries or damage to Tate & Lyle's attention but Tate & Lyle refused to abate the nuisance

– the undisputed facts in this case are directly the opposite.  At no time prior to the filing of the

Complaint did <u>any</u> Plaintiff complain to Tate & Lyle or otherwise provide Tate & Lyle with

notice of his or her alleged complaints, damage, or injury.  <u>Exhibits H-01 through H-37, I-01</u>

<u>through I-37</u>.  Nor did <u>any</u> Plaintiff complain to any governmental or regulatory agency about

Tate & Lyle's operations and the alleged effects thereof at any time prior to the filing of their

complaint.  <u>Id.</u>  Plaintiffs have no evidence that Tate & Lyle operated the Plant with knowledge

of harm to Plaintiffs and/or in a conscious disregard thereof.  For all of the foregoing reasons, the

Court should grant summary judgment with respect to Plaintiffs' claim for wantonness and for

punitive damages under their nuisance count.

**IV) The Court Should Grant Summary Judgment With Respect To Plaintiffs' Claim For Negligence Because Plaintiffs Cannot Present Any Evidence That Tate & Lyle Breached Any Applicable Standard Of Care.**

 In Count Two, Plaintiffs purport to state a claim for negligence based on Tate & Lyle's

alleged negligent design, construction, maintenance and/or operation of the plant.  (Doc. #59 at ¶

31).  It is well-established that Plaintiffs bear the burden of proof in establishing the following

elements of negligence: (1) an obligation owed by Tate & Lyle to Plaintiffs, (2) a breach of the

standard of care applicable to that obligation, (3) causation, and (4) damage.  *See Borden v. CSX*

*Transp., Inc.*, 843 F.Supp. 1410, 1416 (M.D.Ala. 1993) (citations omitted).  In this case, even assuming Tate & Lyle owed a duty to Plaintiffs, summary judgment should be granted in favor of Tate & Lyle because Plaintiffs have not and cannot present any evidence of the standard of care applicable to the design, construction, maintenance and/or operation of the Plant and/or Tate & Lyle's breach thereof.  Several cases support this conclusion.

*Yelder*, *supra* p. 16, is instructive.  Plaintiff brought suit against a credit card provider for, *inter alia*, negligently sending a pre-approved credit card application in her name to a third-party who fraudulently used the card, thereby adversely impacting plaintiff's credit rating.  *Id.* at 1279-80.  In support of her negligence claim, plaintiff argued that the procedures used by defendant "fall below the standard of care owed by a credit card provider."  *Id.* at 1286.

In rejecting this argument and granting summary judgment with respect to the negligence claim, the court stated:

> Yelder, however, offers no evidence to show that these procedures are commercially reasonable for credit card companies to follow in verifying the identity of a credit card applicant.  She offers no expert testimony on whether these procedures are commercially reasonable.  Nor does Yelder offer any evidence as to the procedures other credit card companies employ to verify credit card applications.  **Without evidence as to the reasonableness of Yelder's suggested procedures or evidence as to what other credit card providers follow in verifying credit card applications, Yelder cannot establish that Providian failed to employ commercially reasonable procedures to verify credit card applications**.  Therefore, Providian's Motion for Summary Judgment is due to be GRANTED.

131 F.Supp.2d at 1286 (emphasis added).  *See also Dresco Mechanical Contractors, Inc. v. Todd-CEA, Inc.*, 531 F.2d 1292, 1295 (5th Cir. 1976) (in negligence action against a particular profession, here an engineering firm, plaintiff had burden to establish the standard of care and breach thereof by the introduction of expert opinion evidence); *Dapremont v. Overcash, Walker & Co.*, 2000 WL 1566532 at *5 (S.D.Ala. 2000) ("Summary judgment is also due on negligence claims in this case because The Dapremonts have failed to present any evidence, expert or

otherwise, that the defendants, certified public accountants, deviated from the applicable standard of care in the preparation of plaintiffs' tax returns. *Expert testimony is required in negligence claims against professionals*.") (emphasis added); *Nat'l Tele. Co-op. Ass'n v. Exxon Corp.*, 38 F.Supp.2d 1, 9-10 (D.D.C. 1998) (noting that expert testimony is both required and essential to establish the relevant standard of care when the subject in question is related to some science, profession or occupation as to be beyond the ken or understanding of the average lay person/juror).

These cases mandate summary judgment in favor of Tate & Lyle on Plaintiffs' negligence claim. Plaintiffs have not and cannot establish the relevant standard of care, let alone a breach thereof. The subject in question in this case is whether Tate & Lyle negligently designed, constructed or operated its manufacturing plant resulting in the release of "fugitive emissions" of various chemicals thereby affecting Plaintiffs and/or their properties. This is not within the common knowledge or understanding of lay persons. Indeed, as the authorities above mandate, Plaintiffs retained an expert – Montgomery – to analyze and discuss these subjects. However, nowhere in his report or testimony does Montgomery identify or address the relevant standard of care for the design, construction, operation and/or maintenance of the Plant or the industry standard or practice regarding the same. Exhibits D, E.

