IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| BOBBY J. RADCLIFF, et al. | * | |
| Plaintiffs, | * | |
| v. | * | CV 06-345-CG-M |
| TATE & LYLE SUCRALOSE, INC.; | * | |
| Defendants. | * | |

**PLAINTIFFS' AFFIDAVIT OF JAMES R. MONTGOMERY, P.E.**

STATE OF ALABAMA )
)
COUNTY OF HUNSTVILLE )

Before me the undersigned party for said State and County personally appeared James R. Montgomery, who being sworn to me on oath doth depose and say as follows:

I have reviewed the filings of Tate & Lyle Sucralose, Inc. in reference to their motions for summary judgment. In particular, I have reviewed again the testimony of Rand Roslak, who testified as a representative of the Defendant Tate & Lyle Sucralose, Inc., at a deposition taken January 15, 2008. Of particular significance is that Mr. Roslak testified that DMA is an unwanted by-product of the sucralose chemical process and that the most common way to experience DMA is through smelling it. Further, Mr. Roslak confirmed that Tate & Lyle Sucralose, Inc.'s plant, in the process of manufacturing sucralose, produces DMA. As that process is quite complex, there are potential

Page 1 of 4



leaks of DMA from the facility. In fact, Mr. Rostak talks about thousands of points at the plant where there could be leaks that the average person could not see.

DMA is documented in the industry-accepted reports known as MSDS reports, to cause headaches, labored breathing, shortness of breath, sore throat, a burning sensation and cough, as well as redness and burning of the eyes if contacted. That is why it is an unwanted by-product of the sucralose process utilized by Tate & Lyle Sucralose, Inc.

The DMA utilized, while having severe effects on the sensibilities of citizens as reported in the Tate & Lyle Sucralose, Inc. accepted MSDS publications, is not reportable as a fugitive emission as it is not on the hazardous or toxic chemical list. Accordingly, when "puffs" or fugitive emissions occur on there being a spill or when the plant is switched over to the flare when the thermal oxidizers are not working properly, I am of the belief that a "puff" or fugitive emission occurs and that those fugitive emissions have occurred at this particular plant during the time frame that Tate & Lyle Sucralose, Inc. has operated the plant, from August, 2004 forward.

TLV values referred to in my initial report and deposition are useful as a guide to potentially negative conditions in the surrounding area and the use of TLVs is useful in defining necessary and sufficient conditions when there is chronic exposure. However, the TLV is not the guide for determining specific symptoms as incurred by individual sensitivities. Accordingly, as all the Plaintiffs in this case have incurred the listed symptoms caused by the release of DMA as confirmed by the governmental reporting forms accepted by Tate & Lyle Sucralose, Inc., and the industry, that is coughing, burning sensation, headaches, labored breathing, redness of eyes and obnoxious odors, I am of the opinion, based on a reasonable degree of scientific certainty, that those problems can be

initiated by the random and intermittent releases of "puff" or fugitive emissions from the Tate & Lyle Sucralose, Inc., plant. As these fugitive emissions occur at a irregular times, based on the in-excess of a thousand points of potential release from the plant as documented by Rand Roslak, it would be difficult if not impossible for me or anyone retained as an expert, to observe those specific events. As they are not necessarily reportable events, the most reliable evidence of the event is the fact that the plant is in close proximity to the Plaintiffs' homes, the plant utilizes DMA and has incurred instances of fugitive emissions or "puffs" as documented on occasion, and the Plaintiffs incur symptoms caused typically by those fugitive emissions. Again, it is my opinion from a reasonable degree of scientific certainty that he odors smelled by the Plaintiffs and health problems incurred by the Plaintiffs can be caused by fugitive DMA emissions from the Tate & Lyle Sucralose, Inc.'s plant.

The fact that DMA is certainly transferrable by air, evidences an odor quite noticeable, is documented in the documentation I have reviewed where the representative of Olin Corp came to the plant in search of the source of the "fishy odor" from the plant. The fact that this particular person smelled the "fishy odor" and based on Mr. Greenberg's report on behalf of the Defendant that the perception of odor of DMA would occur at .34 ppm (parts per million), it is evident that a "puff" or release of DMA occurred from the plant on that occasion. Based on that particular event, and based on the thousand or so points of exit for the "puff" or emissions to release from the plant on a daily basis, and the model that I have used for the dispersion of those odors, it would take less than one-half (½) teaspoon of DMA to contaminate the air 1,100 meters from the release in the area of the Plaintiffs' homes. Such a release not only would cause the symptoms complained of by the Plaintiffs in this case, but would also exceed the A.D.E.M. permitted level for release of obnoxious

*[signature]*
JAMES R. MONGTOMERY

Subscribed and sworn to before me this  3  day of  April , 2008.

By *[signature: Kim Janner]*
State of Alabama , Notary Public
My Commission Expires:  8-9-10

Page 4 of 4