## IN THE UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

BOBBY L. RADCLIFF, *et al.,*                    :

      Plaintiffs,                                    :

v.                                              :                    Case No. 06-345-CG-M

TATE & LYLE SUCRALOSE, INC.,                    :

      Defendant.                                     :

                        :       :       :

### DEFENDANT'S REPLY IN SUPPORT OF SUMMARY JUDGMENT

Defendant Tate & Lyle Sucralose, Inc. ("Tate & Lyle"), pursuant to Local Rule 7.1 and 7.2, hereby respectfully submits this reply in support of both motions for summary judgment on Plaintiffs' Fourth Amended Complaint.[1]

### I.    Plaintiffs' "Suggestion of Undisputed Facts" does not set forth undisputed facts.

Tate & Lyle disputes Plaintiffs' "Suggestion of Undisputed Facts" and takes a moment to clarify the record before responding to Plaintiffs' substantive argument.  Plaintiffs claim as an "undisputed fact" that DMA produces a "strong odor and is so foul so as to cause, based upon governmental brochures (MSDS),[2] hyper-ventilation, burning sensation, cough, headache, labored breathing, shortness of breath, sore throat and redness, pain and blurred vision of the eyes."  (Doc. #161, p. 2-3).  To the extent Plaintiffs suggest that *any* amount of DMA is

---

[1]  Plaintiffs responded to both motions for summary judgment in a single opposition.  In turn, Tate & Lyle responds with a single reply.  To distinguish between the two motions, Tate & Lyle refers to them as the "common issues" motion and/or brief (Doc. #141 & 142) and the "individual issues" motion and/or brief (Doc. #144 & 145), respectively.

[2]  MSDS stands for "material safety data sheet," a form prepared by any number of agencies or private entities containing data on the properties of a particular substance or chemical.  *See* 29 C.F.R. 1910.1200 *et seq.*  The Occupational Health and Safety Administration requires that these forms be submitted to employees handling potentially harmful substances in the workplace.  *Id.*

offensively odorous or *any* type or level of DMA exposure can cause these symptoms, Tate & Lyle disputes this "fact" and notes that the evidentiary record does not support it, including the MSDSs themselves.  (Doc. #121).  MSDSs set forth Threshold Limit Values ("TLVs"), which are *reasonable* levels to which a worker can be exposed over a continuous eight (8) hour period *without* adverse health effects.  (Doc. #142, p. 5).  Thus, even the MSDSs note that DMA exposure must *exceed* a certain level before it may cause potentially adverse health effects.  Similarly, DMA must *exceed* a certain level before it becomes odorous, let alone offensively odorous.  (Doc. #142, Ex. B, p. 14) (noting that DMA has an odor threshold concentration of 0.34 parts per million (ppm), *i.e.* this is the lowest concentration of DMA that is perceivable by the human sense of smell).  Because the MSDSs fail to establish that any DMA exceeding the relevant odor/health thresholds was actually emitted from the plant during Tate & Lyle's operations, let alone that Plaintiffs living thousands of feet away from the plant were exposed to such excessive levels, Plaintiffs' repeated reliance on the MSDSs is misguided and unfounded.[3]

Plaintiffs also claim as an undisputed fact that "there are thousands of points of emission for DMA on the Tate & Lyle plant location," citing the deposition of Rand Roslak in support.  (Doc. #161, p. 3).[4]  Not even once do Plaintiffs point out where in the testimony of Roslak this statement comes from, despite repeating this alleged "fact" throughout their opposition and in Montgomery's affidavit.  (Doc. #161, 162-2.).  Each time it is mentioned, Plaintiffs cite only to Roslak's deposition transcript in its entirety.  The likely reason is that this statement *does not*

---

[3]  Notably, Plaintiffs (and Montgomery) do not allege any chemical or substance *other than* DMA is or could be the culprit of any alleged odor or physical symptoms at issue in this case.  (Doc. #161).  Nowhere in their opposition or in Montgomery's affidavit do Plaintiffs present any evidence or raise any argument that anything other than DMA is at issue here.

[4]  Plaintiffs mistakenly refer to Roslak as "Defendant's expert" at one point in their opposition.  (Doc. #161, p. 9).  To clarify, Roslak is the current Vice President of Operations for Tate & Lyle, which includes McIntosh plant operations.  (Doc. #142, Ex. A, ¶ 1).  He is not a retained expert, and was presented and deposed as a fact witness only.

*appear in Roslak's testimony*.  Tate & Lyle presumes that Plaintiffs rely on p. 32 of Roslak's

transcript, when he discusses the plant's Leak Detection And Repair (LDAR) program:

> …And what LDAR is looking for are leaks you cannot see.  I mean, anybody
> can see a drip, drip, drip.  What LDAR is doing is going around with very
> sophisticated sniffing instruments and they're going up to the valve packing and
> the pump seals and flanges and sniffing around those connections to detect leaks
> that are so small you basically can't see them.  It's like the next level of – not
> protection, but detection of any type of leak in the system.
>
> So the vast majority of these leaks, that very sophisticated sniffing equipment
> detects it.  Most of them – if you go there you couldn't see it if you were standing
> there looking at it.
>
> And they come through once a month, once every couple of months and
> there's thousand of points in the plant that they're going around with this leak
> detection equipment to find those leaks that the average person just – you can't
> see them with your eyes.  And we get a list of what those leaks are when they go
> through and do their monthly program.
>
> Like I say, from what I've seen, generally, *it's a handful of these very small
> leaks they detect out of a thousand and something points that they check.*

(Doc. #161, Ex. 3, p. 32:2 – 33:1) (emphasis added).[5]

Plaintiffs' suggestion that this language establishes as an undisputed fact that "there are

thousand of points of emission for DMA" or that DMA "can and does escape from over 1,000

points of exit" (Doc. #161, p. 3 & 8), is at best a mischaracterization of Roslak's testimony.  A

clear reading of Roslak's testimony, *in its entirety*, unequivocally shows that he did not state

DMA can and does escape from over 1,000 points in the plant.  Instead, he clearly and

thoroughly explains that Tate & Lyle uses sophisticated leak detection equipment on a regular

basis to check thousands of points on the plant's piping system to confirm no leaks have

occurred, but that sometimes, such testing does reveal *de minimis* leaks non-visible to the human

eye.  Of those thousands of checkpoints, *only a handful* generates any leaks or emissions, and

---

[5]  The LDAR program allows Tate & Lyle to discover and rapidly fix any leaks in its
manufacturing process or equipment, and is not limited to the part of the process or equipment
involving DMA.  (Doc. #142, Ex. B, p. 18-22; Doc. #161, Ex. 3, p. 31-33).  It was implemented
in accordance with EPA protocols and is enforced by Tate & Lyle's permit with ADEM.  (Id.)

even then, nothing in Roslak's testimony suggests how many of those handful of leaks involves

DMA, if at all.

