IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| BOBBY L. RADCLIFF, *et al.*, | : | |
| Plaintiffs, | : | |
| v. | : | CA 06-345-CG-M |
| TATE & LYLE SUCRALOSE, INC., | : | |
| Defendant. | : | |
| | : : : | |

**DEFENDANT'S *DAUBERT* MOTION TO EXCLUDE THE
TESTIMONY OF PLAINTIFFS' EXPERT, JAMES R. MONTGOMERY**

Defendant Tate & Lyle Sucralose, Inc. ("Tate & Lyle"), by and through its undersigned counsel, moves the Court pursuant to Federal Rule of Evidence 702 and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) to exclude the proposed testimony of Plaintiffs' expert, James R. Montgomery, in its entirety.[1]

**INTRODUCTION**

Thirty-seven (37) Plaintiffs from seventeen (17) different properties allege obnoxious odors and/or noises emanate from

---

[1] Tate & Lyle raised Daubert challenges specific to Montgomery's affidavit testimony given in support of Plaintiffs' Opposition to Tate & Lyle's Motions for Summary Judgment. (Doc. #163, pp. 17-19). Tate & Lyle realleges and incorporates such arguments against Montgomery's affidavit testimony as if set forth fully herein. By this separate Motion, Tate & Lyle seeks to exclude *all* testimony by Montgomery, whether by way of deposition, affidavit, or trial testimony, for all of the reasons previously given (Doc. #163) and as set forth herein.

motexclexptest1.jrm.radcliff(tla)        1

Defendant's manufacturing plant[2] thereby causing property diminution, personal injury, emotional distress and/or loss of use and enjoyment of property.[3] Plaintiffs bring causes of action for nuisance, negligence, wantonness, inverse condemnation and injunctive relief.

Plaintiffs designated James R. Montgomery, P.E., as their sole expert. (Doc. #108, 121). Montgomery attempted to link Plaintiffs' complaints of obnoxious odor and/or physical symptoms to emissions of dimethylamine (DMA) or dimethylformamide (DMF) from Tate & Lyle's Plant. Although Montgomery purported to analyze several chemicals, he opined that only DMA or DMF could be the source for any noted obnoxious odor and/or physical symptoms as described by the Plaintiffs. (Doc. #121; #141, Ex. E at pp. 116:3-8, 116:22 – 117:2, 211:10-11).

Montgomery never investigated or otherwise obtained objective evidence of the existence or level of DMA or DMF on any Plaintiff's property. He personally never encountered any odor while conducting his investigation near the Plant and/or at

---

[2] As noted in Tate & Lyle's summary judgment papers, the Plant was originally designed and constructed in 1998-2000 by McNeil-PPC, Inc. ("McNeil"), which owned and operated the Plant from May of 2000 to April of 2004, when Tate & Lyle acquired the Plant and took over operations. (Doc. #141, Ex. A, ¶ 3).

[3] Tate & Lyle does not admit the truth of any such allegations. It simply notes that, as of now, prior to any ruling on its motions for summary judgment, these are the various claims of Plaintiffs by way of their complaint, discovery responses, and/or deposition testimony.

Plaintiffs' properties. (Doc. #141, Ex. E at pp. 100:6-17; 102:14 – 103:8). Nor did he attempt to detect or measure the presence or extent of any DMA or DMF on any Plaintiff's property. (Id. at pp. 150:9 – 152:23; 158:5-9; 166:20 – 167:5). Instead, the only basis for Montgomery's belief that any DMA or DMF actually is or was present on any Plaintiff's property are the Plaintiffs' subjective complaints themselves, which Montgomery learned through Plaintiffs' counsel. (Id.). Based solely on Plaintiffs' complaints and the admitted fact that DMA and DMF are used at Tate & Lyle's plant, Montgomery developed a theory wherein he hypothesized that a sufficient amount of DMA or DMF could be emitted from the Plant, travel through the ambient air, reach Plaintiffs' properties some 3,500 feet away, and ultimately cause the odors and/or symptoms of which Plaintiffs complain. (Doc. #121, pp. 3-4).

