IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| BOBBY J. RADCLIFF, et al. | * | |
| Plaintiffs, | * | |
| v. | * | CV 06-345-CG-M |
| TATE & LYLE SUCRALOSE, INC.; | * | |
| Defendant. | * | |

**PLAINTIFFS' RESPONSE TO DEFENDANT'S DAUBERT MOTION
TO EXCLUDE TESTIMONY OF PLAINTIFFS' EXPERT, JAMES R. MONTGOMERY**

The facts are undisputed in this matter that Tate & Lyle Sucralose, Inc. ("Tate & Lyle") produces sucralose and uses DMA, which, according to governmental brochures known as MSDS Brochures, produces a bad "dead fish" strong odor so foul so as to cause, based upon governmental brochures, hyperventilation, burning sensation, cough, headache, labored breathing, shortness of breath, sore throat and redness, pain and blurred vision of eyes and that all of these symptoms have been complained of by the Plaintiffs over a period of time during the operation of the premises by Tate & Lyle. (See Defendant's Exs. "H1" - "H37" attached to Defendant's Notice of Filing in Support of Motion for Summary Judgment).

Additionally, the undisputed evidence is that the DMA is an unwanted byproduct of the production process of Tate & Lyle and according to the uncontroverted testimony of Ran Roslick, Tate & Lyle's 30(b)(6) representative, during the Tate & Lyle production process, there are a thousand or so points of leaks for the unwanted byproduct, DMA,

during the production process, which are monitored by sophisticated sniffing instruments, which if in individual were to go out to the plant, he could not see even if the individual were standing there looking at it. (See Ran Roslick Depo., pp. 32-33; Ex. 2 to Plaintiffs' Notice of Filing).

Further, Mr. Roslick testifies that Tate & Lyle does not have any equipment that formally records or detects wind directions. (See Ran Roslick Depo., p. 34, Ex. "2" to Plaintiffs' Notice of Filing).

Additionally, the undisputed evidence and testimony is that the Plaintiffs, over a period of time, have smelled odors during plant operation and have incurred symptoms referred to in industry accepted MSDS publications related to DMA, namely, burning sensation or inhalation, cough, headaches, labored breathing, shortness of breath, sore throat, redness of eyes, pain and blurred vision (Plaintiffs' Interrogatory Responses, Exs. "H1" - "H37" and Ex. D to Defendant's Notice of Filing in Support of Motion for Summary Judgment, Expert Report of James Montgomery).

Mr. Montgomery testified that he is familiar with DMA and its side effects as produced in governmental brochures adopted industry-wide known as "MSDS." (See Depo. of James Montgomery, Ex. "E" to Defendant's Notice of Filing).

Further, Mr. Montgomery has a bachelor and masters degrees in chemistry and engineering and has been involved in the past with industry production techniques and standards including the MSDS publication on DMA and incident report forms as to the release of emissions and/or unwanted byproducts from chemical production processes.

(See Depo. of James Montgomery, Ex. "E" to Defendant's Notice of Filing).

Mr. Montgomery, in Affidavit, has established that he has reviewed Mr. Roslick's testimony and agrees that DMA is an unwanted byproduct of the sucralose chemical process and that the most common way to experience DMA is through smelling it. (See Ex. "2" to Plaintiffs' Notice of Filing; Ex. "3" to Plaintiff's Notice of Filing, Depo. of Ran Roslick).

Additionally, Mr. Montgomery reviewed the Rosclick deposition about the thousand points of potential leakage of the DMA from the Tate & Lyle facility and the fact that DMA, while having severe effects on the sensibilities of citizens as reported in the Tate & Lyle accepted MSDS publications, is not reportable as a fugitive emission as it is not a hazardous or toxic chemical so as to be reported on incident report forms known as "DNR's." (See Defendant's Ex. "D;" Plaintiffs' Ex. "2" to Notice of Filing).

Based on the Affidavit of Mr. Montgomery, puffs of fugitive emissions have occurred from the Tate & Lyle plant and that while TLV values are useful, they are <u>not</u> the guide to potentially negative conditions in the surrounding area or specific symptoms as incurred by individual sensitivities. (See Ex. "2" to Plaintiffs' Notice of Filing).

Based on the fact that the testimony of the Plaintiffs has been reviewed by Mr. Montgomery and that they were exhibiting symptoms relative to burning sensation, headaches, labored breathing, redness of eyes and obnoxious odors, Mr. Montgomery formed the opinion that based on a reasonable degree of scientific certainty that those problems were the result from the random and intermittent releases or "puffs" of fugitive

3

emissions from the Tate & Lyle plant, which emissions, based on the in excess of a thousand points of potential release, would be difficult, if not impossible, to be observed. (See Ex. "2" to Plaintiffs' Notice of Filing; Affidavit of James Montgomery).

