**IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| **BOBBY J. RADCLIFF, et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| v. ) | Civil Action No. 06-0345-CG-M |
| ) | |
| **TATE & LYLE SUCRALOSE, INC.,** ) | |
| ) | |
| **Defendant.** ) | |

**ORDER**

This matter comes before the court on Tate & Lyle Sucralose, Inc.'s ("defendant" or "Tate & Lyle") motion to exclude the testimony of plaintiffs' expert, James R. Montgomery ("Mr. Montgomery"), and the plaintiffs' response. (Docs. 172 and 184). The defendant argues that Mr. Montgomery's testimony should be excluded because he lacks the necessary qualifications to testify as an expert, because the methodology that he used to reach his opinions was not sufficiently reliable, and because his testimony will not assist the trier of fact. (Doc. 172, p. 8). The court finds that the motion is due to be granted based on the argument regarding the unreliability of the methodology.

**I.     DAUBERT STANDARD**

No party requested a "Daubert hearing" to supplement the motion. See Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla., 402 F.3d 1092, 1113 (11th Cir. 2005) (Daubert hearings may be helpful, but they are not required.).

As the United States Supreme Court explained in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), the starting point for the court's analysis of this motion is Rule 702 of the Federal Rules of Evidence.  The rule says:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED. R. EVID. 702.  See also Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137 (1999) (recognizing that, although Daubert applied to a "scientific" matter, its flexible teachings apply to experts who offer testimony based on their "technical, or other specialized knowledge" as well).

> The Rule, in respect to all such matters, "establishes a standard of evidentiary reliability."  [Daubert,] 509 U.S. at 590, 113 S.Ct. 2786. It "requires a valid . . . connection to the pertinent inquiry as a precondition to admissibility." Id., at 592, 113 S.Ct. 2786. And where such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question, . . . the trial judge must determine whether the testimony has "a reliable basis in the knowledge and experience of [the relevant] discipline." 509 U.S. at 592, 113 S.Ct. 2786.

Kumho Tire,  526 U.S. at 149.

The Eleventh Circuit described the district court's duty when faced with such a motion as follows:

> The admission of expert evidence is governed by Federal Rule of Evidence 702, as explained by Daubert and its progeny.  Under Rule 702 and Daubert, district courts must act as "gatekeepers" which admit expert testimony only if it is both reliable and relevant.  District courts are charged with this gatekeeping function "to ensure that speculative, unreliable expert testimony does not reach the jury" under the mantle of reliability that accompanies the appellation "expert testimony."  To fulfil their obligation under Daubert, district courts must engage in a rigorous inquiry to determine whether: "(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue."  The party offering the

> expert has the burden of satisfying each of these three elements by a preponderance of the evidence.
>
> In ascertaining reliability under the second <u>Daubert</u> prong, we have identified several factors which can be considered: (1) whether the expert's methodology can be tested; (2) whether the expert's scientific technique has been subjected to peer review and publication; (3) whether the method has a known rate of error; (4) whether the technique is generally accepted by the scientific community. This list of factors, however, "do[es] not exhaust the universe of considerations that may bear on . . . reliability." District courts "have substantial discretion in deciding how to test an expert's reliability . . . ."

<u>Rink v. Cheminova, Inc.</u>, 400 F.3d 1286, 1291-92 (11th Cir. 2005) (citations and footnote omitted, alterations in original). <u>See also</u> <u>General Elec. Co. v. Joiner</u>, 522 U.S. 136, 143 (1997) (district court's decision to admit or exclude expert testimony is reviewed for an abuse of discretion).

> Under the second prong of <u>Daubert</u>, the relevance requirement, the court must "ensure that the proposed expert testimony is 'relevant to the task at hand,' . . . i.e., that it logically advances a material aspect of the proposing party's case." <u>Daubert</u>, 43 F.3d at 1315 (on remand). Thus, the evidence must have a valid scientific connection to the disputed facts in the case. <u>Daubert</u>, 509 U.S. at 591, 113 S. Ct. 2786 (holding "scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes. . . . Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility"). This connection has been appropriately denominated as "fit." <u>Id</u>.

<u>Allison v. McGhan Med. Corp.</u>, 184 F.3d 1300, 1312 (11th Cir. 1999).

The court is mindful that it must focus "solely on principles and methodology, not on the conclusions that they generate." <u>Daubert</u>, 509 U.S. at 595. <u>See also</u> <u>Rudd v. General Motors Corp.</u>, 127 F. Supp. 2d 1330, 1335 (M.D. Ala. 2001) (quoting <u>Daubert</u>, 509 U.S. at 595). To that end, however, "nothing in either <u>Daubert</u> or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the <u>ipse</u> <u>dixit</u> of the expert. A court may conclude that there is simply too great an analytical gap between the data

and the opinion proffered." Joiner, 522 U.S. at 146. See also Cook, 402 F.3d at 1111 (same).

## II. ANALYSIS

Mr. Montgomery's expert report is found in the record at Document 121. The expert report and Mr. Montgomery's deposition transcript are also attached as exhibits to Tate & Lyle's motions for summary judgment. (Doc. 147-2, p. 1). The plaintiffs filed an affidavit of Mr. Montgomery in response to Tate & Lyle's motions for summary judgment. (Doc. 162-2).

In his expert report, Mr. Montgomery opines:

> Based on my study, the emissions from the Splenda Plant are sufficient to cause the symptoms noted and inconvenience reported by the surrounding home owners, e.g. mild upper respiratory symptoms, mild breathing troubles, watery and burning eyes, and headaches, and unpleasant odors as noted above, and the inconvenience in having to limit time outside the home to escape such symptoms and odors. Such "annoyance" caused by the odor, symptoms and limited ability to use the area surrounding their home is the direct effect of Tate & Lyle's emissions, though I found no evidence of those emissions causing fatal, toxic, or carcinogenic conditions.

