1      UNITED STATES DISTRICT COURT
       SOUTHERN DISTRICT OF ALABAMA
2

3   BOBBY L. RADCLIFF, et al.,
                                        CASE NO. CV06-0345
4           Plaintiffs,
    v.
5                                       COURTROOM 2B
    TATE AND LYLE SUCRALOSE,
6   INCORPORATED,
                                        MOBILE, ALABAMA
7           Defendant.
                                        DECEMBER 4, 2008
8   * * * * * * * * * * * * *

9                   MOTIONS HEARING
       BEFORE THE HONORABLE CALLIE V. S. GRANADE,
10      CHIEF JUDGE, UNITED STATES DISTRICT COURT

11  APPEARANCES:

12  FOR THE PLAINTIFFS:
    HERNDON INGE, III
13  Herndon Inge III, LLC
    P. O. Box 40188
14  Mobile, AL 36640-0188
    251-432-1444
15  hinge@herndoninge.com

16  JOHN W. PARKER
    820 S. University Boulevard, Suite 2-F
17  Mobile, AL 36609
    251-341-1020
18  ltannerjwp@earthlink.net

19  FOR THE DEFENDANT:
    MICHAEL H. WETMORE
20  Husch, Blackwell, Sanders, LLP
    190 Carondelet Plaza, Suite 600
21  St. Louis, MO 63105-3441
    314-480-1500
22
    HALRON W. TURNER
23  Turner, Onderdonk, Kimbrough & Howell
    P.O. Box 1389
24  Chatom, AL 36518-1389
    251-847-2237
25  hwt@tokh.com

1    (Continued)

2    MARC E. BRADLEY
     1359 Dauphin St.
3    Mobile, AL 36604
     251-432-2855
4    meb@tokhmobile.com

5    THE CLERK:  MARY ANN BOYLES
     THE LAW CLERK:  BEN WHIPPLE
6    COURT REPORTER:   ROY ISBELL, CCR, RDR, CRR

7              Proceedings recorded by OFFICIAL COURT REPORTER
              Qualified pursuant to 28 U.S.C. 753(a) & Guide to
8    Judiciary Policies and Procedures Vol. VI, Chapter III, D.2.
              Transcript produced by computerized stenotype.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1        (9 a.m., in open court.)
 2             THE CLERK:  Case set for motion hearing in Bobby L.
 3    Radcliff and others versus Tate and Lyle Sucralose,
 4    Incorporated, civil case number 06-345.  Are counsel for the
 5    plaintiffs ready to proceed?
 6             MR. PARKER:  We are, Your Honor.
 7             THE CLERK:  Are counsel for the defendant ready to
 8    proceed?
 9             MR. WETMORE:  Yes, we are, Your Honor.
10             THE COURT:  Good morning.
11             MR. PARKER:  Good morning.
12             MR. WETMORE:  Good morning.
13             THE COURT:  I'd like to hear first your arguments on
14    the renewed motion for summary judgment.  I tell you, frankly,
15    I think that it's due to be granted because of lack of proof of
16    causation as to the odor nuisance.  But I'm particularly
17    interested in hearing about the noise nuisance.  So, Mr. Parker
18    or Mr. Inge, whoever's going to --
19             MR. PARKER:  Well, Your Honor, in regard to our
20    position on both noise and odor, if I could just generally
21    speak to that, and then I'll separate that?
22             THE COURT:  Well, I need you to separate them out.
23    But you can speak generally first, if you'd like.
24             MR. PARKER:  Essentially our position is that this
25    case was brought on a nuisance claim.  And the Alabama case law
```

1    that we're relying on specifically says that nuisance is based

2    on the loss of use and enjoyment of one's home or the effect of

3    reasonable sensibilities of these people who we represent as

4    plaintiffs.

5         And I think that I cited to Your Honor a case in brief

6    called Baldwin v. McClendon, in which the Alabama Supreme Court

7    held that a nuisance is that which is offensive to the senses

8    or so as to produce physical discomfort such as to materially

9    interfere with the comfortable enjoyment of the property within

10   the sphere of the property of the plaintiffs.

11        In this case the plaintiffs have testified, to a man,

12   that not only were they not able to live comfortably and with

13   enjoyment because of the smell and the noise, but that they

14   also incurred, according to their own sensibilities, certain

15   problems -- coughing, redness of the eyes, labored breathing,

16   et cetera.  They don't have a clue what the MSDS says.  They

17   don't know what it is that's causing this.  But they

18   consistently testify that they were not able to use their

19   homes.

20        THE COURT:  Well, I don't have any question but that

21   they are suffering some symptoms and that something is causing

22   it.  But the question is:  What is the proof of causation that

23   you've been able to produce, without your expert's testimony?

24        MR. PARKER:  Well, I'll put it succinctly, so as to

25   just focus on that.  The causation issues, we feel are -- the

1  factual issues are that the plant has admitted emitting what

2  they call a fugitive emission, called DMA, which is the

3  chemical that produces -- and smells a certain way and produces

4  certain symptoms which these people have incurred

5  consistently.

6       Mr. Roslak has testified that they have had emissions

7  from the plant.  They contend that it's colorless, you can't

8  see it, and they have a sensitive sniffer system to test these

9  points of emission.  But they do admit that they've had points

10 of emission.  They do admit that their MSDS says do not allow

11 this to get into the environment.  That's one of the comments

12 in their technical data which they embrace and use, is this DMA

13 cannot be allowed to get into the environment.

14      They've admitted it gets into the environment.  They

15 admit they use the MSDS forms.  They admit that there are

16 literally thousands of points of potential exit and that we

17 would have to have a sensitive sniffer device there to detect

18 these emissions.

19      Also, Your Honor, these emissions are not

20 toxic.  We're not claiming a toxic tort.  Therefore, they are

21 not required to be reported on a form per se.  There's nothing

22 we could put our hands on to show on X day there was X

23 emission.