Notably, *even if* Plaintiffs could establish the relevant standard of care without expert testimony, which they cannot, Plaintiffs have failed to do so. No Plaintiff testified as to industry practice, the degree of skill or care required under similar conditions, or the degree of skill or care ordinarily employed by other chemical/industrial manufacturers. Exhibits I-01 through I-37. Nor have Plaintiffs presented any documentary evidence regarding industry practice and/or the relevant standard of care required by Tate & Lyle. Exhibits F, H-01 through H-37. Plaintiffs

may not presume that this Court or the jury knows the applicable standard of care for Tate &

Lyle's sucralose manufacturing operations.  Neither this Court nor the jury is responsible for

determining the appropriate standard of care.  It is Plaintiffs' burden to prove and they have

failed to do so, entitling Tate & Lyle to summary judgment on their negligence count.

Plaintiffs also fail to present any evidence establishing a breach of the standard of care.

The Alabama Supreme Court's decision in *Courtaulds Fibers, Inc. v. Long*, 779 So.2d 198 (Ala.

2000) is instructive.  Property owners filed suit against a rayon fabric manufacturer for allegedly

emitting harmful substances from its plant.  *Id.* at 199-200.  In support of their claims for

negligence and nuisance, plaintiffs alleged that the defendant "negligently or improperly

operated its plant."  *Id.* at 201.  The Alabama Supreme Court, however, concluded that the

plaintiffs failed to provide sufficient evidence to support these claims.  In so doing, the court

emphasized that "**[w]e will not assume negligence; we will not assume improper operation**."

*Id.* (emphasis added).  In addition, the court noted that "the record contains no evidence

indicating that the defendant violated its permit from ADEM."  *Id.*  Finally, the court rejected

plaintiffs' claim that the defendant acted negligently by not installing carbon bed absorption

technology (which plaintiffs claimed was industry standard):

> Even if a jury can consider industry practice as evidence of a duty, the breach of
> which would constitute negligence, the record contains no evidence indicating
> that carbon bed absorption is the industry practice… **The plaintiffs presented no
> expert testimony on this issue, and they presented no testimony indicating
> the defendant breached any standard or acted unreasonably by not installing
> carbon-bed technology in this Axis plant**.

*Id.* (emphasis added).  *See also Republic Steel Corp. v. Peoples*, 217 F.2d 236, 238 (5th Cir.

1954) ("The burden is on the plaintiffs to show some specific act or acts of negligence, and to

show further that such negligence directly contributed to the result. Mere proof that the

residential structures were damaged by blasting would not alone sustain the actions.") (applying

Alabama law); *Marshall Durbin Co., Inc. v. Hartley*, 392 So.2d 240, 241 (Ala. Civ. App. 1980) ("plaintiff cannot recover unless he proves the defendant to have been negligent…negligence will not be inferred from a mere showing of an accident and injury") (citations omitted).

The analogous circumstances in this case compel the same result.  Plaintiffs claim that Tate & Lyle negligently designed, constructed, maintained and/or operated the plant.  However, Plaintiffs improperly ask the Court to *assume* such negligence because they were allegedly injured, rather than offering any evidence of specific acts of negligence by Tate & Lyle.

As in *Courtaulds*, Plaintiffs cannot offer any evidence that Tate & Lyle violated any applicable permits issued by ADEM.  Instead, the documentary evidence proves the opposite. Exhibit A at ¶¶ 4-5; Exhibit B at p. 33.  Moreover, Plaintiffs' expert admits that the emission stacks at the Plant were designed correctly and did not release chemicals in excess of TLV's. Exhibit D at p. 3-4; Exhibit E at p. 88:3-4, 110:23 – 111:4.  In addition, Montgomery acknowledged that any "fugitive" emissions allegedly exceeding the TLV's did not occur during Tate & Lyle's ownership or operation.  Id.  Montgomery also notes that permits cover the release of obnoxious odors from the Plant and such permits are issued with the condition that should obnoxious odors arising from plant operations be verified by Air Division inspectors from ADEM, measures to abate the odorous emissions shall be taken.  Exhibit E at p. 148:11 – 149:18.  Plaintiffs offer no evidence that Air Division inspectors from ADEM have ever verified obnoxious odors arising from Tate & Lyle's Plant operations.  Indeed, the record indicates the opposite.  Exhibit B at p. 33; Exhibit E.

Plaintiffs offer no evidence of the relevant standard of care by which to judge Tate & Lyle's actions.  Nor do they offer any evidence establishing negligent conduct by Tate & Lyle in violation of the applicable standard of care.  Their opinions and/or assumptions that Tate & Lyle

must be negligent merely because they claim injury are insufficient to withstand Tate & Lyle's summary judgment motion and accordingly, Tate & Lyle is entitled to summary judgment on Plaintiffs' negligence claim.

**V)      The Court Should Grant Summary Judgment With Respect To Plaintiffs' Tort Claims (Nuisance, Negligence and Wantonness) Because Plaintiffs Cannot Present Any Evidence Of Proximate Causation, A Necessary Element Of Each Tort Cause Of Action.**

In order to survive this motion and recover under any of their tort theories, Plaintiffs must present substantial evidence tending to show that the conduct complained of proximately caused the harm in question. *See Brushwitz v. Ezell*, 757 So.2d 423, 432-33 (Ala. 2000) (to have actionable wantonness claim, the alleged wanton act or omission must proximately cause the injury of which the plaintiff complains); *Tipler v. McKenzie Tank Lines*, 547 So.2d 438, 440 (Ala. 1989) (granting summary judgment on nuisance claim because no evidence of proximate cause); *Wal-Mart Stores, Inc. v. Langham*, 794 So.2d 1170, 1172 (Ala. Civ. App. 1997) (granting summary judgment on negligence and wantonness claims because no evidence of proximate cause). *See also Keller v. Kiedinger*, 389 So.2d 129, 133 (Ala. 1980) (when reasonable men cannot differ, questions of proximate cause are matters of law for the court to decide).