Indeed, as Tate & Lyle's expert Alan Greenberg found, for the three-year period of April

2004 through April 2007, out of 58,147 measurements taken on processes handling DMA, only

eighty (80) leaks were uncovered, representing less than a 0.2% leakage rate, well under what the

applicable regulations allow.  (Doc. #142, Ex. B, p. 22).  Moreover, Greenberg notes that any

such leaks of DMA did not and could not have possibly resulted in DMA levels at Plaintiffs'

properties exceeding either threshold previously mentioned.  (Id., p. 32) (noting the maximum

hourly value for DMA at any Plaintiff property is 0.0000846 ppm, well less than the odor

threshold of 0.34 ppm and the health threshold, or TLV, of 10 ppm).  Thus, Plaintiffs' repeated

reliance on Roslak's testimony in support of their argument that DMA "can and does escape

from over 1,000 points of exit" also is misguided and unfounded.[6]

II.    **Plaintiffs concede Tate & Lyle's entitlement to summary judgment on all causes of action and damages except nuisance.**

By way of their opposition, Plaintiffs concede that (a) they have no viable causes of

action for inverse condemnation, negligence, wantonness/wanton nuisance, or nuisance based on

noise, and (b) no viable claims for punitive or emotional distress damages.  (Doc. #161).  Their

opposition is entirely void of any response to Tate & Lyle's arguments and evidentiary support

regarding these issues, and/or fails to raise a genuine issue of material fact on any of these issues

sufficient to withstand summary judgment.

---

[6]  For the sake of brevity, Tate & Lyle addresses in detail only these two "suggestions of undisputed fact" from Plaintiffs.  It does not admit the truth of all other "facts" as stated by Plaintiffs on p. 2-3 of their opposition, however.  For instance, Plaintiffs also state that "all of these symptoms have been complained of by the Plaintiffs…."  (Doc. #161, p. 3).  This is simply not true.  As pointed out in Tate & Lyle's individual issue motion and brief, at least four Plaintiffs have no physical symptoms or complaints.  (Doc. #145, p. 6).

### A.  Inverse Condemnation

Plaintiffs point to no evidence in the record tending to show that Tate & Lyle has the power or right of condemnation, a necessary element for their inverse condemnation claim. Indeed, they do not even address this cause of action or Tate & Lyle's argument regarding the same.  Accordingly, for all of the unrefuted reasons announced in Doc. #141 & 142, Tate & Lyle is entitled to summary judgment on Plaintiffs' inverse condemnation claim.  *See Evans v. Pemco Aeroplex, Inc.*, 1998 WL 1048470 at *12 (M.D.Ala. Feb. 23, 1998) (plaintiff's failure to respond to defendant's argument was reason enough alone to grant defendant's summary judgment motion) (citing *Brewer v. Purvis*, 816 F.Supp. 1560, 1679 (M.D.Ga. 1998), *aff'd* 44 F.3d 1008 (11th Cir. 1995) ("Summary judgment is appropriate since Plaintiff failed to respond to [defendant's] argument on this issue.")).

### B.  Negligence

Likewise, Plaintiffs point to no evidence in the record tending to show the appropriate standard of care for Tate & Lyle's operations or a breach thereof, both necessary elements of their negligence claim.  Again, they entirely fail to address this cause of action or Tate & Lyle's arguments regarding the same.  The only times Plaintiffs even mention negligence is in their "statement of the case," noting that their Complaint alleges negligent conduct by Tate & Lyle (Doc. #161, p. 2), and in their repeated argument that a nuisance claim need not be premised on negligent conduct.  (Id., p. 5, 7, 10-11).

Merely noting or repeating the allegations in the Complaint is insufficient to withstand a motion for summary judgment.  (Doc. #142, p. 13) ("In opposing a motion for summary judgment, a party may not rely on his pleadings to avoid judgment against him.") (citing *Dickinson v. Springhill Hosp., Inc.*, 397 F.Supp.2d 1337, 1341 (S.D.Ala. 2005)).  Also,

repeatedly noting that Alabama law does not require negligent conduct for purposes of nuisance only suggests an acknowledgement by Plaintiffs that there is <u>no</u> evidence of negligence by Tate & Lyle in this case.  Plaintiffs do all but expressly concede Tate & Lyle is not negligent in its operations by stating, in response to Tate & Lyle's argument that it complied with all relevant ADEM or other governmental regulations and standards, that this "is no defense in this case, as a private nuisance is actionable though not otherwise unlawful, and notwithstanding the *absence of negligence* in the operation and construction of the plant or facility."  (Doc. #161, p. 7) (emphasis added) (citation omitted).

Finally, Plaintiffs do not list Tate & Lyle's alleged negligence as a disputed question of fact or law,[7] they do not cite or mention any evidence from the record tending to prove any negligence, and their only expert still provides no opinion on the issue.  (Doc. #162-2).  As with Plaintiffs' opposition, Montgomery focuses solely on the alleged nuisance created by the use of DMA at Tate & Lyle's plant, rather than on any applicable standard of care or Tate & Lyle's alleged breach thereof.  (Id.)[8]  With no proof or counterargument supporting their claim of negligence, for all of the unrefuted reasons previously stated in Doc. #141 & 142, Tate & Lyle is entitled to summary judgment on Plaintiffs' negligence claim.

### C.  Wantonness/Wanton Nuisance/Punitive Damages

Plaintiffs also point to no evidence in the record tending to show that Tate & Lyle's conduct is wanton or malicious, a prerequisite to their wantonness claim and/or for any recovery

---

[7]  *See* Doc. #161 at p. 3-4 (failing to raise whether Tate & Lyle's operations were negligent as a "disputed fact"), and p. 9 (listing as questions of fact to be determined by the jury only "whether there is a nuisance created by the distribution of DMA in close proximity to the Plaintiffs['] properties…" and "whether that conduct rises to the level of wanton conduct").

[8]  As explained *infra*, Montgomery's affidavit should be stricken and/or disregarded; however, to the extent this Court considers it, Tate & Lyle notes it provides no support for Plaintiffs' negligence claim.

of punitive damages under their (wanton) nuisance claim.  Plaintiffs' opposition mentions their wantonness/punitive damages claim only twice.  First, Plaintiffs note that they alleged wanton conduct in the Complaint.  (Doc. #161, p. 2).  As stated above, this fails to defeat summary judgment.  Second, Plaintiffs claim Tate & Lyle engaged in wanton or malicious conduct, or at least a jury question is created, simply because (a) its plant is "in close proximity" to Plaintiffs' properties, and (b) DMA, a by-product of Tate & Lyle's operations, has the *potential* to cause "harmful and unpleasant side effects."  (Doc. #161, p. 8-9).