To test his hypothesis, Montgomery adopted the "Threshold Limit Values" (TLVs) of DMA and DMF as the benchmark against which to measure Tate & Lyle's alleged plant air emissions.[4] He then reviewed routine discharge monitoring reports and/or other materials submitted by Tate & Lyle or McNeil to the Alabama

---

[4] TLV's are the highest reasonable levels to which a worker at a plant can be exposed to a certain chemical over an eight (8) hour period without adverse health effects, as recommended by the American Conference of Government Industrial Hygienists ("ACGIH"). (Doc. #121, pp. 3-7). TLV's have been adopted and incorporated into the Occupational Safety and Health Administration's regulations as setting forth a permissible, non-hazardous level of exposure to a chemical for employees. 29 C.F.R. 1900.1200(d)(3)(ii) (2007).

Department of Environmental Management (ADEM).  (Doc. #121, at p. 3; #141, Ex. E at pp. 108-114).

From these materials he analyzed two types of air emissions released from the plant--"stack" emissions and alleged "fugitive" emissions.[5]  Despite having no experience in air modeling or air dispersion (Doc. #141, Ex. E at pp. 38:11-16, 40:16-19), Montgomery then applied a "dispersion factor" model designed to determine ground plumes of hazardous waste to Tate & Lyle's air emissions to purportedly arrive at the minimal amount of DMA and DMF that must be released from the Plant in order to exceed the TLV's for DMA and DMF at 3,500 feet away from the Plant.  (Doc. #121, at pp. 3-4, 7; #141, Ex. E at pp. 42-43, 52-53, 91:13 – 92:13; 194:10-19; 205:17 – 206:10).  In other words, Montgomery hypothesized a certain level of emissions of DMA and DMF that, had they happened, could have resulted in DMA and/or DMF levels in excess of TLV's at a property 3,500 feet away from the Plant.  (Id.).

Montgomery then went back to McNeil's and/or Tate & Lyle's monitoring reports and other materials to see if there were in fact any emissions meeting or exceeding his hypothesized emission levels.  He found no "stack" emissions from the Tate & Lyle plant satisfying his hypothesis, *i.e.*, there were no stack

---

[5] Montgomery defined "stack emissions" as those coming from the Plant's thermal oxidizer or flare, and "fugitive emissions" as those coming from any other source.  (Doc. #141, Ex. E at pp. 89:14-18, 92:7 – 93:6, 109:3-11).

emissions producing levels of DMA or DMF sufficient enough to exceed the respective TLV's at any Plaintiff's property. (Doc. #121, at p. 3). Similarly, he identified no "fugitive" releases of DMA or DMF at the Plant *after* April of 2004 (*i.e.*, during Tate & Lyle's ownership) sufficient enough to exceed the TLV level at any Plaintiff's property. (Id., p. 4; #141, Ex. E at pp. 194:10-19, 217:7 – 219:14).

Montgomery is not a toxicologist or medical doctor, nor does he consider himself to be an expert in either field. (Id., at pp. 51:18 – 52:10, 53:15-22, 61:20 – 62:11). He did not review the medical records for any of the Plaintiffs or their deposition testimony, and does not know the physical symptoms or injuries claimed by any particular Plaintiff. (Id., at pp. 54:1-22, 61:20 – 62:11).

Nonetheless, relying on various publications that listed physical symptoms that DMA or DMF can cause generally, which included some of the symptoms claimed by Plaintiffs, Montgomery opined that Plaintiffs' symptoms "could" be caused by the release of DMA from Tate & Lyle's plant. (Id., at pp. 162:14 – 164:16). The only objective basis for this opinion is the fact that Plaintiffs complain of these symptoms. (Id., at pp. 166:20 – 167:5; #121, at p. 4).

Indeed, Montgomery made no effort to determine whether Plaintiffs' symptoms were *actually* caused by any exposure or

certain level of exposure to these chemicals, *i.e.*, he did not analyze whether and/or at what level any particular Plaintiff was exposed to these chemicals or whether such exposure was sufficient to cause the symptoms claimed, instead admitting that other expert testimony was needed to address this issue. (Doc. #121, at pp. 3-4; #141, Ex. E at p. 61:20 – 62:11, 160:8 – 161:18). Montgomery also opined that there is "no imminent health hazard" related to any alleged DMA odor/emission. (Doc. #141, Ex. E at p. 150:18-23).