Further, Mr. Montgomery, based on the thousand points of potential leakage from the facility and the use of the sucralose process emitting as an unwanted byproduct DMA, reviewed records from the plant that the perception of odor of DMA would occur at .34 ppm (parts per million), based on Mr. Greenburg's report and that on at least one occasion, the Olin Corporation representative had come to the plant in search of the "fishy odor" coming from the plant. Based on that particular event and based on the thousand points or so of exit for the "puff" or "emissions" to release from the plant on a daily basis and the model that Mr. Montgomery, in concert with Mr. Polanski of the University of South Alabama, who performed a model as to the dispersion of those odors, Mr. Montgomery opined that one-half (1/2) teaspoon of DMA would contaminate the air 1,100 meters from the release near the Plaintiffs' homes causing the symptoms complained of by the Plaintiffs and exceeding ADEM permitted levels for release of obnoxious odors. (See Ex. "2," Affidavit of James Montgomery to Plaintiffs' Notice of Filing).

## ARGUMENT

Against the aforementioned backdrop of basically undisputed facts, the Defendant attacks Mr. Montgomery as not having the appropriate Daubert credentials, namely, not being qualified as an expert, not having proper methodology and not having afforded any testimony that would assist the trier of fact through the application of scientific, technical,

or specialized expertise.

To the contrary, we are looking at a Tate & Lyle plant that was constructed within a neighborhood consisting of the Plaintiffs' homes, which emits admittedly from potentially a thousand points of invisible exit points DMA, an unwanted byproduct of the sucralose production, which causes in individuals incurring those smells burning sensation, coughs, headaches, labored breathing, shortness of breath, sore throat, redness of eyes, pain and blurred vision, all of which have been exhibited by the Plaintiffs in this matter.

Mr. Montgomery, as an educated, trained and competent engineer with a chemical background, has reviewed the testimony of Mr. Roslick as to the thousand points of exit and the utilization of the DMA and has also reviewed the MSDS publications, testimony of the Plaintiffs and reporting forms of the Defendant, Tate & Lyle, relative to fugitive emissions. Based on these reviews, Mr. Montgomery is able to bring to the table and to the trier of fact the fact that the fugitive emissions or DMA "puffs" would not be of sufficient toxicity to be necessarily reported on reporting forms, but nevertheless would cause, if incurred by individuals in the area being the symptoms as called for in the Tate & Lyle brochures. Specifically, Mr. Montgomery, based on a dispersion model, opined that minimal quantities, namely, one-half (1/2) teaspoon of DMA would cause contamination up to 1,100 meters from the release in the area of the Plaintiffs' homes.

The symptoms include shortness of breath, burning sensation, hyperventilation, cough, labored breathing and sore throat, all of which have been exhibited by the Plaintiffs

in this matter. Obviously, Mr. Montgomery's opinions in this regard are based on governmental brochures and pamphlets, namely, MSDS used by Tate & Lyle, Tate & Lyle reporting forms, uncontroverted testimony of Mr. Roslick as to the thousand points of exit, which a lay person could not see nor really an expert standing over those points of exit and on Mr. Montgomery's knowledge concerning reporting forms as to fugitive emissions, which would not necessarily pick up leakage or "puffs" of DMA as DMA is not classified as a toxic, or a carsogenic chemical and would be emitted in such quantities such as not to be reportable. (See Ex. "2" and "3" to Plaintiffs' Notice of Filing).

Further, Mr. Montgomery, unlike the categorization by the Defendant in the Daubert motion, to exclude Mr. Montgomery's testimony, establishes that he is not relying on PLV values in determining the specific symptoms as occurred by individual sensitivity and is relying on the Plaintiffs' testimony as to incurring the exact symptoms that are published in the governmental brochures utilized by Tate & Lyle caused by the release of DMA, namely, coughing, burning sensation, headaches, labored breathing, redness of eyes and obnoxious odors. (See Ex. "2" to Plaintiffs' Notice of Filing, Affidavit of James Montgomery).

Further, Mr. Montgomery called on a colleague, Mr. Polanski, at the University of South Alabama to assist in the modeling relative to dispersion of the odors and went about that dispersion model in a scientific manner utilizing and calling on expertise from a colleague while forming the final opinions on his own that in fact the release of DMA in the area of the Plaintiffs' properties in minimal dosages would contaminate the air up to

1,100 meters from the release in the area of the Plaintiffs' homes. (See Ex. "2" to Plaintiffs' Notice of Filing).