(Doc. 121, p. 4). After reviewing the record on file in this case, including Mr. Montgomery's report, his deposition, and his affidavit, the court finds that the methodology Mr. Montgomery used was unreliable. Specifically, the court finds that Mr. Montgomery assumed that Tate & Lyle's plant emitted a certain amount of chemical in order to determine that the plaintiffs' alleged symptoms were caused by sufficient chemical emissions from the plant. In other words, Mr. Montgomery assumed the fact that he testifies is true.

Although Mr. Montgomery's expert disclosure references five different chemicals, he testified that DMA or DMF are the chemicals that could cause the nuisance at issue in this case. (Doc. 121, p. 3; Montgomery Depo. pp. 116-17, 211). Based on what Mr. Montgomery determined was a sufficient level of exposure to cause the asserted nuisance, which he called a

Threshold Limit Value, or "TLV" (Doc. 121, p. 3), and a calculation about how the chemicals would be disbursed in the air, Mr. Montgomery determined how much of the chemicals would have to be emitted from the Tate & Lyle plant in order to cause a nuisance. (Doc. 121, pp. 3-4; Montgomery Depo. pp. 87, 91-92, 205-06, 209).

Mr. Montgomery's expert report identifies two basic ways the chemicals could be emitted from Tate & Lyle's plant: "stack" emissions and "fugitive" emissions. (Doc. 121, p. 3). Stack emissions "are verifiable, controlled, emissions which are considered acceptable in the environment." (Doc. 121, p. 3). Fugitive emissions "are unintended releases of Hazardous Air Pollutants[.]" (Doc. 121, p. 3). He opined that the stack emissions from the plant were insufficient to meet the TLV. (Doc. 121, p. 3; Montgomery Depo. pp. 110-111). His report indicates that fugitive chemical emissions in the past had put enough of the chemicals into the atmosphere to cause the alleged nuisance. (Doc. 121, p. 3). Mr. Montgomery's conclusion that Tate & Lyle caused a nuisance, then, is based on his determination that there were sufficient fugitive emissions to meet his threshold level.

In response to the question, "what is the objective basis that you have for a Tate & Lyle emission being in the community at a level to cause those effects [of a nuisance]," Mr. Montgomery testified "[p]eople complaining about it." (Montgomery Depo. pp. 166-67). His subsequent affidavit confirms that Mr. Montgomery decided that Tate & Lyle caused a nuisance based on "the fact that the plant is in close proximity to the Plaintiffs' homes, the plant utilizes DMA and has incurred instances of fugitive emissions or 'puffs' as documented on occasion, and the Plaintiffs incur symptoms caused typically by those fugitive emissions." (Doc. 162-2, p. 3). The documented fugitive emissions that Mr. Montgomery references, however, occurred prior to

the relevant time period; he could not identify any fugitive emissions that occurred during the relevant time period. (Montgomery Depo. pp. 83-84, 110-13, 122-43, 155, 217-19).

Mr. Montgomery did not test for the presence of DMA or DMF at any of the plaintiffs' properties. (Montgomery Depo. pp. 150-52, 158, 166-67). There is no evidence that Mr. Montgomery tested for the presence of DMA or DMF in the atmosphere at Tate & Lyle's plant. He also has not seen any of the plaintiffs' medical records, read any of their depositions, or seen or spoken to any of them. (Montgomery Depo., pp. 54, 62, 64, 98-100, 150). He cannot name any particular plaintiff's symptoms. (Montgomery Depo., p. 54). He knew about the plaintiffs' symptoms because the plaintiffs' attorney described them to him. (Montgomery Dep., p. 106).

Mr. Montgomery's report, his deposition, and his affidavit lack an explanation of how Mr. Montgomery reached the conclusion that fugitive emissions from Tate & Lyle's plant were sufficient to cause the "symptoms noted and the inconvenience reported by the surrounding home owners" (Doc. 121, p. 4) other than based on the plaintiffs' complaints and his calculations about the level of emission that is required to cause the alleged nuisance. Mr. Montgomery's opinion boils down to asserting that, because the plaintiffs are complaining about problems that could be attributed to chemicals that are present at Tate & Lyle's plant, Tate & Lyle must be emitting those chemicals. In other words, Mr. Montgomery's opinion that Tate & Lyle's plant is causing a nuisance by releasing chemicals is based on the plaintiffs' complaint of a nuisance and the fact that it is theoretically possible for the plant to emit, accidentally as fugitive emissions, enough DMA or DMF to cause a nuisance.

Without determining how much, if any, DMA or DMF is at any plaintiff's property at any time, or how much, if any, DMA or DMF escaped from the Tate & Lyle plant during the

relevant period of time, Mr. Montgomery opined that the Tate & Lyle plant emits enough DMA and DMF to cause a nuisance to the plaintiffs.  The opinion lacks any credible analysis of whether the chemicals that purportedly caused the nuisance were emitted from the plant or were present at the plaintiffs' properties.  Mr. Montgomery's testimony is based on assumptions and speculation about the level of chemical emissions from Tate & Lyle's plant, rather than on principles and methods based on reliable factual predicates.  As such, the motion to exclude the testimony of plaintiffs' expert is **GRANTED**.

**DONE and ORDERED** this 25th day of November, 2008.

/s/ Callie V. S. Granade
CHIEF UNITED STATES DISTRICT JUDGE