24      So what we have is we have the manager of the plant

25 admitting they used -- they admit the fugitive unwanted

1    byproduct, DMA.  We have him admitting there are thousands of

2    points of potential exit.  We have him admitting that there are

3    instances of emissions; he admits that.

4            We have these people adjacent to the plant who have

5    testified that prior to the expansion of the plant, so as to

6    enlarge the facility and the production, they did not have

7    these symptoms.  They then began to smell in the mornings when

8    they go to work, and in the evenings when they come back, and

9    then the weekends when they're there the odor, the fishy odor,

10   that emits as per their brochures.

11           They began to have the symptoms associated when they

12   would smell this, they would have what they said, the redness

13   of the eyes and the coughing and the breathing and all those

14   associated things.  So those are the causation issues, we

15   think -- at least we submit to Your Honor, with all due

16   respect.

17           THE COURT:  All right.  What about the noise?

18           MR. PARKER:  May I briefly say, though, on the

19   causation issue, I was about to say --

20           THE COURT:  All right.

21           MR. PARKER:  -- I think Your Honor in your initial

22   ruling stated that these issues are historically fact

23   issues.  And I think the law consistently states that.  Now,

24   the defendants have cited the Tipler case.  Tipler did not say

25   that causation is anything other than an issue of fact.  What

1    Tipler said --

2         THE COURT:  Well, I agree it's an issue of fact.  But

3    there has to be some actual proof of causation as opposed to an

4    inference of causation.

5         MR. PARKER:  Well, it's kind of like -- I'll draw the

6    analogy, Your Honor -- the David and Goliath battle.  We have

7    this huge plant.  They admit it's colorless.  They admit they

8    have to have sensitive sniffer devices to detect the

9    emissions.  They admit they have emissions.  But they don't

10   fill out a form showing them.  They admit what it causes people

11   to suffer.  They admit that it should not get into the

12   environment.  My people live there, lived there before they

13   built the plant, expanded it, and they've suffered continuously

14   these symptoms and they've endured these --

15        THE COURT:  Well, I agree, I agree that you may have a

16   case if you had evidence to show that the emissions that the

17   plant was actually letting loose were in a sufficient quantity

18   to cause the symptoms, that if you have some sort of testimony

19   that these emissions are actually detected on your plaintiffs'

20   properties other than through the symptoms that they are

21   expressing, because they don't know what is causing it.  They

22   only know that they are having it.  And it just seems to me

23   that you're asking the Court to say that you can simply jump

24   from the symptoms and the fact that the plant is there without

25   any sort of scientific or expert testimony to say this is

1   actually what is causing the symptoms that your plaintiffs are

2   having.

3           MR. PARKER:  Well, Judge, in that regard, the rules of

4   evidence -- and I went and looked at rule 701 very carefully,

5   and the footnotes and all the associated cases.  And I think

6   that rule really is for this kind of case; and that is, the

7   case law says that nuisance is based on sensibilities and what

8   a reasonable person feels and endures as a result of something.

9           THE COURT:  And what causes it.

10          MR. PARKER:  Yes.  Well, the causation issue here,

11  Judge, respectfully, is bound into these other things.  The

12  cases say that in nuisance the issue is not the operative --

13  let me read it to you rather than try to state it or I'll state

14  it incorrectly.  The test in a nuisance case is not necessarily

15  what causes the problem, but what the problem is.  In other

16  words, what it consists of.

17          THE COURT:  What test?  The test for what, rather?

18          MR. PARKER:  Well, the case I'm looking for, I had it

19  in hand here a minute ago.

20          MR. INGE:  Judge if I might interrupt?  Mr. Roslak,

21  the manager of the -- chemical engineer, manager of the plant,

22  testified that the DMA, which is what we're talking about, has

23  a fishy smell.  Each one of these homeowners say a fishy smell,

24  a fishy or an urine-like smell.  They don't just have the

25  symptoms.  It's tied to the admission of the plant operator,

1    the plant president, the 30(b)(6) representative of the plant,

2    that DMA is an unwanted byproduct and smells fishy.

3         The next step is all of the people say it is a fishy

4    smell.  All of them describe it.  They don't describe it as

5    another smell.  It is a fishy smell.  And then they have the

6    symptoms.  So it's not -- it's not moving from no symptoms to

7    symptoms.  It's moving to production of a chemical, a fishy

8    smell, admittedly a fishy smell, they say a fishy smell, and

9    they say they have these symptoms when they smell the fishy

10   smell.

11        THE COURT:  I know.  But you've got to make the tie

12   from there's a fishy smell that's caused by this chemical that

13   from time to time may be released from the factory to actual

14   symptoms that your plaintiffs had.  You have no expert

15   testimony that says that this is the actual chemical that's

16   causing these symptoms.

17        MR. INGE:  Judge, okay.  As historical background,

18   this case -- it was alleged initially that the worrisome

19   chemical in this neighborhood was phosgene.  Phosgene is a

20   nerve gas.  It was early on -- we were looking, the plaintiffs

21   were looking, for phosgene.  The defense said:  "If you admit

22   that you will stop looking for phosgene, because it's not

23   there, DMA is what causes the fishy smell."

24        By that time -- we were taking the depositions of all

25   the plaintiffs.  They all testified that there was a fishy

1    smell.  And so the defendant said:  "DMA is what you're looking

2    at.  It's not phosgene that causes the fishy smell.  It's the

3    DMA that causes the fishy smell."  And so -- and they have

4    industrial documents that are standard documents, called an

5    MSDS, that say that DMA causes a fishy smell.

6         The plant manager says:  "The DMA, that is a byproduct

7    that is made by us every day, we don't want it, we try to

8    recycle it, but that causes a fishy smell."