In a toxic tort case such as this, proximate cause requires scientific or expert testimony. *See Rider v. Sandoz Pharm. Corp.*, 295 F.3d 1194, 1197 (11th Cir. 2002) ("Toxic tort cases, such as this one, are won or lost on the strength of the scientific evidence presented to prove causation."). This is especially true given Plaintiffs' claims of personal injury and property diminution. *See Cash Energy, Inc. v. Weiner*, 81 F.3d 147 at *2 (1st Cir. 1996) (table opinion) (in groundwater contamination case, without expert testimony plaintiff failed to demonstrate a trialworthy issue of fact on any theory of damage, including diminution of property value);

*Rianda v. Olin Corp.*, 2006 WL 1525694 at *5 (N.D.Cal. May 30, 2006) (granting summary judgment in favor of defendant in toxic tort claim and noting "to support their claims of personal injuries, plaintiffs will need medical expert testimony to establish that they suffer illnesses, disorders, and diseases, and such injuries are caused by the contamination," and further noting for claims of both personal injury and diminution in property value, "[a]bsent the requisite medical and other expert opinion evidence, plaintiffs' claims cannot survive"); *Meyer v. The Lockformer Co.*, 2005 WL 1869656 at *2-4 (N.D.Ill. 2005) (granting summary judgment in favor of defendant in TCE contamination case based on plaintiff's failure to offer expert testimony establishing defendant's conduct as the proximate cause of physical ailments, which also necessitated summary judgment on claim of emotional distress, as well as plaintiff's failure to identify competent opinion testimony to establish causation of diminution in value of her property).

### A.  Personal Injuries/Medical Causation

Plaintiffs have no testimony, documents or evidence from a medical doctor or toxicologist linking their physical symptoms or injuries to Tate & Lyle's Plant operations. Exhibits F, G, H-01 through H-37, K-01 through K-37.  No Plaintiff has ever been told that his or her physical symptoms or injuries are caused by the Tate & Lyle Plant operations.  Exhibits I-01 through I-37.  Montgomery, Plaintiffs' only expert, is neither a toxicologist nor a medical doctor.  Exhibit E at p. 51:18 – 52:10, 53:15-22, 61:20 – 62:11.  Moreover, he stated that he could not and would not offer any testimony regarding any Plaintiff's personal exposure to chemical emissions from the Plant and whether such exposure caused that Plaintiff's symptoms or injuries.  Id. at 164:9-16.  He acknowledged that Plaintiffs would need "expert testimony from somebody else about that."  Id.

Rather than offering expert testimony from somebody else, Plaintiffs rely on their own uncorroborated, personal lay opinions to establish that their physical injuries and/or medical problems are proximately caused by Tate & Lyle's operations.  Exhibits I-01 through I-37.  This is insufficient to defeat Tate & Lyle's motion.  Plaintiffs must present credible expert testimony to establish the necessary medical causation of their physical symptoms or injuries as resulting from Tate & Lyle's operations.  *See Fletcher v. Conoco Pipe Line Co.*, 223 F.3d 661, 666 (8th Cir. 2003) (in suit for property damage and personal injuries based on claims of inverse condemnation, nuisance, trespass, and ordinary negligence, summary judgment in favor of defendant was proper because "[m]ere evidence of electricity recorded on the property, without corresponding expert testimony or some clearly obvious evidence as to its source, harmful level, and ability to cause directly and foreseeably the injuries complained of, will not defeat summary judgment"); *Webster v. Offshore Food Serv., Inc.*, 434 F.2d 1191, 1193 (5th Cir. 1970) (technical questions of medical causation are beyond the competence of lay determination); *Emody v. Medtronic, Inc.*, 238 F.Supp.2d 1291, 1295 (N.D.Ala. 2003) (granting summary judgment in favor of defendant in products liability action where plaintiff failed to present expert testimony, passing *Daubert* muster, that defect was the medical cause of plaintiff's claimed injuries) (citing Tidwell v. Upjohn Co., 626 So.2d 1297, 1299 (Ala. 1993)).[15]

To the extent Plaintiffs *do* rely on Montgomery for purposes of proximate causation of their physical injuries or symptoms, such reliance is misplaced.  In the similar case of *Koehn v. Ayers*, 26 F.Supp.2d 953 (S.D.Tex. 1998), the court aptly explained:

---

[15]  Plaintiffs' personal opinions and beliefs also are insufficient to establish causation because Plaintiffs themselves admit they do not actually know whether Tate & Lyle is the cause of any claimed physical injury or symptom.  *See, e.g.*, Exhibit I-16 at p. 60:12-17 (Plaintiff Bernice Pressley does not know and could not say whether her breathing problems were caused by Tate & Lyle's Plant); Exhibit I-34 at p. 70:9-18 (Plaintiff Lora Ward does not know whether her diabetes was caused or contributed to by Tate & Lyle's Plant).