Plaintiffs' argument must be rejected as it lobbies for a strict liability standard for the imposition of punitive damages against any industrial or chemical manufacturer operating near a residential area, or otherwise calls for the judiciary to usurp the expertise and decision-making power of governmental bodies and agencies whose responsibility is to oversee and regulate the operations of such entities and approve the locations where such entities operate.  Plaintiffs completely overlook the undisputed fact that the plant was constructed by McNeil in its location *because it was zoned for industrial use* and because its operations in such location were *approved by the necessary governmental and regulatory agencies*.  (Doc. #142, p. 18-19).  The plant was expanded by Tate & Lyle for the same reasons and *pursuant to the same approval*. (Id., p. 18-19).  Since then, Tate & Lyle has operated the plant pursuant to government oversight and has not violated any applicable permits, regulations or governmental standards.  (Id., p. 18-19).  Plaintiffs point to no evidence suggesting otherwise.  Nor do they cite any authority or support for their proposition that Tate & Lyle acted maliciously or wantonly simply by carrying out the operations it was authorized to do in a location approved for such operations.[9]

---

[9]  Indeed, Tate & Lyle questions how on the one hand, Plaintiffs concede that Tate & Lyle's conduct was not negligent because it complied with applicable governmental regulations and

Instead, Plaintiffs cite only one authority in support of their argument on wantonness/ punitive damages, but it is entirely inapposite to this case.  (Doc. #161, p. 9) (citing *Abbot v. Braswell*, 265 So.2d 871 (Ala. 1972)).  In *Abbot*, plaintiff notified the defendant of the alleged nuisance, specifically asked him to abate the nuisance or correct the damages stemming therefrom, and defendant refused to do so.  *Id.* at 873, 876.  The court explained that such evidence justified sending the question of wanton conduct/punitive damages to the jury.  *Id.* at 876.  In contrast, here there is absolutely <u>no</u> evidence that any of the Plaintiffs complained to Tate & Lyle about an alleged nuisance, that Tate & Lyle disregarded any complaints from Plaintiffs, or that Tate & Lyle refused to correct/abate any alleged nuisance.  (Doc. #142, p. 20) Plaintiffs do not point to any evidence otherwise.  (Doc. #161).

Thus, the totality of evidence conclusively shows that Tate & Lyle did not act with reckless or conscious disregard of the rights or safety of Plaintiffs.  Because Plaintiffs fail to point to any evidence in the record establishing otherwise, Tate & Lyle is entitled to summary judgment on any and all claims of wantonness or for punitive damages.

### D.  Noise

Although Plaintiffs' opposition repeatedly defends the nuisance claim against summary judgment, noticeably absent from Plaintiffs' argument is any mention of noise.  Plaintiffs do not respond at all to Tate & Lyle's scientific/expert evidence conclusively showing that the decibel levels of any noises stemming from the plant paled in comparison to the decibel levels of other noise sources closer in proximity to Plaintiffs' properties.  (Doc. #142, p. 5).  Nor do they cite to any specific evidence or testimony in support of their noise claims.  Instead, Plaintiffs appear to concede the point, focusing solely on their claim of nuisance based on odor.  (Doc. #161).  To

---

standards, but on the other hand, suggest that by the same conduct, Tate & Lyle acted maliciously or wantonly so as to create a jury question on punitive damages.

wit, when discussing *Drummond Co. Inc. v. Boshell*, 641 So.2d 1240 (Ala. 1994), a case

involving a claim of nuisance based on noise, Plaintiffs curiously state that "[w]hile the case of

*Drummond* involved noise, the concept is applicable to the odors emitted by Defendant."  (*Id.*, p.

13).   This statement evidences a clear abandonment by Plaintiffs of any nuisance claim based on

noise, an equivocation further confirmed by Montgomery's affidavit, which focuses exclusively

on odor.  (Doc. #162-2).  Because Plaintiffs present no argument or evidence to create a genuine

issue of material fact on whether noise stemming from Tate & Lyle's plant constitutes a

nuisance, for all the unrefuted reasons stated in Doc. #141 & 142, Tate & Lyle is entitled to

summary judgment on Plaintiffs' nuisance claim based on noise.

### E.  Emotional Distress Damages

Because Plaintiffs have no viable claims for negligence or wantonness, Plaintiffs' only

potential tort cause of action providing a basis for recovery of emotional distress damages is their

nuisance claim.  Accordingly, the "zone of danger" test is inapplicable here and does not provide

a mechanism by which Plaintiffs can recover emotional distress damages.  (Doc. #142, p. 37).

Plaintiffs apparently recognize as much, as they do not attempt to rely on this test or otherwise

respond to Tate & Lyle's argument regarding the same.

Whether Plaintiffs can recover damages for emotional distress or mental anguish

pursuant to their nuisance claim depends on whether there is evidence of "insult or contumely"

by Tate & Lyle.  (Doc. #142, p. 36).  Plaintiffs recognize as much by claiming that a jury

question is presented as to whether Tate & Lyle engaged in malicious, insulting, inhumane or

contumacious conduct, thereby entitling them to emotional distress damages, by operating the

plant in close proximity to Plaintiffs' properties and using the potentially harmful substance

DMA.  (Doc. #161, p. 11) (citing *Rice v. Merrick*, 549 So.2d 508, 511 (Ala. 1989), mistakenly

cited as *Price v. Merrick*).  This argument fails for the same reasons it failed under Plaintiffs' wantonness/punitive damages count.  Merely engaging in lawful/regulated chemical or industrial processes involving potentially harmful substances at an approved and specially zoned location does not constitute circumstances of "insult or contumely" and does not present a jury question.

 *Rice*, the only case cited by Plaintiffs, does not require a different result.  In *Rice*, the court held that a jury question was presented as to whether defendant acted under circumstances of insult or contumely because the evidence showed that defendant operated its fuel distributorship dangerously, in violation of the state fire code.  *Id.* at 511.  Fire inspectors made several attempts to have defendant correct the hazards caused by its lack of fire extinguishers, padlocked cut-off valves, and lack of a human attendant, but defendant failed to do so.  *Id.*  This blatant disregard of the fire code, which clearly presented a risk of fire and explosion to the adjoining landowner plaintiff, created a jury question as to whether circumstances of insult or contumely were present and therefore whether plaintiff could recover for emotional distress caused by the fear of fire or explosion.  *Id.*[10]  Because there is no evidence in this case that Tate & Lyle operated the plant in disregard or violation of any applicable permits, regulations or governmental standards, *Rice* is completely distinguishable and does not support Plaintiffs' argument that they are entitled to recover emotional distress damages based on Tate & Lyle's allegedly insulting, inhumane or contumacious conduct.  Accordingly, Tate & Lyle is entitled to summary judgment on Plaintiffs' claims of "severe mental anguish and emotional distress."