## STANDARD OF REVIEW

As the proponents of Montgomery's testimony, Plaintiffs have the burden of establishing its admissibility by a preponderance of the evidence. Allison v. McGhan Med. Group, 184 F.3d 1300, 1306 (11th Cir. 1999) (citing Daubert, 509 U.S. at 592, n. 10). Specifically, a plaintiff must establish that (1) the expert is *qualified* to testify competently regarding the matters he intends to address, (2) the methodology by which the expert reaches his conclusion is *sufficiently reliable*, and (3) the testimony *assists the trier of fact*, through the application of *scientific, technical, or specialized expertise*, to understand the evidence or to determine a fact in issue. Id. at 1309 (emphasis added).

Proof of the expert's qualifications requires proof that the putative expert has "such knowledge, skill, experience,

training, or education that his or her opinion will aid the trier of fact in understanding the evidence." Browder v. General Motors Corp., 5 F.Supp.2d 1267, 1281 (M.D.Ala. 1998) (citing FED. R. EVID. 702). Proof of the expert's method's reliability requires the court to consider (1) whether the theory or technique can be tested; (2) whether it has been subjected to peer review; (3) whether the technique has a high known or potential rate of error; and (4) whether the theory has attained general acceptance within the scientific community. Allison 184 F.3d at 1312 (citing Daubert, 509 U.S. at 593-94). Some other factors considered when determining reliability are anecdotal evidence, temporal proximity, and improper extrapolation. Id.

In other words, "[t]he proposed testimony must derive from the scientific method; good grounds and appropriate validation must support it." McClain v. Metabolife Int'l, Inc., 401 F.3d 1233, 1237 (11th Cir. 2005) (citing Daubert, 509 U.S. at 589, n.7). "Daubert requires the trial court to act as a gatekeeper to insure that speculative and unreliable opinions do not reach the jury." Id.

And it is not enough for the expert himself to validate his methods. "The expert's assurances that he has utilized generally accepted scientific methodology [are] insufficient." Id. at 1244 (citing Moore v. Ashland Chem. Inc., 151 F.3d 269,

278 (5th Cir. 1998)).  "Such statements can spring just as quickly from the *ipse dixit* of the expert as some ultimate opinion about causation or toxicity."  Id.  "[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." Id. (quoting Gen. Elec. Co. v. Joiner, 522 U.S. 136, 147, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997)).  Moreover, "[t]he trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'"  Id. (quoting FED. R. EVID. 702 advisory committee's note (2000)).

**ARGUMENT**

Plaintiffs fail to establish any of the prerequisites for admissibility of Montgomery's testimony:  qualification, reliability, and/or application of scientific, technical, or specialized expertise which assists the trier of fact.

**I.   Montgomery lacks the necessary qualifications.**

As noted, Montgomery developed a theory whereby using TLV's, he determined the amount of emission necessary to be released from Tate & Lyle's plant, travel through several thousand feet of ambient air, and have an odorous or potentially physically harmful effect at Plaintiffs' properties.  Montgomery ultimately opined that any "annoyance," odors, symptoms and/or

motexclexptest1.jrm.radcliff(tla)          8

limited ability to use Plaintiffs' homes is the "direct effect" of Tate & Lyle's emissions.  (Doc. #121, p. 4).

Montgomery lacks the necessary qualifications to render this opinion on two separate fronts.  First, he admits that he has no education, training or experience with air modeling or air dispersion. (Doc. #141, Ex. E at pp. 38:11-16, 40:16-19).  Second, he admits he is not a toxicologist or medical doctor, nor does he consider himself to be an expert in either field.  (Id. at pp. 51:18 – 52:10, 53:15-22, 61:20 – 62:11).  Notably, Montgomery did not review the medical records for any of the Plaintiffs or their deposition testimony, and he does not know the physical symptoms or injuries claimed by any particular Plaintiff.  (Id. at pp. 54:1-22, 61:20 – 62:11).

Montgomery thus lacks the two quintessential areas of knowledge, skill, training, experience, or expertise necessary to (a) develop a model estimating the emission levels necessary to travel or disperse through ambient air in order to affect Plaintiffs' properties, or (b) give causation to Plaintiffs' physical symptoms or medical complaints.  Perhaps the best proof of this is that Montgomery could opine only that Plaintiffs' symptoms "could" be caused by the release of DMA from Tate & Lyle's plant.  (Id. at pp. 162:14 – 164:16).