Mr. Montgomery's methodology is far superior to that utilized by the Defendant's expert, Mr. Greenburg, who utilizes wind data from the National Weather Station in the City of Mobile, some forty-two (42) miles away and opines that based on that wind data there would not be enough prevailing winds blowing toward the property of the Plaintiffs to cause them to incur the predicted side effects of DMA, the unwanted byproduct of the Tate & Lyle process.

While, as this court has observed in its ruling on the Defendant's Motion for Summary Judgment, Mr. Greenburg, based on National Weather Station wind data some forty-two (42) miles away, differs from Mr. Montgomery and Dr. Polanski as to whether or not Tate & Lyle's plant is the source of the specific odors that the Plaintiffs describe, it is up to the jury to sort out the factual differences between the parties. To place the Plaintiffs in a position of not having the testimony of an educated and skilled chemist and engineer who has studied the situation, not only from the standpoint of the Plaintiffs' testimonies, but from the standpoint of the Defendant's production process, testimony of Mr. Roslick, and the chemical processes and emissions, it is submitted would be blatantly unfair as Tate & Lyle has a production process, as evidenced by the testimony of Mr. Roslick that is somewhat of a phantom process as while there are over a thousand points of exit for the DMA as the unwanted byproduct of the production process, those sources of exit are essentially invisible and cannot be seen if someone were standing there looking

at them. (See Depo. Testimony of Ran Roslick, Plaintiffs' Ex. "3" to Notice of Filing, pp. 31-33).

Accordingly, while Tate & Lyle has admitted that DMA is the unwanted byproduct of its production process and that the Tate & Lyle plant is in a relatively short distance of the Plaintiffs' homes and that the Plaintiffs have incurred and suffered symptoms as predicted by governmental brochures embraced and incorporated by MSDS publications used by Tate & Lyle, Tate & Lyle denies that the thousand invisible points of exit for the DMA have caused any emissions that would cause any of the problems incurred by the Plaintiffs based in part on the testimony of Mr. Greenburg using National Weather Station data forty-two (42) miles away as to wind frequencies.

Against this backdrop, the trier of fact is entitled to and it is strongly suggested that Mr. Montgomery's testimony be adduced to assist the trier of facts in understanding the evidence and sifting through various methodologies used by Mr. Greenburg and the Tate & Lyle plant in making the factual determination as to the source of the odors and symptoms that the Plaintiffs have incurred in this matter on a regular, daily basis.

## CONCLUSION

Tate & Lyle has a very sophisticated process with invisible points of exit numbering over a thousand, which are checked, according to Tate & Lyle, on a regular basis. The Plaintiffs are not capable nor is anyone capable, according to Mr. Roslick, of observing the DMA being emitted. Accordingly, Mr. Montgomery has utilized all of his skills and training along with government brochures and publications embraced and utilized by Tate

& Lyle along with the location of the Plaintiffs' properties along with an air dispersion model performed by Mr. Montgomery in concert with a University of South Alabama engineer and in conjunction with the testimony of the Plaintiffs as to the symptoms incurred by them to form an opinion that in fact the Tate & Lyle facility and its unwanted byproduct, DMA, is the cause of the Plaintiffs' problems, which they incur, which upsets them both physically and emotionally on a daily basis.

In that regard, Mr. Montgomery's testimony clearly meets the requirements of <u>Daubert v. Merrill Dow Pharmaceuticals</u>, 509 U.S. 579 (1993) and his testimony should clearly be allowed in this matter to assist the jury in performing their duty of sorting out all of the factual differences between the parties and, accordingly, it is respectfully requested that the Defendant's <u>Daubert</u> motion to exclude the testimony of Plaintiffs' expert, James R. Montgomery, be denied.

                                      Respectfully submitted,

                                      <u> s/John W. Parker              </u>
                                      **JOHN W. PARKER (PARKJ3605)**
                                      Attorney for Plaintiffs

**OF COUNSEL:**

**LAW OFFICES OF JOHN W. PARKER**
820 S. University Boulevard, Suite 2-F
Mobile, Alabama  36609
(251) 341-1020
(251) 341-1235 (Fax)

## **CERTIFICATE OF SERVICE**

I do hereby certify that on this the 5th day of September, 2008, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

Herndon Inge, III, Esq.
Post Office Box 40188
Mobile, Alabama 36640-0188

Halron W. Turner, Esq.
Post Office Box 1389
Chatom, Alabama 36518

Marc Bradley, Esq.
1359 Dauphin Street
Mobile, Alabama 36604

Michael H. Wetmore, Esq.
William J. Curtis, Esq.
Robyn D. Buck, Esq.
Husch Blackwell Sanders, LLP
190 Carondelet Plaza, #600
St. Louis, Missouri  63105


 s/ John W. Parker
**JOHN W. PARKER**