9         Then the homeowners say:  "It's the fishy smell.  And

10   when I smell the fishy smell, that's when I get the

11   symptoms."

12        So -- and according to your own summary judgment order

13   in August, Your Honor has correctly followed the rule --

14   followed the law that says that it's up to the property

15   owner -- the fact question is to be determined by the jury,

16   whether there's a causation between the smell that they all

17   reported, the fishy smell, and the symptoms related to the

18   fishy smell and that they didn't -- that many of them lived in

19   that same neighborhood their whole lives, they did not smell it

20   until Splenda came, and then Splenda came and then they smelled

21   it.

22        MR. PARKER:  Judge, I know we're -- I don't mean to

23   double team.  But I wanted to -- the case I was trying to find

24   when we got -- Mr. Inge spoke, I do have it now and I wanted to

25   read.  You asked a question about this.  And this case is the

1    case of Saint Louis-San Francisco Railroad v. Wade, and it's at

2    607 F. 2d 126, a 1979 case.   The case says damage by nuisance,

3    the injurious consequences resulting, rather than the acts

4    which produced the nuisance, constitute the cause of action.

5         Now, I know you're saying, well, you've got to link

6    the consequence to a particular emission.

7         Well, I submit to you it would be -- I think for us to

8    go in and get records, they don't have them.

9         It's colorless.   We can't see it.   They admit that.

10        The only way they know they have emissions is they

11   have admitted that on occasion they have minimal emissions

12   because they have this sensitive sniffer device to test all

13   these thousand points of exit for this chemical.

14        Then we have these people adjacent to the plant, or in

15   the area of the plant, who smell the odor that they say is

16   associated and incurred the symptoms associated with this gas

17   or with this chemical.

18        And so we feel that, as per Your Honor's previous

19   ruling, that we've met the burden.   We've done all that could

20   be done relative to linking -- we have a plant, we have a

21   chemical emitted, an unwanted fugitive byproduct that they

22   admit, they've admitted it escapes, we have people who suffered

23   and continue to suffer the same symptoms that they admit are

24   related to this emission.   Now --

25        THE COURT:   Who admitted?

1          MR. PARKER:   -- on day X we don't have a device --

2          THE COURT:   Who admits that they are related to this

3    emission?

4          MR. PARKER:   Well, the emission that I'm speaking of

5    is the form that they used, the MSDS form.

6          THE COURT:   Oh, the emission, not the admission?

7          MR. PARKER:   Emission.   I'm sorry.

8          THE COURT:   All right.

9          MR. PARKER:   And the form says, among other things,

10   that it causes burning sensations, coughing, headache, it

11   smells fishy, it has an odor, should not be released into the

12   environment, and they admit that this is a byproduct of their

13   process and it gets into the environment.   They've admitted

14   that.

15          Now, they say it's de minimis.   But we submit that the

16   question as to whether in a nuisance case, when weighing the

17   testimony of many people who have suffered these symptoms that

18   the defendant admits are a result from the use of this

19   particular -- or emission of this particular chemical, compared

20   to the fact there is a plant that emits it and admitted that it

21   gets into the environment, compared to their reports that say

22   they should not allow that to happen, when in fact the issue of

23   causation historically is one of fact, we feel there are enough

24   facts to submit the matter to the finder of fact, which is the

25   jury in this case.   And that relates -- that argument really

1  would relate -- of course, I'm talking the odor aspect of this,

2  if you will.  You asked about, I think, when we started, about

3  the --

4          THE COURT:  The noise.

5          MR. PARKER:  -- the noise.  The decibel -- they will

6  have a person, I think, as I understand, who will testify that

7  she's done a test on the site of the plant, that she feels the

8  decibel level of the noise is not enough to impact on these

9  individuals, where in fact they've testified repeatedly that

10  they hear, day and night, noises associated with pressure

11  releases from the valves and other noise-related things.  And

12  those are questions as to whether they impact on their use and

13  enjoyment of their home.  They are historically questions of

14  fact as are the questions, I submit, of the odor.

15          And so the arguments we would make in regard to the --

16  quite candidly, as Your Honor, I'm sure, can discern, the

17  majority of the symptoms -- in fact, all of the physical

18  symptoms they incur relate to the odor aspect.  The noise is

19  just an infringement, if you will, on their use of their

20  property per se.

21          And so -- but as far as us having a test, no, we don't

22  have a decibel meter planted out there on the plant site or on

23  our people's property.  They will testify they hear it, it's

24  loud, it interrupts, it's at night, it's in the daytime, when

25  they're home on the weekends.  They work during the day most of

1　them, a lot of them.  And it impacts on the use and enjoyment

2　of their home, which is the basis of the nuisance claim.

3　　　　　THE COURT:  All right.  Is it Mr. Wetmore?  Were you

4　going to argue for the defendants?

5　　　　　MR. WETMORE:  Yes, Your Honor.  And I'll address the

6　noise, which is what concerns you.  The analysis with respect

7　to odor, however, is the same with respect to noise.  There's

8　absolutely nothing factually in the record that links the plant

9　to the noise that the plaintiffs complain of.  There's a total

10　lack of a link.  They have no expert.  We do have an expert,

11　and that report was attached to our original summary judgment

12　motion as Exhibit --

13　　　　　THE COURT:  Is the kind of noise we're talking about

14　here, is that something that would need an expert to say where

15　it's coming from?

16　　　　　MR. WETMORE:  No.  But you still need the causal

17　link.  Simply because there's a plant -- this is an industrial

18　park.  There is Olin, there's Ciba, there's Bay Gas.  There's a

19　railroad track between the plaintiffs' properties and the

20　plant.  So the evidence of record, the only evidence of record

21　with respect to decibel levels, is what was submitted with our

22　expert report from a woman, Brenda Tolson.