Specifically, in an action for personal injuries allegedly caused by exposure to a toxic substance, the plaintiffs must come forward with sufficient competent evidence to prove both that they were actually exposed to a toxic substance and that there is a causal link between the plaintiffs' exposure and the plaintiffs' alleged injuries. *See, e.g., Allen v. Pennsylvania Eng'g Corp.*, 102 F.3d 194, 199 (5th Cir. 1996) ("Scientific knowledge of the harmful level of exposure to a chemical, plus knowledge that the plaintiff was exposed to such quantities, are minimal facts necessary to sustain the plaintiffs' burden in a toxic tort case."). In the instant case, the Koehns have failed to come forward with any credible evidence that they were exposed to toxic materials allegedly in the pit or that injuries and illnesses they may have suffered were medically caused by such exposure.

* * *

The Koehns have also failed to proffer any meaningful evidence on the issue of medical causation. *They submitted expert reports from two experts which contain generalized statements about the link between some toxins allegedly in the pit and various illnesses including autoimmune disorders which are among the conditions complained of by Plaintiffs. Neither expert appears to have actually examined the individual Plaintiffs, considered their medical history, or offered any substantiated conclusions about the medical probability that these Plaintiffs' injuries were caused in whole or even in part by exposure to environmental toxins*. None of the reports submitted by the Koehns even suggest that they are a statistical anomaly representing a higher than normal incidence of the various conditions they complain of. *Without an opinion from at least one doctor that there is a reasonable medical probability that the specific illnesses complained of by the individual Plaintiffs resulted from exposure to toxins associated with the pit, the Plaintiffs' claims must fail as a matter of law*. This is certainly not to say that the Court is unconcerned with the Plaintiffs' health problems. But, Plaintiffs' feelings of concern and apprehension, while understandable, are just not enough to show the necessary demonstrable causal link between the Defendants' conduct and the illnesses allegedly suffered by the Plaintiffs.

*Id.* at 955-56 (emphasis added).

The same is true here.  Montgomery did not examine Plaintiffs or review their medical records and histories.  Exhibit E.  He was unable to offer any testimony about the medical probability that any individual Plaintiff's medical symptoms or injuries were caused by exposure to emissions from Tate & Lyle's Plant.  Id. at p. 51:18 – 52:10, 53:15-22, 61:20 – 62:11.  At best, he offered generalized statements about a link between some of the chemicals used at the Tate & Lyle Plant and various physical symptoms that happened to include the symptoms allegedly

suffered by Plaintiffs.  Id.  The only bases for this opinion, however, are the Plaintiffs'

complaints themselves.  Id.  In other words, Montgomery concludes Tate & Lyle's emissions

were sufficient to cause Plaintiffs' claimed symptoms simply because Plaintiffs experienced

those symptoms.  This opinion is entirely circular, assumes causation rather than establishing it,

and does not survive Tate & Lyle's motion.  *See Republic Steel*, *supra* p. 23, at 238 (mere proof

of damages does not sustain finding of negligence or proximate causation); *Viterbo v. Dow*

*Chemical Co.*, 826 F.2d 420, 424 (5th Cir. 1987) (in case alleging exposure to chemical

herbicide, expert's opinion resting only on plaintiff's statement and consisting of "no more than

[plaintiff's] testimony dressed up and sanctified as the opinion of an expert" was properly

excluded and summary judgment granted to defendant).  For all of the reasons announced in

*Koehn* and the other authorities above, neither Plaintiffs' non-expert medical opinions nor

Montgomery's general opinions on causation are sufficient to establish the ultimate issue of

proximate causation of Plaintiffs' physical injuries.

      Finally, even assuming *arguendo* that Montgomery's opinion is sufficient to link *these*

Plaintiffs' physical symptoms to Tate & Lyle's emissions, Montgomery states any link between

Plaintiffs' symptoms and Tate & Lyle's operations is only a possibility.  He opines that the

chemicals used and/or emitted through Tate & Lyle's operations "are sufficient to cause" or

"could" cause Plaintiffs' physical symptoms or injuries.  Exhibit D at p. 4; Exhibit E at p.

162:14-21.  Identifying a *possible* cause of Plaintiffs' physical symptoms or injuries is not the

same as presenting substantial evidence of the proximate cause of such injuries sufficient to

withstand a motion for summary judgment.  *See McDonald v. Servpro*, 581 So.2d 859, 861 (Ala.

Civ. App. 1991) (expert testimony speculating that defendant's chemicals "could" have caused

plaintiff's allergic reaction was not substantial evidence of proximate causation creating a

genuine issue for trial and therefore summary judgment on plaintiff's personal injury claim was proper); *Marshall*, *supra* p. 24, at 241 (defendant entitled to judgment notwithstanding the verdict because "[t]he mere possibility that negligence caused an injury, without evidence, is not sufficient to support a verdict").