---

[10]  Moreover, as expressed in the opinion, the *Rice* court reviewed the circuit court's decision under the "scintilla rule," meaning that "a question must go to the jury, if the evidence, or any reasonable inference arising therefrom, furnishes a mere gleam, glimmer, spark ... or a scintilla in support of the theory of the complaint."  *Id.* at 510 (citation omitted).  This is far different than the applicable standard here, as Plaintiffs must come forward with *substantial evidence* on all essential elements of their claims in order to survive summary judgment.  (Doc. #142, p. 13).

### F.  Injunctive Relief

Plaintiffs concede that their right to injunctive relief rests wholly on whether they have a valid nuisance claim.  (Doc. #161, p. 14).  They do not refute Tate & Lyle's argument that no cause of action for injunctive relief can stand where there is no viable nuisance claim.  Because Tate & Lyle is entitled to summary judgment on Plaintiffs' nuisance claim, as explained *infra*, and for all of the reasons set forth in Doc. #141 & 142, Tate & Lyle likewise is entitled to summary judgment on any claim for injunctive relief.

### G.  Limiting Damages Based On Continuous Tort Theory

Plaintiffs do not refute Tate & Lyle's argument that to the extent any of Plaintiffs' claims survive summary judgment, their damages must be limited under the continuous tort theory.  (Doc. #142, p. 38-39).  Indeed, Plaintiffs do not even address this argument.  Accordingly, for all of the unrefuted reasons set forth in Doc. #141 & 142, Tate & Lyle is entitled to summary judgment on any recoverable damages occurring prior to June 2, 2004.

### III.  <u>Tate & Lyle is entitled to summary judgment on Plaintiffs' odor nuisance claim because Plaintiffs lack any credible evidence of proximate causation.</u>

At the end of the day, Plaintiffs' only argument is that they have a viable nuisance claim based on odor and/or unpleasant physical effects from DMA allegedly emitted from Tate & Lyle's plant.  However, rather than *prove* that there were sufficient levels of DMA emitted from the plant during Tate & Lyle's operations in order to cause said odor and/or physical effects, Plaintiffs and Montgomery simply ask this Court to take their word for it.  Stripped of all its smoke and mirrors, Plaintiffs' argument boils down to this: DMA is involved in Tate & Lyle's operations, Plaintiffs complain of odors and/or symptoms which DMA may cause at certain levels of exposure, and therefore, Tate & Lyle must have released DMA from the plant at those levels during its operations and such releases must be the cause of Plaintiffs' symptoms.  This

syllogism, claim Plaintiffs, creates a jury question as to nuisance.  Plaintiffs are mistaken.  All Plaintiffs' argument does is *assume* causation rather than prove it, and this is insufficient to withstand Tate & Lyle's motion.[11]

Plaintiffs' odor nuisance claim rests on three key points or pieces of evidence: (1) the MSDSs for DMA, (2) the testimony of Rand Roslak, and (3) Montgomery's affidavit.  As noted previously, the first two do not support Plaintiffs' argument.  The MSDSs, in and of themselves, do nothing to suggest that *these Plaintiffs* were exposed to levels of DMA sufficient to cause any alleged physical complaints.  Similarly, Roslak's testimony does nothing to suggest that *any* DMA, let alone a potentially harmful level or amount, was emitted from the plant at any particular time and affected these Plaintiffs.  The third – Montgomery's affidavit – has similar shortcomings and fails to save Plaintiffs' nuisance claim.

First, the affidavit should be stricken or disregarded because it is inadmissible pursuant to the sham affidavit rule, a *Daubert* analysis/Fed. R. Evid. 702, and/or Fed. R. Evid. 703.  *See Denney v. City of Albany*, 247 F.3d 1172, 1190 n.10 (11th Cir. 2001) ("In considering a summary judgment motion, a court may only consider evidence that is admissible or that could be presented in an admissible form.") (citation omitted).  Second, even if the affidavit is considered, in it Montgomery himself merely *assumes* causation rather than offering proof of it to a reasonable degree of scientific certainty.  Without citing any documents or evidence in support,

---

[11]  To the extent Plaintiffs suggest that they need not establish proximate causation for a *prima facie* cause of action for nuisance, they are mistaken.  (Doc. #161, p. 5-6) (citing *St. Louis-San Francisco R.R. Co. v. Wade*, 607 F.2d 126 (5th Cir. 1979).  *Wade* simply notes that **negligence** is not a necessary element of a general nuisance claim and therefore plaintiff need not prove negligence in order to make out a *prima facie* case of nuisance.  *Id.* at 131 (citations omitted).  *Wade* does not state that all a plaintiff needs to establish for purposes of a *prima facie* case of nuisance is his damages, *i.e.* interference with use or enjoyment of property.  To the contrary, as noted in Doc. #141 & 142, Alabama law requires proximate causation as part of a *prima facie* nuisance claim, just like any other tort.  (Doc. #142, p. 145); *see also Tipler v. McKenzie Tank Lines*, 547 So.2d 438, 440 (Ala. 1989) (causation is necessary part of a private nuisance claim).

Montgomery states that fugitive emissions of DMA sufficient to cause Plaintiffs' symptoms have occurred during Tate & Lyle's operations merely because he *believes* this to be true.  (Doc. #162-2, p. 2).  This is the quintessential *ipse dixit* routinely rejected by courts and does not present a jury question.  Neither Montgomery nor Plaintiffs point to *anything* in the record which documents, let alone suggests that, any emissions of DMA sufficient enough to cause Plaintiffs' symptoms have occurred since Tate & Lyle's operations began in April of 2004.  This is Plaintiffs' burden to prove, and they have fallen woefully short.  Accordingly, Tate & Lyle is entitled to summary judgment on Plaintiffs' nuisance claim.

### A.  Montgomery's affidavit should be stricken or disregarded under the sham affidavit rule, the federal rules of evidence, and/or a *Daubert* analysis.