Because Montgomery is not qualified, he must be excluded under Daubert and/or Rule 702.  See Morris v. FL Transformer,

Inc., 455 F.Supp.2d 1328, 1332-33 (M.D.Ala. 2006) (accident reconstructionist who admitted that he was not a medical doctor or biomechanic and had no formal medical training, was not qualified to give opinion on what caused the decedent's death); Cook v. Sunbeam Prod., Inc., 365 F.Supp.2d 1189, 1192 (N.D.Ala. 2005) (witness who admitted he did not consider himself to be expert in origin or cause of fires and had no formal training in the area was not qualified to serve as causation expert).

**II. Montgomery's methodology is not sufficiently reliable.**

Montgomery's methods lack reliability for several reasons. First, Montgomery's use of TLV's as the "measuring stick" by which to determine causation and/or liability in this case is an inappropriate extrapolation under Allison. TLV's are not by definition indicative of any alleged obnoxious odor. Nor are they by definition indicative of any alleged physical symptoms based on intermittent exposure of treated emissions at a distance. Rather, they set forth relevant health and safety standards for employees working directly with chemicals on a daily basis, for up to eight (8) hours per day. Supra at n. 4.

Here, Plaintiffs do not work with DMA or DMF on a daily basis, let alone for eight (8) hours each day. Nor do they have direct exposure to the chemicals themselves. Instead, Plaintiffs are located some several thousand feet away from the Plant and allege being exposed to treated emissions from the

motexclexptest1.jrm.radcliff(tla)            10

Plant's thermal oxidizer during isolated intervals. (Doc. #121, Exs. B, I-01 through I-37). TLV's, therefore, are not an appropriate standard by which to measure Plaintiffs' exposure to DMA or DMF at their properties (if any), and/or to suggest that any such exposure is sufficient enough to cause some type of obnoxious odor or alleged physical harm.

Instead of OSHA's TLV's, the appropriate standard by which to measure Tate & Lyle's treated emissions is through OSHA's odor threshold concentration and/or the EPA's Toxic Release Inventory (TRI). (Doc. #141, Ex. B, p. 14). Indeed, these are the standards adopted and employed by the EPA and ADEM in identifying, monitoring, and permitting emissions from Tate & Lyle's plant. (Id.)[6] Thus, Montgomery's use of TLV's is an improper extrapolation and renders his methodology unreliable. Allison, 184 F.3d at 1312.

Second, Montgomery *agrees* that meteorological conditions such as wind speed, direction, etc. have an effect on whether and to what extent Tate & Lyle's emissions reach Plaintiffs' properties. (Doc. #141, Ex. E, pp. 112:22 – 113:10, 213:5 – 217:2). Yet Montgomery *did not take meteorological conditions into account* when doing his calculations of how much DMA or DMF allegedly needed to be emitted to impact Plaintiffs' properties.

---

[6]   Of note, Tate & Lyle "has consistently operated in compliance with all federal and Alabama requirements including its permits issued by ADEM, from prior to April 2004 to the present." (Doc. #141, Ex. B, p. 33) (citing ADEM inspection reports).

(Id., pp. 93:7 – 96:22). Indeed, Montgomery did not determine or consider wind direction, wind speed, ambient air temperature or humidity, or precipitation. (Id.). Instead, he simply ignored these relevant underlying facts or data, or otherwise *assumed* them to be constant or at levels which supported his calculations. (Id.).

This is not "good grounds [or] appropriate validation" for any methodology. McClain, 401 F.3d at 1237. Montgomery must take into account all relevant facts or data, or all necessary anecdotal evidence, in order for his methodology to be reliable. Allison, 184 F.3d at 1312. His failure to do so, and/or his assumption that all meteorological data is constant or otherwise supports his calculations, is nothing more than his *ipse dixit*, which is insufficient to pass Daubert. Id.

Third, but most importantly, the undisputed, objective data and underlying facts themselves conclusively show that Montgomery's methodology is patently unreliable. Montgomery himself cannot identify *any* emission of DMA or DMF occurring from April 2004 to present that exceeds the quantity he deemed necessary to exceed TLV's at Plaintiffs' properties. (Doc. #141, Ex. E at pp. 100:6-17; 102:14 – 103:8; 150:9 – 152:23; 158:5-9; 166:20 – 167:5). Indeed, there is no such emission of DMA or DMF during this timeframe. (Id., Ex. B, p. 33). In order words, Montgomery cannot prove, let alone test, his own

hypothesis based on the undisputed evidentiary record. Indeed, instead of proving (or even minimally supporting) Montgomery's theory of liability, the objective evidence and underlying data actually *disproves* any liability by Tate & Lyle. This is the antithesis of any reliability to Montgomery's methodology or opinion, and his testimony must be excluded.