23　　　　　What she did was she put noise meters at the fence

24　line of the plant, at the backyard of the one of the

25　plaintiffs' properties, and at the railroad track and she ran

1   tests for a week.   And the noise levels at the plant never
2   changed.   The noise levels increased at the plaintiffs'
3   properties and increased at the railroad tracks at the same
4   time.   The hissing, the banging, is the railroad cars going
5   into the Olin plant.   There are no rail lines going into the
6   Tate and Lyle plant.

7           But it's the same causal link.   There is absolutely no
8   facts of record that would allow a jury to do anything other
9   than speculate, from the plaintiffs' standpoint, that the noise
10  is coming from the plant as opposed to the railroad tracks in
11  between the two.   That's the point.   Whether or not you need an
12  expert, you certainly need some objective facts.   Because
13  there's nothing other than speculation to say that I have Tate
14  and Lyle's plant, I have the Olin plant, which is closer, I
15  have the Ciba plant, I have Bay Gas -- excuse me -- which is an
16  underground gas storage facility that has pressure relief
17  valves.   There's absolutely nothing to allow a jury to do
18  anything other than speculate, from the plaintiffs' evidence,
19  that the noise that they claim to hear in fact comes from the
20  plant.

21          On the contrary, from the defendant's side the
22  evidence, which is unrefuted -- and we're here on a summary
23  judgment motion, where we have to put our cards face up on the
24  table.   What is the evidence that we have?   The evidence is
25  unrefuted.   It's not as if they couldn't get a noise

1    expert.  They certainly could.  And it's their property.  They

2    can put noise meters on their properties without any

3    difficulty, to say here are the noise levels.  Had they asked

4    permission, they could have put noise levels.  Outside our

5    fence line, it's not our property outside the fence line.

6           The point is that there's that same lack of a causal

7    link that would, from a factual standpoint, that would allow a

8    jury to do anything other than speculate that the noise is

9    coming from Tate and Lyle versus from the railroad tracks.

10           Counter that with the expert testimony that Tate and

11   Lyle submitted which goes unrefuted -- Mr. Parker says he

12   doesn't have any contrary evidence -- that says the source of

13   the noise is the railroad tracks.

14           And on a motion for summary judgment.  Where there's

15   no contrary evidence, then I believe the summary judgment

16   standard is that, absent that evidence, absent whether it's an

17   expert or whether it's from the plaintiffs that say it comes

18   from the plant, because they don't know where it comes from

19   either, they just know they hear it -- then the summary

20   judgment is due to be granted.

21           MR. INGE:  Judge, if I might respond?  On page 11 of

22   your summary judgment order of August of 2008, Your Honor

23   correctly found that issues of causation are normally properly

24   submitted to the jury because they are generally dependent upon

25   the facts in the case.  Also, as set forth above, all that the

1   plaintiffs need to show in order to prevail over the
2   defendant's motion for summary judgment is a loss of use and
3   enjoyment of their properties.
4          They all -- many of them have lived there from
5   birth.  They said:  "We did not hear the noises, the hissing
6   noise, the pressure noise, the generator noise, the running
7   noise, the banging noise, we did not hear that.  We've lived
8   there for 50 years before the Splenda plant.  The Splenda plant
9   opened and now we hear it.  We can see Splenda, the lights of
10  Splenda at night.  We never hear noises from Olin or Ciba."
11         That is also in the record.  Their depositions are in
12  the record, submitted in response to summary judgment.  The
13  causation that they did not hear it before the plant, then the
14  plant came, they heard it, they've never heard it before, that
15  ties the causation, from the plaintiffs' testimony to the cause,
16  to the breach of duty.
17         THE COURT:  Mr. Wetmore, do you care to respond to
18  that or do you have any argument that you'd care to make about
19  the burning sensation or the odor?
20         MR. WETMORE:  Let me respond briefly to the
21  noise.  The issue that Mr. Inge presented, there is not only
22  the Tate and Lyle plant, but this Bay Gas plant that it's
23  undisputed had come beforehand, but the same lack of causal
24  link, the argument Mr. Inge just made was a very similar
25  argument Mr. Parker was making with respect to the odor.  And I

1   come back again to the point of summary judgment, where if you

2   have the undisputed evidence, that the plaintiffs may say that

3   they hear this noise, but we have the evidence that there is no

4   increase in noise level at the plaintiffs' -- at the plant line

5   but there is an increase noise level when a railroad car goes

6   by or when the trains are coupled and uncoupled going into the

7   Olin plant.  And that's undisputed.

8           With respect to odor, Your Honor, I think you have the

9   issue correctly in hand.  And we pointed that out in our

10  brief.  And candidly, even Mr. Montgomery, the expert that's

11  now gone, was very candid in admitting that in order for them

12  to prevail on an odor issue in a chemical exposure case, you

13  would need to have evidence of the concentrations of this DMA

14  at the plaintiffs' property and evidence that that

15  concentration is sufficient to exceed both the odor threshold

16  and the threshold at which these symptoms emit.  There's

17  nothing in that MSDS that addresses anything about thresholds,

18  concentration thresholds or anything.

19          And when the plaintiffs indicated in the brief they

20  filed yesterday that gas is unachievable, the response to that

21  is:  No, it's not unachievable.  Now, maybe the facts couldn't

22  support it in a particular case, but the methodology is not

23  difficult.  And they don't even have to come onto our

24  property.

25          The issue is:  What is the level of DMA at their

1    property line?  They have access to that property.   There's

2    access to experts with technology to say:   Is there in fact DMA

3    at the property, is it at a level that can cause an odor or

4    that can cause the health effects that are currently the

5    complaints that the plaintiffs make?