### B.  Property Diminution.

Montgomery offered no opinion or evidence regarding the existence, cause or amount of Plaintiffs' property diminution damages.  <u>Exhibits D, E</u>.  All such evidence or testimony comes from Plaintiffs' personal lay opinions unsupported by any relevant documentation.  <u>Exhibits F, G, H-01 through H-37, I-01 through I-37, J-01 through J-37</u>.  This is insufficient evidence to withstand Tate & Lyle's motion.  While Plaintiffs may be entitled to offer their opinion as to the *value* or diminution in value of their properties under Alabama law, they are prohibited under both Alabama and federal law from offering their opinions as to the ultimate issue of *proximate cause* of such loss or damage.  *See City of Birmingham v. Watkins*, 670 So.2d 878, 880 (Ala. 1993) (citing *Burkett v. Loma Machine Mfg., Inc.*, 552 So.2d 134, 136 (Ala. 1989)) (plaintiff's lay opinion as to the ultimate issue of proximate cause of his injuries was inadmissible and insufficient to withstand summary judgment); *Knapp v. Wilkins*, 786 So.2d 457, 462 (Ala. 2000) (an *expert* may testify as to ultimate issue of causation in tort case); *U.S. Aviation Underwriters, Inc. v. Yellow Freight Sys., Inc.*, 296 F.Supp.2d 1322, 1331-32 (S.D.Ala. 2003) (lay person's opinion testimony as to extent and cause of damage of jet engine exhaust duct clearly involved scientific, technical, or other specialized knowledge, and was therefore outside the ken of lay opinion testimony admissible under Fed. R. Evid. 701).

Thus, at best Plaintiffs have admissible opinion evidence on only one element of their claim: the allegedly diminished *value* of their properties (though Tate & Lyle disputes Plaintiffs'

personal opinions regarding the existence and amount of such damages), but not the *proximate cause* thereof.  Plaintiffs cannot prove their tort claims by merely proving their damages, however.  They must prove causation to withstand Tate & Lyle's motion.  *See Republic Steel*, *surpa* p. 23, at 238 (plaintiffs must show defendant's actions "contributed to the result…[m]ere proof of damage[s] by blasting would not alone sustain the actions").

Even if a plaintiff's personal opinion was proper or sufficient to establish proximate causation generally, Plaintiffs' opinions here fail to establish proximate causation of property diminution.  Instead, Plaintiffs suggest *multiple* causes of their alleged property diminution damages, but fail to segregate any diminution caused by Tate & Lyle from the diminution caused by Olin and/or Ciba.  Exhibits I-04, I-06, I-08, I-14, I-21, I-24, I-30 (Plaintiffs Billie Barnes, Anita Hicks, Eva Gray Jones, Elizabeth Mitchell, Bobby Radcliff, Jr., Linda Reed, and Linda Thomas, respectively).  Plaintiffs' failure to sufficiently segregate Tate & Lyle as a cause of their damages from other causes destroys any proof of proximate causation sufficient to withstand Tate & Lyle's motion.  *See Cash Energy*, *supra* p. 25, at *2 (granting summary judgment in favor of defendant where plaintiff failed to segregate damage caused by the defendants from damage generated by the former on-site dry cleaning operation, noting it is "axiomatic that the defendants are not liable for damages they did not cause").

Those Plaintiffs that did segregate Tate & Lyle as a distinct cause of diminution from other causes are no better off.  Exhibits I-01, I-03, I-10, I-11, I-12, I-13, I-19, I-27, I-34 (Plaintiffs Sylvester Abrams, Leroy Adams, Sr., Spencer Lang, Laurina Law, Bobby and Dianne McKenzie, Lloyd Pressley, Bonnie Sullivan, and Lora Ward).  Again, like the others, these Plaintiffs segregated their damages based only on personal lay opinion without any supporting documentation or evidence.  The case of *South Camden Citizens for Action v. N.J. Dept. of Env'l*

*Protection*, 2006 WL 1097948 (D.N.J. 2006) is instructive.  In *South Camden*, plaintiffs alleged

that defendant's operations at its blast furnace slag grinding facility constituted a nuisance.  *Id.* at

*1.  Specifically, plaintiffs alleged that dust, soot, vapors, fumes, noise and vibrations from the

facility unreasonably interfered with their use and enjoyment of property.  *Id.* at *15.  In granting

summary judgment in favor of the defendant, the district court explained:

> *The issue here is causation, and Plaintiffs have made no effort to separate out the harm to their properties allegedly caused by SLC's operations from any nuisance caused by other industries in the area.* Indeed, Williams and Potter testified that there had always been dust in their homes, before SLC even began operating. Potter and Pfeiffer testified that trucks other than SLC's drive through the area. Pfeiffer testified that she had city dust in her home that was not from SLC. Potter also testified that there exists natural dirt in her home, and that the industry dust and dirt in her home is a result of the trucks that drive in the area, of which some, but not all, are SLC's. Holmes testified that she imagined other area industries produced sand or dust. *At best, Plaintiffs' testimony is that there is more dust, dirt, white sand and truck noise, vibrations and fumes since SLC began its operations but have not quantified or differentiated these alleged nuisances from other polluting sources. That is insufficient to withstand summary judgment. Moreover, even though discovery is complete, Plaintiffs have not submitted any expert reports, sampling, testing or monitoring that link an increase in dust, dirt, white sand and truck noise, vibrations and fumes to SLC's operations and/or trucking.*
> * * *
> *It is clear, therefore, that Plaintiffs' testimony that SLC has legally or proximately caused an interference with their use and enjoyment of their property is conjectural and speculative; however, speculation and conjecture normally cannot create a material factual dispute.* [Citations omitted]. Plaintiffs' conjecture extends to the alleged diminution of their property values as a result of SLC's activities. They have submitted no evidence from any real estate expert in support of those contentions.
> * * *
> As such, the Court, and not a jury, will resolve the proximate cause issue here because I find that reasonable minds could not differ that the proximate cause element of the Plaintiffs' case has not been established. [Citation omitted].  After intensive fact and expert discovery, Plaintiffs have produced no credible proofs of the harm or nuisance they suffered as a result of SLC's operations and they have failed to prove the causation element of their claim. Furthermore, they have made no effort to single out the nuisance at their properties allegedly caused by SLC as opposed to other area industries…