This court and this circuit recognize the sham affidavit rule.  *See Dickinson*, 397 F.Supp.2d at 1345 ("When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony.") (quoting *Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984)).  Under the rule, a district court may strike or disregard an affidavit which contradicts deposition testimony previously given without giving any valid explanation.  *Van T. Junkins*, 736 F.2d at 656-57.  This court has applied the rule to strike or disregard affidavits from experts which contradict their prior deposition testimony.  *See, e.g., Fisher v. Ciba Specialty Chemicals Corp.*, 238 F.R.D. 273, 284 (S.D.Ala. 2006) (striking affidavit of hydrologist submitted with motion for class certification where affidavit – identifying a migrating groundwater contamination plume – contradicted prior deposition testimony wherein hydrologist admitted he had done no mapping, modeling or identifying of any such plume or the migration thereof).

At his deposition, Montgomery admitted that he did not know of and could not find any evidence of fugitive emissions during Tate & Lyle's operations, *i.e.* April 2004 to present. (Doc. #142, Ex. E, p. 217-220). The only documents identified by Montgomery in his deposition concerned pre-April 2004 emissions, and when asked to produce or locate any documents evidencing fugitive emissions occurring since April of 2004, Montgomery was unable to do so. (Id.). In his affidavit, Montgomery opines for the first time that fugitive emissions of DMA (now described as "puffs") were released from the plant during the timeframe when Tate & Lyle operated the plant. (Doc. #162-2, p. 2). Specifically, he states that he is "of the *belief* that a 'puff' or fugitive emission occurs and that those fugitive emissions have occurred at this particular plant during the time frame that Tate & Lyle Sucralose, Inc. has operated the plant, from August, 2004 forward." (Doc. #162, p. 2) (emphasis added).[12] This is directly contrary to his deposition testimony, and Montgomery fails to explain this change in testimony. Similarly, he fails to identify a single document or piece of evidence in support of this new statement.[13] With no explanation and no citation to any evidence supporting this change in opinion,

---

[12] To the extent Montgomery intended simply to state that fugitive emissions have occurred since Tate & Lyle took over plant operations, the relevant date would be April of 2004 and not August of 2004, as stated in his affidavit.

[13] Although Montgomery states that the plant "has incurred instances of fugitive emissions or 'puffs' *as documented on occasion*" (Doc. #162-2, p. 3) (emphasis added), he still fails to identify any documents suggesting that such "puffs" have occurred *since April of 2004*. As noted, all documents identified by Montgomery at his deposition concerned emissions preceding April of 2004. This holds true for Montgomery's statement that "puffs" or fugitive emissions occur "when the plant is switched over to the flare when the thermal oxidizers are not working properly." (Id., p. 3). At his deposition, Montgomery stated that the only objective proof or documentation supporting his belief that fugitive emissions occur when the plant switches from the thermal oxidizer to the flare were discharge monitoring reports (DMRs). (Doc. #142, Ex. E, p. 73-84). However, Montgomery pointed only to DMRs pre-dating April of 2004. (Id.). Accordingly, Montgomery still has no objective or verifiable proof of any DMA fugitive emissions from the plant, whether caused by switching from the thermal oxidizer to the flare or otherwise, since Tate & Lyle took over operations.

Montgomery's affidavit testimony lacks sufficient explanation and must be stricken or disregarded pursuant to the sham affidavit rule.

Another significant change in Montgomery's testimony is his opinion, "based on a reasonable degree of scientific certainty, that [Plaintiffs'] problems can be initiated by the random and intermittent releases of 'puff' or fugitive emissions from the Tate & Lyle Sucralose, Inc., plant."  (Id., p. 2-3).  Later on, he states "it is my opinion from a reasonable degree of scientific certainty that he [sic] odors smelled by Plaintiffs and health problems incurred by the Plaintiffs can be caused by fugitive DMA emissions from the Tate & Lyle Sucralose, Inc.'s plant."  (Id., p. 3).  This is a far cry from Montgomery's deposition testimony where, after admitting that he was not a medical doctor or toxicologist, Montgomery stated he could not and would not be able to opine as to any individual Plaintiff's level of exposure and/or whether such exposure caused that Plaintiff's specific medical complaints:

> Q:      So when Mr. Inge contacted you he indicated, as I understand it, there are some persons living in McIntosh, Alabama who have some symptoms and could you determine if there's some relationship between potential exposure and symptoms?
> A:      Well, the thing is we can look at MSDSs and find specific chemicals that might be used in that plant and we say these are typical symptoms of people in that plant.  Whether those people's symptoms were cause by the that exposure – I'm not a doctor – I don't know.
> Q:      Okay.
> A:      And I have not seen the people. I don't know how severe their symptoms are.  I know nothing about the people.
> * * *
> Q:      Did you make any effort to determine what dose or what amount of these chemicals would have to be in the ambient air to cause these kind of symptoms?
> A:      No.   And there's a couple of reasons for that.  First of all, I'm not a toxicologist.  And secondly, each person's response to a dose level of an outside irritant is different than each other person's.  So therefore, it could be person specific.
> For example, if you were allergic to a certain thing like peanut butter and I gave you a microgram of peanut butter you might go into a convulsive

reaction or something.  Whereas I could eat the whole jar of it and it would do nothing.

So you're asking me to quantify something that is very personal and individual.

Q:      Well, the point of my question wasn't asking you to quantify it, Mr. Montgomery.  You do agree that whether an individual experiences these symptoms has to do with the dose that's in the ambient atmosphere and, of course, the particular individual themselves?

A:      Correct.

Q:      And you've made no effort to try to determine that?

A:      No.

Q:      As you say, you're not a toxicologist or a medical doctor.

A:      That's right.

* * *

Q:      Whether an individual on Charlie Lee Road experienced, for example, irritated and burning eyes because of a release by Tate & Lyle of DMA, would require an evaluation of the exposure of that  individual to the DMA and the level of such exposure, correct?

A:      That's correct.  And you would need expert testimony from someone else about that.