### III. Montgomery's opinions do not assist the trier of fact.

Plaintiffs, having failed to meet Rule 702's first requirements (that Montgomery is "qualified as an expert by knowledge, skill, experience, training, or education" and that his "testimony is based upon sufficient facts or data" and "is the product of reliable principles and methods"), it follows perforce that they cannot meet Rule 702's last requirement that Montgomery's testimony, "through the application of scientific, technical, or specialized expertise," assists the trier of fact. See Morris, 455 F.Supp.2d at 1334.

Moreover, putting aside all concerns of qualification or reliability, Montgomery's opinion boils down to nothing more than speculation or conjecture. In his written report, Montgomery opines that Tate & Lyle's excessive emissions (assuming *arguendo* some existed) "are sufficient to cause" Plaintiffs' symptoms. (Doc. #121, p. 4). In testimony, Montgomery opined that Plaintiffs' symptoms "could" be caused by the release of DMA from Tate & Lyle's plant. (Doc. #141, Ex. E,

at pp. 162:14 – 164:16).  He clearly stops short of saying certain DMA or DMF emissions from the Tate & Lyle plant are the cause of Plaintiffs' complaints.  Such restraint is well-founded, given the fact that he is neither a toxicologist nor a medical doctor.  At its core, therefore, Montgomery's testimony is nothing more than his unqualified, unsupported belief or speculation that Tate & Lyle is the cause of Plaintiffs' complaints.  This amounts to nothing more than his *ipse dixit*, which does not assist the trier of fact.  See Allison, 184 F.3d at 1315-17 (affirming exclusion of plaintiff's expert's testimony based more on personal opinion than scientific knowledge).  Accord Sanderson v. Int'l Flavors and Fragrances, Inc., 950 F.Supp. 981 (C.D.Cal. 1996) (plaintiff's expert evidence establishing only a "mere possibility" that defendants' products caused plaintiff's injuries was inadmissible and insufficient to defeat defendant's motion for summary judgment).

## CONCLUSION

WHEREFORE, for all of the foregoing reasons, Defendant Tate & Lyle Sucralose, Inc. moves this Court to exclude all testimony or evidence from Plaintiffs' proposed expert, James R. Montgomery, at the trial of this matter.

Dated:  August 1, 2008

                                    Respectfully submitted,


                                    /s/ Halron W. Turner
                              HALRON W. TURNER (TURNH9339)
                              MARC E. BRADLEY (BRADM9922)
                              Turner, Onderdonk, Kimbrough,
                                Howell, Huggins & Bradley, PA
                              Post Office Drawer 1389
                              Chatom, Alabama 36518
                              Telephone:  (251) 847-2237
                              Facsimile:  (251) 847-3115

                              **And**

                              MICHAEL H. WETMORE (*pro hac vice*)
                              WILLIAM J. CURTIS (*pro hac vice*)
                              ROBYN D. BUCK (*pro hac vice*)
                              Husch Blackwell Sanders, LLP
                              190 Carondelet Plaza, Suite 600
                              Saint Louis, Missouri 63105
                              Telephone:  (314) 480-1500
                              Facsimile:  (314) 480-1505

                              **Attorneys for Defendant,**
                                  **Tate & Lyle Sucralose, Inc.**


                          **CERTIFICATE OF SERVICE**

    I hereby certify that on August 1, 2008, I electronically filed the foregoing document with the Clerk of the Court utilizing the CM/ECF system, which will send notification of such filing to counsel of record as listed below.


                                    /s/ Halron W. Turner
                              HALRON W. TURNER
                              Counsel for Defendant

**Counsel of Record**:

John W. Parker, Esq.
820 S. University Blvd., Suite 2-F
Mobile, Alabama 36609
Telephone:  (251) 341-1020
Facsimile:  (251) 341-1235

Herndon Inge III, Esq.
Post Office Box 40188
Mobile, Alabama 36640
Telephone:  (251) 432-1444
Facsimile:  (251) 432-6941