6            And the cases that we cite, we cite the McClain case,

7    which is an Eleventh Circuit case from the Northern District of

8    Alabama; the Whatley case, which came out of the Alabama

9    Supreme Court.  They all indicate when you're dealing with a

10   chemical exposure, the individual causation issues mean that

11   you must have that kind of testimony, because otherwise all

12   you're doing is allowing the jury to speculate.

13           Candidly, the McClain case cited a publication from

14   the Federal Judicial Panel as an aid to judges.  It was from

15   the Federal Judicial Center publication by Dr. David Eaton,

16   Scientific Judgment for Toxic Torts, and it said precisely what

17   Your Honor pointed out; and that is, there has to be this

18   causal link.  Not simply proof of exposure, but proof of enough

19   exposure to cause the plaintiffs' specific complaints.

20           THE COURT:  Do you distinguish between toxic torts and

21   a nuisance case in that regard?

22           MR. WETMORE:  No, Your Honor.  Because what we're

23   talking about is a chemical exposure.  Now, there are obviously

24   nuisance cases that don't involve chemicals, nuisance cases

25   that involve water running onto somebody's property, the

```
 1    Whatley case had to do with an electrical -- or the
 2    Stringfellow case an electrical transformer.  But the point is
 3    it's a chemical exposure that causes a particular symptom and
 4    it's the dose, it's the concentration, it's the level at which
 5    that can cause the symptom.  It doesn't cause it at all
 6    levels.  The question is at what level does it cause it?  It's
 7    a total absence of proof.  Even Mr. Montgomery didn't have that
 8    proof.
 9          MR. PARKER:  Judge, have you heard all you need to
10    hear or may I respond briefly?
11          THE COURT:  You may respond.
12          MR. PARKER:  I think, if I understood counsel to
13    cite -- and I spoke to this briefly in my response.  There are
14    some cases that are cited for the proposition that if
15    reasonable men cannot differ as to causation, it becomes a
16    legal issue.  Those cases they've cited, the two that they did
17    cite out of Alabama, don't support that proposition.  And he
18    spoke of the Whatley -- I think he said Whatley case.  I think
19    that's the case he's referring to, Cardinal Pest Control.  That
20    was a pesticide case where there was an allegation someone
21    suffered a physical debilitating disease and there was medical
22    testimony that the pesticide did not cause that particular
23    disease; therefore, no case, no cause.  That's not a nuisance
24    case.
25          The other case they cited out of Alabama that they
```

1   found was a case where a 14-year-old young man had taken a

2   vehicle and driven on the wrong side of the road and had a

3   head-on collision and killed someone, and his father sued the

4   person who gave him the vehicle on a bailee-bailor argument.

5   And the court said the obvious proximate cause of the case was

6   driving on the wrong side of the road, which caused the death.

7   And that's about -- that's something reasonable men can't

8   differ about, and therefore no causation.

9           We don't have that here.  We have a nuisance case in

10  which historically the Alabama courts have held that it's an

11  issue of what impacts the reasonable sensibilities of people as

12  reasonable ordinary citizens, vis-a-vis their having to incur

13  things, symptoms, or events that affect their reasonable

14  sensibilities.  These people have testified that they didn't

15  have these problems before, they now have these problems, the

16  problems they have are consistent with their publications.

17          Now, counsel has stated that there's nothing in their

18  publication that says how much you have to let out to create a

19  problem.  It says in their publication:  "Do not let this

20  chemical enter the environment."

21          I'm reading from their publication.

22          They have admitted in Mr. Roslak's deposition it

23  happens.  And he, of course, said de minimis.  But it happens.

24  Their publication says do not let it happen.  It happens.  And

25  that chemical is the unwanted byproduct of their production

1   which can cause these symptoms and does smell the exact way

2   that these people discern it -- these people being reasonable

3   people of reasonable sensibilities.

4          There's no expert to say that we've got a bunch of

5   nuts that don't smell right and can't hear right.  They are

6   reasonable people.  They are normal people that live there and

7   have to endure this on a daily basis, and didn't endure it

8   before the plant was created.  It's a nuisance case.  It's not

9   a negligence case.  It's not wantonness case.  It's not a

10  medical malpractice case.  It's not a toxic tort case.

11         THE COURT:  Well, I understand that.  But whether it's

12  nuisance or toxic tort or medical malpractice or an accident

13  case, you have to prove what caused the injury about which you

14  are complaining.

15         Before we get to the motions in limine, let me consult

16  my lawyer for a minute.

17         MR. PARKER:  Judge?

18         THE COURT:  Yes.

19         MR. PARKER:  Not to interrupt, but I didn't realize --

20  did y'all know the motion was set this morning?

21         MR. TURNER:  That was originally set to be heard

22  before the beginning of the trial, which would have been --

23         THE COURT:  I mean, are you not ready?

24         MR. PARKER:  I didn't bring my --

25         THE COURT:  What more do you need to do in order to

1  prepare for it?

2       MR. PARKER:  Well, I know.  I didn't bring the file.

3   I don't even have it with me.

4       THE COURT:  I have copies of them, if you would like

5  to see them.  As a matter of fact, I think these are all the

6  motions in limine and the responses to them right here.  And

7  I'll be back in a moment.

8       MR. PARKER:  Okay.

9     (A recess was taken at 09:28 a.m.)

10    (9:31 a.m., in open court.)

11       THE COURT:  Well, as I indicated when I first came

12  out, I am inclined to grant the defendant's renewed motion for

13  summary judgment as to the odors which cause the physical

14  symptoms, because of lack of causation after having struck the

15  plaintiffs' expert for lack of proper methodology or foundation

16  for his conclusions.