*Id.* at *19-21 (emphasis added).

The same holds true here.  Even those Plaintiffs opining that Tate & Lyle is 100% at fault for any alleged property diminution readily admit to suing and/or settling with Olin or Ciba for similar damages.  *See supra* n. 8; Exhibits I-01, I-10, I-11, I-18, I-19, I-34.  However, they fail to account for these additional sources of damage in their final opinions on causation.  Id. Similarly, all Plaintiffs assigning at least some level of fault to Tate & Lyle admit that noises from the railroad track and/or heavily trafficked nearby streets can be heard on their properties. However, they fail to account for how these independent noise sources – the sounds of which undisputedly exceed the decibel levels of any noises stemming from Tate & Lyle's properties – affect or otherwise diminish the value of their properties.  Id.; Exhibit C.  Finally, Plaintiffs offer differing and inconsistent opinions as to whether more than one cause exists for the alleged diminution of any given property and if so, what is the appropriate apportionment among these causes.  *See supra* n. 9.  Thus, as in *South Camden* above, the Plaintiffs' opinions in this case are mere speculation and conjecture and do not withstand Tate & Lyle's motion for summary judgment.

### C.  Loss of use and enjoyment of property

For the same reasons as just noted, Plaintiffs fail to sufficiently segregate Tate & Lyle as the proximate cause of any alleged nuisance resulting in the loss of use and enjoyment of property.   Regarding odor, Plaintiffs testified that the obnoxious odor preceded Tate & Lyle's expansion of the Plant, thereby suggesting alternative sources for such odors.  Exhibits I-01 through I-37.  This is consistent with Montgomery's evidence that no fugitive emissions of DMA, which he opines is the cause of any obnoxious odor, have been released from the Plant since prior to April of 2004.  Exhibits D, E.  Further, Montgomery admits he has not tested for and does not know the level of exposure of DMA at the Plaintiffs' properties, if any.  Exhibit E.

In other words, Plaintiffs have no quantifiable or verifiable evidence that DMA emissions do or ever have reached Plaintiffs' properties.  <u>Id.</u>  The only other basis for Plaintiffs' claim that an obnoxious odor stems from Tate & Lyle's Plant, as opposed to from other chemical or industrial plants in the area or any other source, is their personal belief or opinion.  <u>Exhibits I-01 through I-37</u>.  This is not substantial evidence that Tate & Lyle's Plant is the proximate cause of any obnoxious odor.

Regarding noise, Plaintiffs testified that both train/railroad noises and traffic noises interfere with the use and enjoyment of their properties in the same manner as noises from Tate & Lyle's Plant.  *See supra* p. 11; <u>Exhibits I-03 through I-11, I-13, I-14, I-19 through I-21, I-25, I-26, I-30, I-32 through I-34, I-36</u>.  Each noise sources awakens Plaintiffs, causes a loss of sleep, and/or interferes with Plaintiffs' use of their property in some manner.  <u>Id.</u>  The only difference is the allegedly more intrusive nature of Tate & Lyle's noises, as Plaintiffs claim they are used to the train and traffic noises but not Tate & Lyle's noises, despite the duration of Tate & Lyle's noises of anywhere from two to six years.  <u>Id.</u>  The only evidence that Tate & Lyle's noises proximately cause any nuisance substantially interfering with Plaintiffs' use and enjoyment of their properties, as opposed to other noise sources, is Plaintiffs' testimony.

However, the only scientific or expert noise data generated in this case clearly establishes that Tate & Lyle's plant is not and cannot be the source of any unreasonably intrusive noise.  The sound level data generated by CEM, measuring the decibel level, frequency, and calibration of various noise sources in the area, conclusively establishes that the sound levels for a passing train and/or vehicle traffic *exceed* the sound levels for noises stemming from Tate & Lyle's Plant.  <u>Exhibit C</u>.  Not only do these sources generate *higher decibels* of noise, they are substantially *closer* to Plaintiffs' properties than Tate & Lyle's Plant.  <u>Id.</u>  Some Plaintiffs are only 300 to

1,000 feet away from the railroad tracks and/or heavily traveled streets, compared to 3,300 to 6,000 feet away from Tate & Lyle's Plant.  Id.  This evidence undisputedly shows that any loud or intrusive noise interfering with Plaintiffs' use and enjoyment of their properties is not and cannot be from Tate & Lyle's Plant, but is from much closer and much louder sources.