(Doc. #142, Ex. E, p. 61:20 – 62:11; 160:14 – 161:18, 164:9-16.)  Contrary to his prior testimony and recognition that he is not qualified to render such opinions, Montgomery now opines that Plaintiffs were exposed to emissions of DMA from Tate & Lyle's plant at a level sufficient to cause their medical symptoms or complaints.  (Doc. #162-2).  He offers no explanation for this change in testimony or why he is now qualified to render such an opinion, and identifies no documents or materials supporting this new opinion, other than to reiterate the mischaracterization of Roslak's deposition testimony and note that the MSDS for DMA lists physical symptoms which happen to correlate to Plaintiffs' complaints.  (Doc. #162-2, p. 3-4).[14]

---

[14]  In apparent support of this new opinion Montgomery also states: "The fact that DMA is certainly transferable by air, evidences an odor quite noticeable, is documented in the documentation I have reviewed where the representative of Olin Corp came to the plant in search of the source of the 'fishy odor' from the plant.  The fact that this particular person smelled the 'fishy odor' and based on Mr. Greenberg's report on behalf of the Defendant that the perception of odor of DMA would occur at .34 ppm (parts per million), it is evident that a 'puff' or release of DMA occurred from the plant on that occasion."  (Doc. #162-2, p. 3).  Montgomery's disjunctive statements are difficult to understand, but to the extent he suggests that he reviewed

If not stricken by the sham affidavit rule, Montgomery's affidavit should be stricken or disregarded as failing to pass muster under the federal rules of evidence and/or *Daubert*.  As noted in Doc. #141 & 142, and as stated in *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233 (11th Cir. 2005), toxic tort cases such as this require expert testimony, and

> …when a party offers expert testimony and the opposing party raises a *Daubert* challenge, the trial court must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).  This requirement for proof of the reliability of the expert's method comes from FED. R. EVID. 702, which authorizes the admission of expert opinion testimony "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."  Rule 702 lays the foundation for the trial court's Daubert analysis.  509 U.S. at 590, 113 S.Ct. 2786.
>
> *Daubert* requires the trial court to act as a gatekeeper to insure that speculative and unreliable opinions do not reach the jury.  Id. at 589 n.7, 597, 113 S.Ct. 2786.  As a gatekeeper the court must do "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue."  Id. at 593-94, 113 S.Ct. 2786.  The proposed testimony must derive from the scientific method; good grounds and appropriate validation must support it.  Id. at 590, 113 S.Ct. 2786.  "In short, the requirement that an expert's testimony pertain to 'scientific knowledge' establishes a standard of evidentiary reliability."  *Id.* The court must consider the testimony with the understanding that "[t]he burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion...."  [Citation omitted].

*Id.* at 1237-38 (admission of plaintiff's medical causation expert testimony in toxic tort case

---

certain "documentation" which supports his belief that fugitive harmful or odorous emissions of DMA occurred *during Tate & Lyle's operations*, Tate & Lyle notes that Montgomery does not identify or attach the documentation he references, contrary to Fed. R. Civ. P. 56(e) ("If a paper or part of a paper is referred to in an affidavit, a sworn or certified copy must be attached to or served with the affidavit.").  Based on his prior testimony, however, Tate & Lyle believes that Montgomery is referring to a single document bates labeled BR002460, noting an incident where an Olin employee approached the Tate & Lyle plant inquiring about an odor.  (Doc. #142, Ex. E at p. 155-57).  If so, such document reflects an event occurring in 2002, prior to Tate & Lyle's takeover of operations, and therefore does nothing to support Montgomery's new revelation that fugitive, harmful, or odorous emissions occurred during the timeframe 2004 to present.  (Id.)

which failed to satisfy *Daubert* standards substantially prejudiced defendant and warranted reversal); *see also Berry v. Armstrong Rubber Co.*, 989 F.2d 822, 824 (5th Cir. 1993) ("If the basis for the expert's opinion is so unreliable that no reasonable expert could base an opinion on that data, the opinion may be excluded in the district court's determination of whether there is a genuine issue regarding an essential element of the claim.") (citations omitted) (rejecting plaintiff's proffered expert causation testimony under Fed. R. Evid. 703 and affirming summary judgment in favor of defendant).

The *McClain* court discussed at length the importance of causation expert testimony in toxic tort cases, explaining that such evidence must show not only general causation ("whether the drug or chemical can cause the harm plaintiff alleges"), but also individual causation ("was plaintiff exposed to the toxin, was plaintiff exposed to enough of the toxin to cause the alleged injury, and did the toxin in fact cause the injury?"). 401 F.3d at 1239. A *Daubert* analysis in toxic tort cases thus focuses on whether the plaintiff's expert offers reliable opinions on both general causation and individual causation. *Id.*

In deciding that plaintiffs' medical causation experts did not satisfy *Daubert* because they laid no reliable groundwork for determining the dose-response relationship between the amount of each plaintiff's Metabolife consumption/ chemical exposure and his or her physical ailments, the Eleventh Circuit noted that "[i]n toxic tort cases, '[s]cientific knowledge of the **harmful level of exposure to a chemical plus knowledge that plaintiff was exposed to such quantities are minimal facts necessary to sustain the plaintiff's burden**...." *Id.* at 1241 (citation omitted) (emphasis added). "[A] plaintiff must demonstrate 'the levels of exposure that are hazardous to human beings generally as well as the plaintiff's actual level of exposure to the defendant's toxic substance before he or she may recover.'" *Id.* (citation omitted).

Here, Montgomery's affidavit sets forth an opinion that *these Plaintiffs* were exposed to harmful or odorous levels of DMA and that such exposure caused (or could cause) their physical symptoms.  However, Montgomery supplies no principles, reasoning or methodology used by him to arrive at this opinion.  As noted above, he simply infers it from the Plaintiffs' complaints (which he admitted he did not know in his deposition), the fact that Tate & Lyle's processes involve DMA, and the mischaracterization of Roslak's testimony regarding DMA emissions. (Doc. #162-2).  He likewise offers no explanation for why he is now qualified to render such an opinion on medical/physical causation when he previously admitted he was not so qualified. Most importantly, he still lacks any knowledge or information about individual Plaintiffs' actual exposure to any particularly harmful or odorous level of DMA.  (Doc. #162-2).  These are "minimal facts" that Plaintiffs must be able to prove before they bring tort causes of action based on exposure to DMA, including their nuisance claim.  *McClain*, 401 F.3d at 1241.  Without this, Montgomery cannot and does not provide an opinion which satisfies *Daubert* standards or Fed. R. Evid. 702 and 703.  Accordingly, this Court should disregard Montgomery's affidavit, and for all the reasons previously stated in Doc. #141 & 142, Plaintiffs lack the necessary expert causation evidence needed to support a cause of action for nuisance based on DMA exposure.