17       I'm a little perplexed about the noise issue, now,

18  because I had not understood the defendants to ever claim lack

19  of causation on the noise.  I mean, I don't remember anything

20  in your original motion for summary judgment about the fact

21  that your plant was not making the noises that were complained

22  about.  As we had understood the argument before, it was that:

23  "Our noises aren't any louder than other noises around, so they

24  shouldn't really be bothering the plaintiffs."  And I don't

25  recall evidence at all about underground storage, that possibly

1   making the valve release sound.

2         MR. WETMORE:   I believe there was some evidence of

3   that.   But certainly with regard to the measurements with

4   respect to the noise, in our original motion at page 34 what we

5   brought out was that this plant couldn't be causing the noise

6   levels that they were hearing because the noise level at the

7   plant site, at the fence line, was lower than the noise level

8   of the passing trains.   So if they were complaining about a

9   noise, it couldn't be from the plant, because as an undisputed

10  matter of fact that noise was lower than the noise of the

11  passing trains.   And the trains merely -- it's not simply, as

12  we pointed out and as Expert Tolson points out, it's not simply

13  trains running through.   There's a large switching yard right

14  between the plaintiffs' properties and the plant, that goes

15  into the Olin plant.   And we have evidence from Ms. Tolson for

16  a 24-hour period several times during the week what is

17  happening at that plant -- at that switching yard.   So it was

18  the fact that there can't be a causal link because of that.

19        THE COURT:   Well, that doesn't necessarily follow.   I

20  mean, the fact that the trains may be louder than the noise

21  from your plant doesn't negate the fact that your plant is

22  making noise and that it may be interfering with the use and

23  enjoyment of the plaintiffs' property.   So I still think that

24  that is a jury question.   And as you didn't respond when I just

25  said this is the first time I'd ever heard of this underground

1  storage facility that makes valve release noises, is that
2  something that was referenced in your motion for summary
3  judgment?
4       MR. WETMORE:  You know, Your Honor, I'm not sure if we
5  referenced Bay Gas or not.
6       MR. PARKER:  They did not.
7       THE COURT:  All right.  Well, I still think that
8  that's a jury question.   But, you know, at this point I am
9  going to grant the motion for summary judgment insofar as it
10 relates to the odors and the physical symptoms caused
11 thereby.  All we're left with is possible nuisance on the
12 noise.
13       Now, it's hard to believe that we are going to be
14 going to trial over this.  But let me address your motions in
15 limine before we talk about where we go from here.
16       The first motion, the plaintiffs' motion in limine,
17 the first part, I think, is moot because of the granting of
18 summary judgment on the nuisance based on smell.  So anything
19 having to do with the chemicals, I think, would be moot.  If
20 anybody disagrees, speak up.
21       MR. PARKER:  I agree.  Those items related to the
22 odor.  Items one through eight, first section.
23       THE COURT:  Right.  The second section of your motion
24 deals with the previous litigation against Olin Corporation.
25 It may be moot because of where we are, as to what's the only

1    issue left.  Noise wasn't involved in that, and therefore the

2    previous litigation wouldn't really impact on the damages as

3    opposed to the --

4         MR. PARKER:  There was, as I understand, Judge, the

5    defendants have moved to exclude the fact that two of the

6    plaintiffs had previously filed suits as well against entities

7    such as, I think, Tate and Lyle, if I understand.  And I think

8    what's good for the goose is good for the gander.  Yes, we had

9    a couple of people.  They were mercury contamination cases some

10   years ago and there was a minimal settlement achieved.  And we

11   did not represent them.  But I don't think that's admissible.

12   I think it's only prejudicial and confuses the issue.  Whether

13   it's odor or noise, I think it should not come in.

14        THE COURT:  Mr. Wetmore?

15        MR. WETMORE:  Your Honor, there were a number of

16   lawsuits pending.  There are still some pending in state and

17   federal court with respect to the McIntosh area.  The issue

18   here is property diminution.  The plaintiffs, a number of the

19   plaintiffs, have filed lawsuits, some as many as five, alleging

20   that other companies have caused the diminution in value of

21   their properties.  And the fact that they have claimed that

22   other acts by other companies, whether they be mercury or the

23   Ciba plant, which has other chemicals, have served to devalue

24   their properties, I believe is relevant to be brought in.

25        THE COURT:  Well, right now what I'm addressing is

plaintiffs' second section of plaintiffs' motion, which has to
do solely with that the plaintiffs were previously engaged in
litigation with Olin Corporation regarding an abatable nuisance
of mercury.   There may be other lawsuits as well, you say?

MR. WETMORE:  Well, there are.  As I understand it,
Your Honor, there are or were two lawsuits against Ciba, two
lawsuits against Olin , and, of course, this one lawsuit
against Tate and Lyle.   And different combinations of
plaintiffs have been involved in different lawsuits.   One of
those settled with a small payment, as Mr. Parker indicated,
and that was Olin with respect to mercury.   But all of those
four other lawsuits alleged that it's the activities of either
Olin or Ciba that caused the diminution of property value.   And
some of the plaintiffs in this case, in their depositions, even
assigned percentage values, I believe -- I don't remember the
exact percentages -- "A certain percentage I attribute to Olin,
a certain percentage to Ciba, and a certain percentage to Tate
and Lyle."

THE COURT:  Well, I can't say at this point that that
kind of evidence would not be admissible on the damages
issue.   So I suppose that I deny your motion in limine as to
the second section.

The third section has to do with -- well, I think
that's probably moot -- Mr. Greenburg's testimony.

MR. PARKER:   Yes.

1          MR. WETMORE:  That's it, Your Honor.  He's an odor

2   man.