This evidence also conclusively establishes that any noise associated with the Tate & Lyle plant does not constitute a nuisance as defined by Alabama law.  Pursuant to Ala. Code § 6-5-120, "[t]he inconvenience complained of must not be fanciful or such as would affect only one of a fastidious taste, but it should be such as would affect an *ordinary reasonable man*." (Emphasis added).  *See also, Acker v. Protective Life Ins. Co.*, 353 So.2d 1150, 1152 (Ala. 1977) (plaintiff homeowners were unable to prove harm to a reasonable person because the complained-of carillon bells could barely be heard in plaintiffs' neighborhood).  Because the decibel levels for any noises coming from Tate & Lyle's Plant are substantially less than the decibel levels for other noises regularly occurring within Plaintiffs' neighborhood and/or originating from sources much closer to Plaintiffs' properties, reasonable minds cannot differ as to whether Tate & Lyle's softer, more distant noises would affect an ordinary, reasonable property owner when the closer, louder and/or more intrusive noises admittedly do not.  For all of these reasons, Plaintiffs fail to establish actionable nuisance resulting in the loss of use and enjoyment of property, and Tate & Lyle is entitled to summary judgment.

**VI)** **The Court Should Grant Summary Judgment On Plaintiffs' Requests For Emotional Distress Damages Because Absent Physical Injury, Plaintiffs Must Establish Circumstances Of (1) Insult Or Contumely, Or (2) A Zone Of Danger, Both Of Which Are Lacking Here.**

In connection with their nuisance claim, Plaintiffs allege that they have suffered "severe emotional stress and mental anguish."  (Doc. #59 at ¶ 27(e)).  This allegation is incorporated by reference in Plaintiffs' claim for negligence.  (Id. at ¶ 29).

As noted, Plaintiffs have no viable personal injury claims against Tate & Lyle because they lack sufficient evidence of the existence, nature, extent or cause of any claimed physical injuries.  Absent a physical injury, the only ways Plaintiffs can recover for emotional distress are (1) under their nuisance count, by showing the nuisance was committed under circumstances of insult or contumely, or (2) under their negligence count, assuming it survives Tate & Lyle's motion, by showing they were within a "zone of danger."  Plaintiffs can prove neither of these as a matter of law, and therefore the Court should grant summary judgment with respect to any claim for emotional distress.

### A)  Absent evidence of wanton conduct, Plaintiffs cannot recover any emotional distress damages under their nuisance claim.

In *Lavender*, *supra* p. 17, this Court emphasized that "[m]ental anguish is compensable in a nuisance case without physical injury if the mental suffering inflicted is accompanied by malice, insult, inhumanity, or contumely."  *Id.* at 14 (emphasis in original).  Applying this standard, the court held:

> The record contains no evidence whatsoever that the defendants commissioned and operated Compressor Station 44 with 'malice, insult, inhumanity, or contumely'.  **Because of a complete failure of proof on this crucial element, the plaintiffs may not pursue any claim for mental anguish damages on their nuisance claims against the defendants**.

*Id.* (emphasis added).  *See also Wal-Mart Stores, Inc. v. Bowers,* 752 So.2d 1201, 1204 (Ala. 1999) (damages for mental anguish are not recoverable in tort where the tort results in mere injury to property unless the damage to property is committed under circumstances of insult or contumely).  As noted in Section II, Plaintiffs have absolutely no evidence that Tate & Lyle's operations constituted a "wanton" nuisance, or that it otherwise acted with malice, insult or contumely.  As in *Lavender*, due to their complete failure of proof of this crucial element,

Plaintiffs cannot pursue emotional distress damages on their nuisance claim and Tate & Lyle is entitled to judgment as a matter of law.

### B) Absent evidence of being in a "zone of danger," Plaintiffs cannot recover any emotional distress damages under their negligence claim.

"The Alabama Supreme Court has definitively stated that one can recover for emotional injury in a negligence action only under two circumstances:  (1) where a plaintiff 'sustain[s] a physical injury as a result of a defendant's negligent conduct'; and (2) where a plaintiff was 'placed in immediate risk of physical harm by the conduct,'" *i.e.* within the "zone of danger." *Rawlings v. Dovenmuehle Mortgage, Inc.*, 64 F.Supp.2d 1156, 1167 (M.D.Ala. 1999) (citations omitted).

In this case, assuming *arguendo* that their negligence claim survives Tate & Lyle's motion, Plaintiffs have not alleged, nor could they establish, that they are in a "zone of danger." *Hardesty v. CPRM Corp.*, 391 F.Supp.2d 1067, 1073 (M.D.Ala. 2005) ("The zone of danger test has been routinely applied in Alabama cases to permit recovery of emotional damages only by those who suffered actual or imminent risk of physical harm.") (citations omitted).  There is a complete failure of proof that Plaintiffs were in imminent risk of physical harm because of Tate & Lyle's operations.  To the contrary, Plaintiffs' only expert opined that any emissions from Tate & Lyle's plant are not "fatal, toxic or carcinogenic" and constitute no "imminent health hazard."  Exhibit D at p. 4; Exhibit E at p. 150:18 – 151:1.  Other than their own unsubstantiated non-expert opinions, Plaintiffs have no evidence that they were at risk of *any* physical harm, let alone actual and imminent physical harm, as a result of Tate & Lyle's operations.  Accordingly, Plaintiffs may not pursue emotional distress damages under their negligence claim and Tate & Lyle is entitled to judgment as a matter of law.