**B.  Even with Montgomery, Plaintiffs fail to show proximate causation sufficient to raise a genuine issue of material fact.**

Despite the new opinions in Montgomery's affidavit, he still fails to give Plaintiffs the causation proof they need to withstand summary judgment.  His testimony still is entirely speculative, as he states only that it is his "*belief*" that fugitive emissions have occurred during the timeframe April 2004 to present (Doc. #162-2, p. 2).  Moreover, Montgomery states only that Plaintiffs' alleged physical complaints "*can be* initiated" or "*can be* caused" by alleged fugitive emissions of DMA from Tate & Lyle's plant.  (Id., p. 2-3).  He stops short of opining to a

reasonable degree of certainty that fugitive emissions *have* occurred during Tate & Lyle's

operations or that Plaintiffs' physical complaints *are* caused by such emissions.  Without such

evidence, Plaintiffs lack the necessary causal link between Plaintiffs' claimed injuries and Tate

& Lyle's allegedly tortious conduct.  (Doc. #142, p. 29-30).  Because Montgomery's opinion is

nothing more than speculation or *ipse dixit*,  Plaintiffs fail to prove proximate causation

sufficient to withstand summary judgment.  *See Allison v. McGhan Medical Group*, 184 F.3d

1300 (11th Cir. 1999):

> [N]othing in either *Daubert* or the Federal Rules of Evidence requires a district
> court to admit opinion evidence which is connected to existing data only by the
> *ipse dixit* of the expert.  A court may conclude that there is simply too great an
> analytical gap between the data and the opinion proffered. * * * Under the regime
> of *Daubert*... a district judge asked to admit scientific evidence must determine
> whether the evidence is genuinely scientific, as distinct from being unscientific
> speculation offered by a genuine scientist."

*Id.* at 1315-17 (affirming exclusion of plaintiff's expert's testimony based more on personal

opinion than scientific knowledge) (citations omitted)); *Fletcher v. Conoco Pipe Line Co.*, 323

F.3d 661, 666 (8th Cir. 2003) ("…we agree with the district court that [plaintiffs] failed to present

competent evidence of causation creating a genuine issue of material fact.  Mere evidence of

electricity recorded on the property, *without corresponding expert testimony or some clearly*

*obvious evidence as to its source, harmful level, and ability to cause directly and foreseeably the*

*injuries complained of*, will not defeat summary judgment.") (emphasis added); *Sanderson v.*

*Int'l Flavors and Fragrances, Inc.*, 950 F.Supp. 981 (C.D.Cal. 1996) (plaintiff's expert evidence

establishing only a "mere possibility" that defendants' products caused plaintiff's injuries was

inadmissible and insufficient to defeat defendant's motion for summary judgment).

     Other than Montgomery's affidavit, Plaintiffs offer no additional evidence or response to

Tate & Lyle's argument that they fail to establish proximate cause sufficient to withstand

summary judgment.  Without any such evidence, their nuisance claim fails as a matter of law and no jury question exists.  *See Evans*, 1998 WL 1048470 at *12.  None of the authority cited in Plaintiffs' opposition suggests otherwise.  *Coleman v. Estes*, 201 So.2d 391 (Ala. 1967), *McClung v. Louisville & N.R. Co.*, 51 So.2d 371 (Ala. 1951), *Parker v. Ashford*, 661 So.2d 213 (Ala. 1995), *Southwestern Constr. Co. v. Liberto*, 385 So.2d 633 (Ala. 1980) and *Baldwin v. McClendon*, 288 So.2d 761 (Ala. 1974) are all injunctive relief nuisance claims decided by a court of equity involving no jury and no damages.  Accordingly, they do nothing to support Plaintiffs' suggestion that cases involving allegations of offensive odors (or noise) always create jury questions.  (Doc. #161, p. 6-8, 14).

Plaintiffs reliance on *Tipler*, *supra* n. 11 (Doc. #161, p. 8, 11) is the most curious, as it *granted summary judgment* on plaintiff's nuisance claim f*or failure to establish the requisite proximate causation*.  *Id.* at 440-41.  Immediately after noting that Ala. Code § 6-5-120 is liberally interpreted, the *Tipler* court stated:

> This does not mean, however, that the plaintiff is not required to prove against the defendant the elements of legal duty and causal relation between the conduct or activity complained of and the hurt, inconvenience, or damaged sued for.  That which works hurt to another, to satisfy the statutory definition of a nuisance, **must comport with the classical tort concepts of duty and causation.**

*Id.* at 440 (emphasis added) (citation omitted).  Affirming the trial court's grant of summary judgment in favor of the defendant, the Alabama Supreme Court noted that "[t]he problem is one of remoteness," *i.e.* the facts did not supply the requisite causal nexus between defendant's activities and plaintiff's harm.  *Id.* at 441.  If anything, *Tipler* directly supports Tate & Lyle's argument that it is entitled to summary judgment for Plaintiffs' complete failure to show a proximate causal nexus between its operations and Plaintiffs' alleged injuries or damage, and does not support Plaintiffs' argument that they have created a jury question as to nuisance.

*Alabama Power Co. v. Stringfellow*, 153 So. 629 (Ala. 1934) and *Drummond*, 641 So.2d 1240 (Doc. #161, p. 7, 9, 12-13) were noise only cases, and because Plaintiffs have abandoned any nuisance claim based on noise, they are inapposite to this case.  Moreover, both cases are distinguishable on their facts and do not support Plaintiffs' argument that their odor nuisance claim presents a fact question for a jury.  In *Stringfellow*, the undisputed evidence showed that defendant operated a power substation a mere 85 feet from plaintiffs' home, resulting in constant noise on plaintiffs' property.  153 So. at 630.  In *Drummond*, the defendant erected a transformer on the property next to plaintiffs' property in order to supply electricity to its mining operation and the noise from the transformer increased to an intolerable level.  641 So.2d at 1242.  Moreover, one plaintiff provided expert testimony from his medical doctor about how such noise affected plaintiff's medical conditions and caused anxiety.  *Id.* at 1243-44.  These cases are markedly different from the case at hand, where there is no evidence that Plaintiffs were subjected to constant odorous or harmful DMA emissions and there is no medical causation expert opinion given.

Finally, *Park Center Inc. v. Champion Int'l Corp.*, 804 F.Supp. 294 (S.D.Ala. 1992) (Doc. #161, p. 14), involved denial of the defendant's motion for judgment on the pleadings.  Thus, the court held that plaintiff's nuisance claims were not legally deficient as pleaded, as argued by defendant in its motion.  The case does not support any general notion that nuisance claims always or generally present jury questions.[15]  Accordingly, without any authority supporting their position or otherwise suggesting that Plaintiffs have raised a genuine issue of

---

[15]  Tate & Lyle notes that *Dickinson*, *supra* p. 5, also cited by Plaintiffs as support that other Plaintiffs have been allowed to submit nuisance cases to juries "under established Alabama case law as cited herein" (Doc. #161, p. 14), is a Title VII and § 1981 race discrimination case.  While perhaps setting forth the relevant standard of review in summary judgment cases, it does nothing to forward Plaintiffs' argument that they have a jury submissible nuisance claim in this case.

disputed fact sufficient to create a question for the jury, for all of the unrefuted reasons stated in

Doc. #141 & 142, Tate & Lyle is entitled to summary judgment on Plaintiffs' nuisance claim.