3          MR. PARKER:  He's the odor meteorologist.

4          THE COURT:  All right.  And then Tate and Lyle's

5   motions, seven motions.  The first one seeks to limit testimony

6   to acts or omissions occurring prior to June 2nd, 2004.  I

7   think any specific acts are probably irrelevant.  But the fact

8   that the noise began -- the noise didn't exist prior to that

9   and did exist after that is probably relevant.  But beyond that

10  specific acts, I think, are not admissible.  So I don't know

11  whether that's granted or denied.  I suppose it's denied, as to

12  the general fact that there was supposedly no noise that is now

13  complained of prior to that date.

14         The second one has to do with chemicals, other

15  chemicals.

16         MR. WETMORE:  Your Honor, if I might, I

17  apologize.  With respect to the first one, there already is a

18  ruling from the Court that, since we're left with a nuisance

19  claim, the measure of damages only extends back two years.  So

20  to the extent that --

21         THE COURT:  Well, I know.  But I was thinking more not

22  on the issue of damages, but on the issue of causation, the

23  fact the sound didn't exist prior to the time Tate and Lyle had

24  the plant and then did exist after that time, I think, is

25  relevant.  And that's the only extent to which it's being

1    denied.

2           Motion number two has to do with chemicals other than

3    DMA.  Is that relevant anymore?

4           MR. WETMORE:  I think that's moot.

5           THE COURT:  Yeah.

6           Three has to do with other lawsuits.  We've already

7    talked about that.

8           MR. WETMORE:  Well, it's a little bit different, Your

9    Honor.  These are lawsuits that were against Tate and Lyle.

10   But I think those lawsuits -- and Mr. Turner can correct me --

11   did not address noise; is that correct?

12          MR. TURNER:  There's one other lawsuit against Tate

13   and Lyle; the Bettis case that's pending in Washington County.

14   And noise is not an issue in that case.  It's only odor.

15          MR. WETMORE:  So it should be moot.  There shouldn't

16   be any evidence, I wouldn't think, because noise is not an

17   issue.

18          MR. PARKER:  We don't intend --

19          THE COURT:  It depended on --

20          MR. PARKER:  Judge, we're not intending to introduce

21   evidence about those other lawsuits.  I don't personally feel

22   that that's relevant and I don't think that the admission of

23   the plaintiffs' lawsuits are relevant.  But that's not what

24   we're here to fight about.  We're here about the facts of this

25   case.

1          THE COURT:  All right.  Well, I grant that one.

2          The fourth motion, which is document 197, has to do

3   with relative size of the plaintiffs and defendants and law

4   firms and lawyers, and there's no need to mention any of

5   that.  So that's granted.

6          Same as to five, the net wealth or financial condition

7   of any party.  That's granted.  That's document 199.

8          Motion number six, document 200 seeks to exclude

9   reference to the alleged property diminution in the leasehold

10  interest.  Are the plaintiffs --

11         MR. WETMORE:  That's relevant, Your Honor, because the

12  issue here is -- if you will recall, we addressed this briefly

13  in chambers back last August.  The issue here is whether

14  somebody who has a leasehold interest really has a cause of

15  action with respect to diminution of property value.  And for

16  the reasons we cited in our motion, we don't believe they do.

17         THE COURT:  Are the plaintiffs intending to prove any

18  such thing on the noise, diminution value of those

19  particular --

20         MR. INGE:  Judge, not of the leasehold interests.  We

21  have no -- there are two or three property owners that leased

22  the land from family members.  They are not claiming -- the

23  family member, the owner, is claiming the decrease in value of

24  that piece of property.  And the person who owns the mobile

25  home on his family's property is claiming damage to the mobile

home.  But we're not claiming a damage to a leasehold

interest.  If they own the mobile home or if they own the land,

that's what they are claiming damage to, not to a leasehold.

MR. TURNER:  I just had a question on that for counsel

so I'll understand.  Like, for instance, on three of the

plaintiffs who did not have a deed at the time the lawsuit was

filed but who got a deed after the lawsuit was filed, you're

not claiming diminution for the period from the beginning of

the lawsuit until the time they got their deed; is that what

you're saying, Herndon?

MR. INGE:  Judge, in two particular --

THE COURT:  Didn't we talk about that at the

pretrial?  I thought we did.

MR. TURNER:  Yeah, we never resolved it, which is why

we filed the motion which says that they are not entitled to

collect for that.  And I thought I heard him say that they

weren't going to.  But I wasn't sure.

THE COURT:  For the time they didn't own the

property?

MR. TURNER:  Right.

THE COURT:  Is that correct, Mr. Inge?

MR. INGE:  Judge, one homeowner was buying it from her

brother.  She paid it off, she lived on it for 10 years, and

then when she realized her brother had never given her a deed,

then she said:  "I want my deed."

1        And her brother said:   "Okay."

2        And that was way into the lawsuit.  So she's claiming

3   damages from when she moved on the property, because she owned

4   her mobile home, and she had a contract to purchase the land.

5        Another, Spencer Lang, he moved onto -- his parents

6   owned a big piece, he cleared a little piece, he moved his

7   double-wide trailer on the little piece, lived there for 10

8   years, and then after the lawsuit was filed, then he said:

9   "Mom, I need a deed to my quarter acre."  And so he's also

10  claiming, since his double-wide mobile home is attached to the

11  land, he's claiming the permanent decrease in value to the land

12  and the mobile home.

13        But none of -- there is no claim of damages to a

14  leasehold, to a leasehold.  It's either they own the

15  improvement on it, they own the mobile home on the property, or

16  they own the land and the house or mobile home.

17        THE COURT:  But if you move the mobile home away from

18  the property, it doesn't have any damages; right?

19        MR. INGE:  It's up to the jury as to whether the

20  mobile home can be -- or it's up to the plaintiff to prove that

21  the mobile home cannot be moved, and therefore it's permanent

22  damage.