**VII)   The Court Should Grant Summary Judgment With Respect To Any Claim For Injunctive Relief Because Plaintiffs Have No Actionable Harm Requiring Temporary or Permanent Injunction.**

As noted above, Plaintiffs have no viable nuisance claim (or any tort claim).  This necessarily mandates judgment as a matter of law in favor of Tate & Lyle on the injunctive relief count, which is based on and inextricably linked to Plaintiffs' nuisance claim.  *See Davis v. Hanson Aggregates Southeast, Inc.*, 952 So.2d 330, 338-39 (Ala. 2006) (because factual issue of whether quarry was a nuisance was inextricably linked with the plaintiffs' request for injunctive relief and the jury found no nuisance, the trial court properly refused to consider whether the trial plaintiffs were entitled to an injunction) (citation omitted).

**VIII)   The Court Should Grant Summary Judgment With Respect To Any Damages Allegedly Suffered By Plaintiffs More Than Two Years Preceding The Filing Of The Original Complaint.**

In Count One of their Complaint, Plaintiffs allege Tate & Lyle's conduct is of a continuous nature and "constitutes the tort of continuous nuisance."  (Doc. #59 at ¶ 27).  They adopt and incorporate these allegations into their other tort causes of action – negligence and wantonness.  (Id. at ¶¶ 29, 32).  In other words, Plaintiffs bring causes of action based on continuous torts.

It is well settled under Alabama law that recovery for a continuous tort is limited "to those damages that occurred within the period of limitations."  *AC, Inc. v. Baker*, 622 So.2d 331, 335 (Ala. 1993) (citation omitted).  *Accord, Santiago v. Lykes Bros. S.S. Co.*, 986 F.2d 423, 426 (11th Cir. 1993) ("Under the continuing tort theory, recovery may be had for resulting injuries subject to the limitation that only damages which occurred within the period of limitations may be recovered…") (citing *Minyard v. Woodward Iron Co.*, 81 F.Supp. 414 (N.D.Ala. 1948).

The applicable period of limitations for each tort claim alleged by Plaintiffs is two years. ALA. CODE § 6-2-38(l).  *See also Saxton v. ACF Ind., Inc.*, 239 F.3d 1209, 1212 (11th Cir. 2001) ("Under Alabama law, the statute of limitations for general tort claims is two years."); *Ratcliff v. Heavy Machines, Inc.*, 2007 WL 2051352 at *3 (S.D.Ala. July 17, 2007) (noting that the statute of limitations for wantonness and negligence claims is two years) (citing *Boyce v. Cassese*, 931 So.2d 932, 945 (Ala. 2006)).  Accordingly, Plaintiffs' recoverable damages, if any, are limited to those occurring within the two years preceding the filing of their Complaint, or since June 2, 2004.  (Doc. #1-1).  Moreover, recovery for any damages occurring prior to Tate & Lyle's acquisition and takeover of the Plant in April of 2004 would necessarily subject Tate & Lyle to liability for actions caused by McNeil for which it is not and cannot be held liable.  *Brown*, *supra* p. 18, at 3.  For all of these reasons, should the Court not grant summary judgment in favor of Tate & Lyle on Plaintiffs' causes of action in their entirety, Tate & Lyle is entitled to summary judgment on any recoverable damages occurring prior to June 2, 2004.

## <u>CONCLUSION</u>

WHEREFORE, for all of the foregoing reasons, Defendant Tate & Lyle Sucralose, Inc. respectfully requests that this Court grant it summary judgment as to all causes of action in Plaintiffs' Fourth Amended Complaint and for such further relief as this Court deems equitable and just.

Dated:  February 19, 2008

Respectfully submitted,

    /s/ Halron W. Turner
HALRON W. TURNER (TURNH9339)
MARC E. BRADLEY (BRADM9922)
Turner, Onderdonk, Kimbrough,
  Howell, Huggins & Bradley, PA
Post Office Drawer 1389
Chatom, Alabama 36518
Telephone:  (251) 847-2237
Facsimile:  (251) 847-3115

**And**

MICHAEL H. WETMORE (*pro hac vice*)
WILLIAM J. CURTIS (*pro hac vice*)
ROBYN D. BUCK (*pro hac vice*)
Husch & Eppenberger, LLC
190 Carondelet Plaza, Suite 600
Saint Louis, Missouri 63105
Telephone:  (314) 480-1500
Facsimile:  (314) 480-1505

**Attorneys for Defendant,**
  **Tate & Lyle Sucralose, Inc.**

## CERTIFICATE OF SERVICE

I hereby certify that on February 19, 2008, I electronically filed the foregoing document with the Clerk of the Court utilizing the CM/ECF system, which will send notification of such filing to counsel of record as listed below.

    /s/ Halron W. Turner
HALRON W. TURNER
Counsel for Defendant

**<u>Counsel of Record</u>**:

John W. Parker, Esq.
820 S. University Blvd., Suite 2-F
Mobile, Alabama 36609
Telephone:  (251) 341-1020
Facsimile:  (251) 341-1235

Herndon Inge III, Esq.
Post Office Box 40188
Mobile, Alabama 36640
Telephone:  (251) 432-1444
Facsimile:  (251) 432-6941