**IV.    Tate & Lyle is entitled to summary judgment on all individual issues or claims set forth in its individual issues motion and brief.**

To the extent anything less than full summary judgment is granted in favor of Tate &

Lyle, Plaintiffs have failed to create genuine issues of material fact with respect to Tate & Lyle's

motion and brief on individual issues.  (Doc. #144 & 145)  In said motion and brief, Tate & Lyle

argued (1) certain Plaintiffs lack claims for personal injury and/or emotional distress due to lack

of evidence, (2) certain Plaintiffs lack claims for property diminution because they did not claim

such damages, did not own the property for which they sought such damages, or did not offer

any evidence of such damages, and (3) certain Plaintiffs lack a cause of action for nuisance based

on noise due to lack of evidence.  (Doc. #145, p. 5-9).

In response to Tate & Lyle's argument that four Plaintiffs cannot recover for personal

injuries (Doc. #145, p. 5-6), Plaintiffs respond that they need not provide medical testimony for

purposes of showing that Tate & Lyle's operations were a nuisance.  (Doc. #161, p. 10-11).

Such response misses the point of Tate & Lyle's argument.  In their Complaint, all Plaintiffs

bring several causes of action and seek recovery for several items of damage, including alleged

personal injuries.  Tate & Lyle simply argues that to the extent any claim other than nuisance

goes forward for these Plaintiffs, they cannot recover for any physical injuries allegedly suffered

because they have no proof of any such injuries.  Plaintiffs offer nothing to suggest otherwise,

and accordingly, for all of the reasons previously stated, Tate & Lyle is entitled to summary

judgment on any claims for personal injury brought by these Plaintiffs.

In response to Tate & Lyle's argument that certain Plaintiffs cannot recover for emotional

distress (Doc. #145, p. 6-7), Plaintiffs respond that such Plaintiffs testified to losing enjoyment of

their homes and experiencing obnoxious odors, thereby meeting the elements of private nuisance.  (Doc. #161, p. 11).  Simply because these Plaintiffs allege to have experienced a loss of use and enjoyment of their properties sufficient to satisfy the damage element of a private nuisance claim does not mean they have suffered "severe mental anguish and emotional distress" as alleged in the Complaint, which they seek recovery for under multiple causes of action.  (Doc. #142, p. 35).  The two theories of recovery are entirely different and involve different elements of damage.  Tate & Lyle seeks summary judgment on the latter because these Plaintiffs testified to suffering no such mental anguish or emotional distress.  Because Plaintiffs fail to point to anything in the record suggesting otherwise, for all of the reasons previously stated in Doc. #144 & 145, Tate & Lyle is entitled to summary judgment on any claims of emotional distress by these Plaintiffs.

Regarding Tate & Lyle's argument that certain Plaintiffs cannot recover for any alleged diminution in property (Doc. #145, p. 7-9), Plaintiffs respond that under Alabama law, tenants or persons occupying the premises or living on the property have an equal right to bring claims of nuisance.  (Doc. #161, p. 10-12).  Tate & Lyle does not dispute this and again such response overlooks Tate & Lyle's argument.  Tate & Lyle does not suggest that any non-owners are prohibited from bringing a nuisance claim; to the contrary, it simply notes that such persons cannot recover for any alleged diminution in property value, as they have claimed.  (Doc. #145, p. 7-8).  Plaintiffs offer nothing to refute this argument or the authority cited in Doc. #144 & 145 and therefore, for all of the reasons previously stated, Tate & Lyle is entitled to summary judgment on any claims for property diminution by said non-owners.

Plaintiffs also claim that Plaintiff Bernice Pressley has a property diminution claim because she did, in fact, testify to such damages in interrogatories.  (Doc. #161, p. 12).  Plaintiffs

also state that Ms. Pressley's family members testified as to such damages by way of their interrogatories.  (Id.)  However, there is no such testimony from Ms. Pressley or her family members in their interrogatory answers.  (Doc. #145, Ex. H-16, H-17, H-18, H-19).  While perhaps generically stating that Ms. Pressley's property suffered diminution, none of these Plaintiffs answered interrogatory nos. 7 or 11 asking about the amount of any such alleged diminution.  (Id.)  Without substantial evidence of the amount of any claimed diminution, and for all of the reasons stated previously, Tate & Lyle is entitled to summary judgment on this claim.

Finally, regarding Tate & Lyle's argument that certain Plaintiffs have no cause of action for nuisance based on noise due to lack of evidence (Doc. #145, p. 9), Plaintiffs provide no response whatsoever.  (Doc. #161).  Thus, for all the reasons stated previously in Doc. #144 & 145, Tate & Lyle is entitled to summary judgment on any claim of nuisance based on noise for these Plaintiffs.  *Evans*, 1998 WL 1048470 at *12.

## CONCLUSION

WHEREFORE, for all of the foregoing reasons, in addition to those set out previously in Tate & Lyle's respective motions for summary judgment, Tate & Lyle respectfully requests that this Court grant it summary judgment as to all causes of action in Plaintiffs' Fourth Amended Complaint and for such further relief as this Court deems equitable and just.

Dated:  April 14, 2008

Respectfully submitted,

_/s/ Halron W. Turner_
HALRON W. TURNER (TURNH9339)
MARC E. BRADLEY (BRADM9922)
Turner, Onderdonk, Kimbrough,
 Howell, Huggins & Bradley, PA
Post Office Drawer 1389
Chatom, Alabama 36518
Telephone:  (251) 847-2237
Facsimile:  (251) 847-3115

**And**

MICHAEL H. WETMORE (*pro hac vice*)
WILLIAM J. CURTIS (*pro hac vice*)
ROBYN D. BUCK (*pro hac vice*)
Husch & Eppenberger, LLC
190 Carondelet Plaza, Suite 600
Saint Louis, Missouri 63105
Telephone:  (314) 480-1500
Facsimile:  (314) 480-1505

**Attorneys for Defendant,**
 **Tate & Lyle Sucralose, Inc.**

## CERTIFICATE OF SERVICE

I hereby certify that on April 14, 2008, I electronically filed the foregoing document with the Clerk of the Court utilizing the CM/ECF system, which will send notification of such filing to counsel of record as listed below.

_/s/ Halron W. Turner_
HALRON W. TURNER
Counsel for Defendant

<u>**Counsel of Record**</u>:

John W. Parker, Esq.
820 S. University Blvd., Suite 2-F
Mobile, Alabama 36609
Telephone:  (251) 341-1020
Facsimile:  (251) 341-1235

Herndon Inge III, Esq.
Post Office Box 40188
Mobile, Alabama 36640
Telephone:  (251) 432-1444
Facsimile:  (251) 432-6941