23        THE COURT:  But it's not a mobile home, is it?

24        MR. INGE:  It becomes a permanent fixture when the

25  axles are taken off and rooms are built around it and it can't

1   be picked up and rolled off.  But, you know, that's for the

2   jury to determine based on the facts.

3           THE COURT:  All right.  Well, if we get to that point,

4   I'm just going to have to wait to see what the ownership

5   interest is at the certain point of time we're talking about

6   before I can rule on that.  So that's carried with the trial.

7           MR. PARKER:  That's number --

8           THE COURT:  That's document 200.

9           Motion seven is document 201.  This has to do with

10  physical symptoms or injuries, and I think that's moot at this

11  point.

12          MR. PARKER:  That's moot.

13          MR. TURNER:  Y'all are not claiming that noise caused

14  a physical symptom; right?

15          MR. INGE:  (Shaking head negatively.)

16          THE COURT:  I think they made that clear at the

17  pretrial.

18          MR. TURNER:  Right.

19          THE COURT:  All right.  Do you still need, given the

20  status of the case, do you still need your subpoena for the

21  ADEM fellow that's moved to quash?

22          MR. BRADLEY:  Judge, the ADEM man was not subpoenaed

23  to address noise issues.  So therefore I see no need for him.

24          THE COURT:  All right.  If you will release him, I'll

25  rule on the motion to quash as moot.  So I don't have -- I did

1   not intend to grant his motion to quash.  But it's moot at this

2   point.

3            MR. TURNER:  We'll call him and tell him that.

4            THE COURT:  All right.  Now, you know, I know this

5   lawsuit wasn't filed over noise.  I know it was filed over the

6   odor.  I don't see any reason why this case needs to go to

7   trial at this point.  What I intend to do is to call the jury

8   and tell them to report Monday instead of tomorrow and hope

9   that this case can either be settled or otherwise disposed of

10  between now and then, because it just doesn't make sense to go

11  to trial over the noise in this case.

12           If that's not the case, then that's the way it will

13  be.  We'll go to trial.  But that's just my personal opinion

14  about it.  I want to give the parties the opportunity to

15  discuss ways of possibly disposing of this case, given the

16  status of it at this point in time.

17           In order to stop the jury for Monday, if you do settle

18  or otherwise dispose of the case, we would need to know by noon

19  tomorrow.

20           Is there anything else the Court can assist with at

21  this time?

22           MR. INGE:  Judge, could we see Your Honor in chambers?

23           THE COURT:  Well --

24           MR. INGE:  I mean off the record?

25           THE COURT:  The parties off the record?  Just you?

1        MR. INGE:   Just the lawyers and the Court.

2        THE COURT:   Are you asking for something -- come over

3    here to side bar let me ask you something.

4        (A discussion was held off the record at side bar.)

5        (At the side bar.)

6        MR. INGE:   I didn't know if this was on the

7    record.   Judge, this guy and this guy are a pleasure to deal

8    with.

9        (Mr. Inge pointed to Mr. Turner and Mr. Bradley.)

10        MR. INGE:   They are straightforward, they ask great

11    questions, and we had worked very well together.   You notice

12    that we haven't come before Your Honor.   Your Honor said back

13    in the pretrial conference that you wanted substantive

14    settlement negotiations.   We have made -- last November we made

15    a substantive settlement negotiation.   No response.   In

16    response to Your Honor's --

17        THE COURT:   Let me just stop you right now,

18    Mr. Inge.   I don't care what's happened in the past.   The

19    status of this case is totally different right now than it was

20    an hour ago.   All I'm asking is that you all have serious

21    discussions about it, and that's all I can ask.   I don't like

22    to get involved in settlement negotiations.   I don't think

23    that's what a judge ought to do.   So I don't need to know the

24    details of what you're doing or what you're not doing.   But all

25    I'm asking is that you make a good-faith effort to do something

1    so you're not trying a nuisance case in federal court over a

2    noise issue.

3              MR. PARKER:   Noise nuisance.

4              THE COURT:   All right.

5              MR. TURNER:   Will Your Honor enter a written order on

6    summary judgment?

7              THE COURT:   I intend to.

8              MR. TURNER:   You intend to?

9              THE COURT:   I do.

10             MR. TURNER:   Thank you, Judge.

11        (In open court.)

12             MR. TURNER:   And you want to hear back from us by

13   lunch tomorrow, Friday; correct?

14             THE COURT:   Right.

15        (A discussion was held off the record between the Court and

16   law clerk.)

17        (This hearing concluded at approximately 9:50 a.m.)

18

19

20

21

22

23

24

25

C E R T I F I C A T E

STATE OF ALABAMA)

COUNTY OF BALDWIN)


        I do hereby certify that the foregoing proceedings

were taken down by me and transcribed using computer-aided

transcription and that the foregoing is a true and correct

transcript of said proceedings.

        I further certify that I am neither of counsel nor of

kin to any of the parties, nor am I in anywise interested in

the result of said cause.

        I further certify that I am duly licensed by the

Alabama Board of Court Reporting as a Certified Court Reporter

as evidenced by the ACCR number following my name found below.




                        _____
                        ROY ISBELL, CCR, RDR, RMR, RPR, CRR
                        ACCR #22
                        COURT REPORTER, NOTARY PUBLIC
                        STATE OF ALABAMA AT LARGE

My Commission Expires:   10/3/2009

Certified Court Reporter
      Alabama Board of Court Reporters
Registered Professional Reporter
Registered Merit Reporter
Registered Diplomate Reporter
Certified Realtime Reporter
      National Court Reporters Association